**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| CHARTER INTERNATIONAL OIL COMPANY,<br><br>Plaintiff,<br>v.<br><br>TRAVELERS CASUALTY AND SURETY COMPANY (f/k/a AETNA CASUALTY AND SURETY COMPANY),<br><br>Defendant. | Civil Action No. 06-324-S |

**TRAVELERS CASUALTY AND SURETY COMPANY'S MOTION FOR SUMMARY JUDGMENT ON THE STATUTE OF LIMITATIONS**

Now comes Defendant, Travelers Casualty and Surety Company ("Travelers C&S"), and submits this Motion for Summary Judgment on the Statute of Limitations, pursuant to Fed. R. Civ. P. 56. In support of this Motion, Travelers C&S relies on the Memorandum of Law, the Separate Statement of Undisputed Material Facts, the Affidavit of Howard E. Fitts, the Affidavit of Julio C. Velez, and the Affidavit of Kathleen Burdette Shields, submitted herewith.

Respectfully submitted,
TRAVELERS CASUALTY AND SURETY COMPANY
By Its Counsel,

/s/ Jason C. Preciphs
R. Kelly Sheridan (#1976)
Jason C. Preciphs (#6727)
Roberts, Carroll, Feldstein & Peirce
10 Weybosset Street
Providence, Rhode Island 02903
(401) 521-7000 (P)
(401) 521-1328 (F)

John A. Nadas (admitted pro hac vice)
Kathleen Burdette Shields (admitted pro hac vice)
Choate, Hall & Stewart LLP
Two International Place
Boston, Massachusetts 02110
(617) 248-5000 (P)

**CERTIFICATION OF SERVICE**

I hereby certify that on this 30th day of April, 2007 the within *Motion by Travelers Casualty and Surety Company for Summary Judgment on the Statute of Limitations* with accompanying memorandum of law, statement of undisputed facts and affidavits, has been filed electronically through the ECF System, where it is available for viewing and downloading and will be sent electronically to the counsel of record listed below who are registered participants identified on the Notice of Electronic Filing:

**Robin-Lee Main**
Hinckley Allen & Snyder
50 Kennedy Plaza
Suite 1500
Providence, RI 02903-0819
rmain@haslaw.com

**Gerald J. Petros**
Hinckley, Allen & Snyder
50 Kennedy Plaza
Suite 1500
Providence, RI 02903
gpetros@haslaw.com

**Anna M. Piazza**
Hinckley, Allen & Snyder, LLP
50 Kennedy Plaza
Suite 1500
Providence, RI 02903
apiazza@haslaw.com

Exhibits to the affidavits filed in support of the within motion, which exhibits exceed the system capacity of the ECF system, have been conventionally filed. In addition, service of this filing by First-Class Mail, postage prepaid, has been made upon counsel listed above, as well as upon the to the following counsel of record who are not registered participants identified on the Notice of Electronic Filing:

**Brian F. Saulnier**
**James R. Segerdahl**
**Neal R. Brendel**
Kirkpatrick & Lockhart Nicholson Graham LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222

/s/ Jason C. Preciphs

400-282/320349/RKS:JCP

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| CHARTER INTERNATIONAL OIL COMPANY,<br><br>Plaintiff,<br>v.<br><br>TRAVELERS CASUALTY AND SURETY COMPANY (f/k/a AETNA CASUALTY AND SURETY COMPANY),<br><br>Defendant. | Civil Action No. 06-324-S |

**MEMORANDUM OF LAW IN SUPPORT OF**
**TRAVELERS CASUALTY AND SURETY COMPANY'S MOTION FOR**
**SUMMARY JUDGMENT ON THE STATUTE OF LIMITATIONS**

TRAVELERS CASUALTY AND SURETY COMPANY

R. Kelly Sheridan (#1976)
Jason C. Preciphs (#6727)
Roberts, Carroll, Feldstein & Peirce
10 Weybosset Street
Providence, Rhode Island 02903
(401) 521-7000 (P)
(401) 521-1328 (F)

John A. Nadas (admitted pro hac vice)
Kathleen Burdette Shields (admitted pro hac vice)
Choate, Hall & Stewart LLP
Two International Place
Boston, Massachusetts 02110
(617) 248-5000 (P)
(617) 248-4000 (F)

Dated: April 30, 2007

TABLE OF CONTENTS


SUMMARY OF UNDISPUTED MATERIAL FACTS....2

A. The Policies....2

B. The Site....3

C. Charter's Claim Against Travelers C&S....6

ARGUMENT....7

I. Summary Judgment Should Be Entered Against Charter's Complaint Because It Is Barred By The Statute Of Limitations....7

II. Massachusetts' Six-Year Statute Of Limitations Governs Charter's Claim....7

A. Rhode Island's Choice of Law Rules Must Be Applied to Determine Which State's Statute Of Limitations Law Governs Charter's Claim....8

B. Under Rhode Island's Choice of Law Rules, Massachusetts Law, Not Rhode Island Law, Governs The Statute of Limitations Issue And The Interpretation Of The Policies....11

1. Massachusetts Law Applies Under the *Lex Loci Contractus* Approach....13

2. Under the *Lex Loci* Approach, Even If The 1983 and 1984 Policies Are Governed By Florida or Georgia Law, There Is No ConflictWith Massachusetts Law....14

3. Massachusetts Law Also Controls Under The Restatement Approach....15

III. Under Massachusetts Law, Charter's Cause of Action Accrued In 1991, And Is Now Time Barred....19

IV. Charter's Claim Is Time Barred Even If This Court Were To Find That Rhode Island's Statute Of Limitations Applies To Charter's Claim....22

A. The Most Applicable Rhode Island Decisions Support Travelers C&S's View That The Statute of Limitations Begins To Run When A Claim Is Denied....23

B. Rhode Island Courts Do Not Support The Only Argument That Would Save Charter's Claim – That The Statute Of Limitations Does Not Begin To Run Until The Last Dime Of Environmental Cleanup Costs Has Been Paid....25

C. Cases From Other Jurisdictions Compel The Conclusion That Charter's Claim Is Too Late. ....................27

D. Public Policy Supports A Finding That Charter's Claim Accrued At The Time of Travelers C&S's Date of Denial (The Alleged Breach of Contract). ....................31

CONCLUSION ....................34

REQUEST FOR ORAL ARGUMENT ....................34

**TABLE OF AUTHORITIES**

**CASES**

*A.C. Beals Co. v. Rhode Island Hospital*,
292 A.2d 865 (R.I. 1972) ........ 12-13

*A&B Constr., Inc. v. Atlas Roofing & Skylight Co.*,
867 F. Supp. 100 (D.R.I. 1994) ........ 26

*Adams v. Town of Burrillville*,
249 F. Supp. 2d 151 (D.R.I. 2003) ........ 23-25

*Albany Ins. Co. v. Wisniewski*,
579 F. Supp. 1004 (D.R.I. 1984) ........ 12, 18

*American Employers Ins. Co. v. Coachmen Industries, Inc.*,
838 N.E.2d 1172 (Ind. Ct. App. 2005) ........ 17-18

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........ 7

*Bartholomew v. Insurance Co. of N. Am.*,
502 F. Supp. 246 (D.R.I. 1980), *aff'd*, 655 F.2d 27 (1st Cir. 1981) ........ 12

*Berkshire Mut. Ins. Co. v. Burbank*,
664 N.E.2d 1188 (Mass. 1996) ........ 19

*Brown v. Church of the Holy Name of Jesus*,
252 A.2d 176 (R.I. 1969) ........ 9

*Byron v. Great American Indemnity Co.*,
173 A. 546 (R.I. 1934) ........ 9

*Clarendon Nat. Ins. Co. v. Arbella Mut. Ins. Co.*,
803 N.E.2d 750 (Mass. App. Ct. 2004) ........ 18

*Clark Equip. Co. v. Arizona Prop. & Cas. Ins. Guaranty Fund*,
943 P.2d 793 (Ariz. Ct. App. 1997) ........ 28

*Coderre v. Travelers Ins. Co.*,
136 A. 305 (R.I. 1927) ........ 12, 20

*Colantuoni v. Alfred Calcagni & Sons, Inc.*,
44 F.3d 1 (1st Cir. 1994) ........ 7

*Crellin Technologies, Inc. v. EquipmentLease Corp.*,
18 F.3d 1 (1st Cir. 1994) ........ 8, 12-13

*Danielson v. National Supply Co.*,
670 N.W.2d 1 (Minn. Ct. App. 2003) ........ 10

*DiIorio v. Abington Mutual Fire Ins. Co.*,
402 A.2d 745 (R.I. 1979) ........ 23

*Dinerstein v. Paul Revere Life Ins. Co.*,
173 F.3d 826 (11th Cir 1999) ........ 15

*Dutton-Lainson Co. v. Continental Ins. Co.*,
716 N.W.2d 87 (Neb. 2006) ........ 29

*Edes v. Verizon Communications, Inc.*,
417 F.3d 133 (1st Cir. 2005) ........ 31

*Ehrig v. Germania Farm Mut. Ins. Ass'n*,
84 S.W.2d 320 (Tex. Ct. App. 2002) ........ 28

*Eidemiller v. State Farm Mut. Auto. Ins. Co.*,
915 P.2d 161 (Kan. App. Ct. 1996) ........ 28

*Erie R.R. Co. v. Tompkins*,
304 U.S. 64 (1938) ........ 8

*Everett/Charles Contract Prods., Inc. v. Gentec, S.A.R.I.*,
692 F. Supp. 83 (D.R.I. 1988) ........ 12

*Federal Ins. Co. v. Purex Indus., Inc.*,
972 F. Supp. 872 (D.N.J. 1997) ........ 30-31

*Gail Frances, Inc. v. Alaska Diesel Electric, Inc.*,
62 F. Supp. 2d 511 (D.R.I. 1999) ........ 24-25, 31

*Geo. Knight & Co., Inc. v. Watson Wyatt & Co.*,
170 F.3d 210 (1st Cir. 1999) ........ 7

*Gordon v. Clifford Metal Sales Co.*,
602 A.2d 535 (R.I. 1992) ........ 12

*Greene v. Rhode Island*,
289 F. Supp. 2d 5 (D.R.I. 2003) ........ 31

*Hay v. Pawtucket Mut. Ins. Co.*,
824 A.2d 458 (R.I. 2003) ........ 23

*International Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc.*,
560 N.E.2d 122 (Mass. App. Ct. 1990) .......................................................................19

*J.C. Penny Life Ins. Co. v. Pilosi*,
393 F.3d 356 (3d Cir. 2004)..........................................................................................13

*John Beaudette, Inc. v. Sentry Ins. Co.*,
94 F. Supp. 2d 77 (D. Mass. 1999) .......................................................................... 20-21

*Liberty Mutual Ins. Co. v. National Council on Compensation Ins., Inc.*,
No. PB 02-3778, 2007 R.I. Super. LEXIS 16 (R.I. Super. Ct. Jan. 22, 2007)............ 11, 13-14

*Lins v. Blau*,
584 N.W.2d 183 (Wis. Ct. App. 1998) ........................................................................11

*Loewer v. New York Life Ins. Co.*,
773 F. Supp. 1518 (M.D. Fla. 1991)...........................................................................28

*Lumbermens Mut. Cas. Co. v. Y.C.N. Transp. Co.*,
705 N.E.2d 297 (Mass. App. Ct. 1999) .................................................................. 19-20

*Marshall Contractors, Inc. v. Peerless Ins. Co.*,
827 F. Supp. 91 (D.R.I. 1993)......................................................................................12

*Massachusetts Mut. Life Ins. Co. v. Strickland*,
667 A.2d 1267 (R.I. 1995)............................................................................................31

*Matarese v. Calise*,
305 A.2d 112 (R.I. 1973).......................................................................................... 11-12

*Merkle v. Robinson*,
737 So. 2d 540 (Fla. 1999)...........................................................................................10

*Mobley v. Murray County*,
173 S.E. 680 (Ga. 1934...................................................................................................15

*Montana Petroleum Tank Release Comp. Bd. v. Capitol Indem. Co.*,
137 P.3d 522 (Mont. 2006)............................................................................................28

*Montaup Elec. Co. v. Ohio Brass Corp.*,
561 F. Supp. 740 (D.R.I. 1983)........................................................................................8

*Morris v. Gov't Dev. Bank of Puerto Rico*,
27 F.3d 746 (1st Cir. 1994)..............................................................................................7

*Muldowney v. Weatherking Prods., Inc.*,
509 A.2d 441 (R.I. 1986)..............................................................................................26

*Naples v. Acer America Corp.*,
970 F. Supp. 89 (D.R.I. 1997)........................................................................................7

*Nierman v. Hyatt Corp.*,
808 N.E.2d 290 (Mass. 2004) ........................................................................................10

*Palazzolo v. Coastal Resource Mgm't Council of R.I.*,
No. 88-297, 1988 WL 1017232 (R.I. Super. Ct. Oct. 31, 1988)......................................25, 27

*Palmero v. Aetna Cas. & Sur. Co.*,
606 A.2d 797 (Me. 1992).................................................................................................28

*Pardee v. Consumer Portfolio Servs., Inc.*,
344 F. Supp. 2d 823 (D.R.I. 2004)............................................................................ 25-26

*Pinkham v. Collyer Insulated Wire Co.*,
No. 92-426B, 1994 WL 385375 (D.R.I. Mar. 22, 1994) ..........................................................9

*Posadas de Puerto Rico, Inc. v. Radin*,
856 F.2d 399 (1st Cir. 1988)..............................................................................................7

*Providence & Worcester Railroad Co. v. Sargent & Greenleaf, Inc.*,
802 F. Supp. 680 (D.R.I. 1992).........................................................................................11

*Rathbun v. Autozone, Inc.*,
253 F. Supp. 2d 226 (D.R.I. 2003).....................................................................................31

*Roe v. Gelineau*,
794 A.2d 476 (R.I. 2002) ..................................................................................................31

*Rohm & Haas Co. v. Capuano*,
301 F. Supp. 2d 156 (D.R.I. 2004).....................................................................................31

*Schwindt v. Commonwealth Ins. Co.*,
997 P.2d 353 (Wash. 2000)................................................................................................28

*Servicios Comerciales Andinos, S.A. v. General Elec. Del Caribe, Inc.*,
145 F.3d 463 (1st Cir. 1998)........................................................................................ 9-10

*Shelter Mut. Ins. Co. v. Nash*,
184 S.W.3d 425 (Ark. 2004)...............................................................................................28

*Shook & Fletcher Asbestos Settlement Trust v. Safety Nat. Cas. Corp.*,
No. 04C-02-087, 2005 WL 2436193 (Del. Super. Ct. Sept. 29, 2005), *aff'd*, 909 A.2d
125 (Del. 2006) ..................................................................................................................18

*Smith v. Robertshaw Control Co.*,
410 F.3d 29 (1st Cir. 2005) .................................................................................................7

*Snow v. WRS Group, Inc.*,
73 Fed. Appx. 2 (5th Cir. 2003)....................11

*State Auto Prop. & Cas. Ins. Co. v. Gorsuch*,
323 F. Supp. 2d 746 (W.D. Va. 2004)....................13

*State ex rel. Wade v. Frawley*,
966 S.W.2d 405 (Mo. Ct. App. 1998)....................11

*Strauser v. Westfield Ins. Co.*,
827 N.E.2d 1181 (Ind. Ct. App. 2005)....................28

*Strong v. UnumProvident Corp.*,
393 F. Supp. 2d 1012 (D. Idaho 2005)....................11

*SW Indus., Inc. v. Aetna Cas. & Surety Co.*,
653 F. Supp. 631 (D.R.I. 1987)....................12

*Travelers Ins. Co. v. Royal Ins. Co.*,
841 N.E. 2d 287, 2006 WL 223854 (Mass. App. Ct. 2006)....................19-22

*Union Savings Bank v. DeMarco*,
254 A.2d 81 (R.I. 1969)....................12

*United Tech. Corp. v. American Home Assurance Co.*,
989 F. Supp. 128 (D. Conn. 1997)....................16, 27

*Waters v. Walt Disney World Co.*,
237 F. Supp. 2d 162 (D.R.I. 2002)....................8

*Wille v. GEICO Cas. Co.*,
2 P.3d 888 (Okla. 2000)....................28

*Wolverine Ins. Co. v. Tower Iron Works, Inc.*,
370 F.2d 700 (1st Cir. 1966)....................21-22

**STATUTES**

42 U.S.C. §1983....................23

Fla. Stat. §95.11(2)(b)....................15

Ga. Code Ann. §9-3-24....................15

Mass. Gen. Laws ch. 260, §2 (2004)....................15, 19

R.I.G.L. 9-1-13 (1985)....................22, 31

R.I. Gen. Laws §6A-2-725....................24

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(c) ....................................................................................................7

Ibrahmin J. Wani, *Borrowing Statutes, Statutes of Limitation and Modern Choice of Law*, 57 U.M.K.C.L. Rev. 681 (1989) ....................................................................................10

Local Rule 7.1 ....................................................................................................34

Local Rule 56 ....................................................................................................2

Restatement (Second) Conflict of Laws §142, cmt. e (1988)....................................................9

Restatement (Second) of the Conflict of Laws, §188 .................................... 12, 16, 18-19

Restatement (Second) of the Conflict of Laws, §193 ....................................................16

Restatement (Second) of the Conflict of Laws, §6 ........................................ 9, 16, 18-19

Uniform Conflict of Laws Limitations Act, 12 U.L.A. 158, §2 (1996)..................................9

This is an insurance coverage case filed by Charter International Oil Company ("Charter") as an afterthought to seek coverage for the costs of cleaning up and redeveloping a parcel of land it formerly owned on the shore of the Sakonnet River in Tiverton, Rhode Island. Historically, the land was an oil and gas distribution terminal. As part of Charter's redevelopment planning for the land, Charter voluntarily conducted environmental assessments of the land, told regulators about those assessments, entered into a consent agreement in 1992 with state regulators to clean up the land to standards that would permit residential development, and sold the land to a developer. By the end of 1998, most of the cleanup was complete and, by May, 2002, regulators certified that Charter's cleanup was complete. Today, as Charter had been planning since 1985, luxury condominiums and town houses grace the site.

In 1991, in response to Charter's request for insurance coverage, Travelers Casualty and Surety Company ("Travelers C&S") told Charter that the insurance policies under which Charter sought coverage did not cover Charter's alleged expenses at the Tiverton site. At the time, Charter did not challenge or respond to Travelers C&S's denial of coverage. For more than 14 years, Travelers had no indication that Charter disagreed with its view of Charter's claim. Now, 21 years after Charter first contacted state regulators about its plans for the site, and more than 14 years after Travelers C&S denied coverage, Charter has finally sued, alleging that Travelers C&S breached its contractual obligations to provide coverage, and seeking reimbursement for the costs it allegedly incurred in cleaning up the site, negotiating with environmental regulators about the site, and redeveloping the site.

Travelers C&S is entitled to summary judgment on Charter's complaint because the facts material to a determination of this Motion are not in dispute, and the complaint is time-barred as a matter of law by the statute of limitations. Applying Rhode Island's choice of law rules, this

court should conclude that the statute of limitations is a substantive legal issue that is governed by Massachusetts law, as are the insurance policies under which Charter seeks coverage. Applying controlling Massachusetts law, it is clear that Charter's limitations period began to run when Travelers C&S denied coverage in 1991, and expired 6 years later in 1997. Even if this court were to apply Rhode Island's 10-year statute of limitations, the court should conclude that Charter's claim began to run in 1991 at the denial of coverage, and thus the limitations period expired in 2001. At the very latest, this court should conclude that Charter's claim began to run in March 1992 when Charter entered into the Consent Agreement (obligating it to remediate the Tiverton Site), and thus its limitations period expired in 2002. Whether Charter was 8 years too late (under Massachusetts law) or 4 or 5 years too late (under Rhode Island law) doesn't matter. The statute of limitations has run.

## SUMMARY OF UNDISPUTED MATERIAL FACTS[1]

### A. The Policies

Travelers C&S, formerly known as The Aetna Casualty and Surety Company, issued primary, umbrella, and excess insurance policies to Northeast Equities, Inc. and Northeast Petroleum Industries, Inc. (collectively, "Northeast"), covering at least sixteen annual periods from July 1, 1965 to October 1, 1985 (collectively, the "Policies").[2] At the time all of the Policies were issued, Northeast was a Massachusetts corporation headquartered in Massachusetts. *See* Affidavit of Kathleen Burdette Shields ("Shields Aff."), Ex. 1. The stock of Northeast was purchased by Charter in 1983, and for the remainder of the time period during

---

[1] This section provides a summary of the facts detailed in Travelers C&S's separate Statement of Undisputed Material Facts ("Stmt."), filed herewith pursuant to Local Rule 56.

[2] Charter alleges that Travelers C&S issued policies to Northeast beginning in July, 1963. Travelers C&S has been unable to confirm the existence, terms, and conditions, of policies covering at least five annual periods. Including these missing Policies brings the total number of policy periods to 22. Solely for purposes of this Motion, and reserving all of its rights to challenge the existence, terms and conditions of those missing or incomplete policies at a later stage of this litigation, Travelers C&S is not herein disputing that it issued to Northeast all of the policies that are listed in the Affidavit of Howard E. Fitts ("Fitts Aff.") filed herewith, and all policies alleged in the Complaint.

which the Policies were issued, Northeast remained a wholly-owned subsidiary of Charter. *See* Affidavit of Julio C. Velez ("Velez Aff."), Ex. M. Today, Charter claims rights under the Policies as the successor in interest by merger to Northeast. *See* Shields Aff., Ex. 2, ¶5.

The declarations page of each Policy indicates that it was issued and delivered to Northeast at the address of its headquarters in Massachusetts, first in Boston, and later in Chelsea, Massachusetts. *See* Fitts Aff., Exs. A-L, O-U. Each Policy (except perhaps the last two) was negotiated between brokers located in Massachusetts, acting on Northeast's behalf, and Travelers C&S employees located in its Massachusetts offices. *See* Stmt. ¶9. Premiums for each Policy (except perhaps the last two) were paid from Massachusetts by Northeast's Massachusetts broker. *See id.*, ¶10. Premiums for the last Policy were ultimately paid by Northeast from its Massachusetts headquarters. *See id.*, ¶16. The risks for which Travelers provided coverage were also based overwhelmingly in Massachusetts. *See id.* at ¶11-12. The Policies' general liability schedules demonstrate that while several of Northeast's subsidiaries had business locations outside of Massachusetts, the substantial majority of the insured's locations were in Massachusetts. *See id.*, (for example, of the 25 Northeast subsidiaries' locations listed in general liability schedule for 1966-67 Policy, only one is in Rhode Island, and 24 are in Massachusetts; of the 49 locations of the insured listed in general liability schedule for 1973-74 Policy, 45 are in Massachusetts, 3 are in Rhode Island, and 1 is unclear).

**B. The Site**

Beginning in the mid-1960's, Northeast owned and operated portions of a parcel of land on the Sakonnet River in Tiverton, Rhode Island (the "Site"). Northeast used the Site as an oil and gas storage and distribution terminal, as its predecessors had done for decades. *See id.*, Ex. 11, at CIOC 37167-70. In 1985, Northeast determined that "[d]ue to the decline in petroleum demand, improvements in highway facilities and proximity of other tank farms [] the [Site] is

underutilized and has a higher and better use for residential development." Velez Aff., Ex. S. Northeast then took a number of actions to close its petroleum storage and distribution operations at the Site, and to prepare the Site for residential redevelopment. One of those steps was contacting the Rhode Island Department of Environmental Management ("RIDEM") in 1985 to obtain its approval of Northeast's residential development plans. As part of that process, Charter determined that the Site was contaminated, primarily with petroleum hydrocarbons. *See* Shields Aff., Ex. 11 at 37190, 37167 (1986 report from Charter's consultant, noting petroleum contamination in several areas of Site, and stating that study was initiated by Charter to determine what is necessary to "comply with requirements for rezoning of the terminal area to a classification suitable for residential construction"). RIDEM informed Northeast/Charter that it would not approve of residential development at the Site until appropriate testing and remediation had taken place. *See* Stmt. ¶ 21.

Accordingly, Charter engaged environmental consultants who conducted extensive environmental testing at the Site, developed a profile of the contamination at the Site, and prepared a workplan for remediating the Site. *See* Stmt. ¶¶ 22-23. In 1987 and 1988, Charter attempted to negotiate a consent agreement with RIDEM under which it would agree to clean up the Site, but those initial negotiations were unsuccessful. *See id.*, ¶ 25. In 1991, Charter submitted to RIDEM a Remedial Work Plan, prepared by its consultant GZA, which presented a remedial plan, based on the previous environmental testing at the Site, that was focused on removing existing tanks, pipes, and equipment from the Site and then bioremediating the Site; that is, promoting the natural decomposition of petroleum hydrocarbons by tilling contaminated soil and increasing its exposure to oxygen and petroleum-digesting bacteria. *See* Shields Aff., Ex. 16 at CIOC 17832-41. The GZA Work Plan outlined the four phases of Site

decommissioning, divided the Site into areas of concern, and detailed the anticipated volume of contaminants that would be treated in each area and the methods of bioremediation that would be used in each area, while noting that they expected to encounter "presently un-characterized areas of soil contamination" once the cleanup started. *Id.* at CIOC 17832-34.

In March 1992, Charter entered into the Consent Agreement with RIDEM. That Agreement specified, as "findings of fact," that the Site had "petroleum and/or petroleum products in the soil and groundwater subjacent thereto," and that RIDEM had "reviewed and approved the conceptual GZA Plan, with the condition that all pollutant concentrations at the Site be reduced to the levels specified in 'Exhibit A.'" *Id.*, Ex. 17, at CIOC 02. Under the Agreement, which was entered into "in lieu of [RIDEM] issuing a Notice of Violation," RIDEM approved the GZA Plan, and Charter "agree[d] to implement the GZA Plan pursuant to the terms and requirements of the schedule of activities attached hereto . . . and subject to the terms of this Agreement and any amendments thereto." *Id.*, at CIOC 02-04. Charter also agreed to study and remediate any off-site contamination that was discovered. *See id.*, at CIOC 04. Significantly, the Agreement recognized that if RIDEM issued new cleanup standards, those new standards would apply to the Site cleanup "where appropriate for and applicable to the remediation of the Site." *Id.*, CIOC 06. The Agreement also stated that, while it did not prevent RIDEM from taking other enforcement actions against Charter in certain circumstances, it "shall have all the force and effect of a final administrative decision and order under the Administrative Procedures Act [] from which no appeal has been taken" and that the Agreement was enforceable in court. *Id.*, CIOC 06-07. The Agreement gave Charter 60 months after its execution to complete the remediation, subject to provisions that Charter could seek extensions of time in some circumstances. *See id.*, CIOC 14, 08-10. Thus, the Consent Agreement clearly: (1) obligated

Charter to undertake a cleanup of the Site; (2) obligated Charter to incur significant costs to achieve that cleanup; and (3) imposed detailed requirements concerning how, to what extent, and when Charter had to perform the cleanup.

As agreed and required, the basic remediation technology and the GZA Plan that was approved by the Consent Agreement was the actual methodology used to remediate the Site. *See* Stmt. ¶30. While RIDEM changed its remediation regulations in 1996, and those changes were applied to the Site (as the Consent Agreement contemplated), the result was to *diminish* the commitments that Charter undertook in the Agreement because the relevant cleanup standard was made *less stringent*. *See* Shields Aff., Ex. 26. The GZA Plan was also modified in 1997 to the extent that contaminated soils along the shore of the Sakonnet River were excavated and treated in upland bioremediation beds rather than bioremediating those soils in place. *See* Stmt. ¶ 32. While this, and other small details of the GZA Plan, may have changed over the course of the cleanup, the basic bioremediation plan set forth in the 1992 Consent Agreement was the actual remediation performed by Charter. Charter began to close its remediation of portions of the Site in 1998, and the bulk of the cleanup activities were completed by late 1998. *See id.*, ¶ 33. RIDEM certified that the cleanup was complete in 2002. *See* Shields Aff., Ex. 27.

**C. Charter's Claim Against Travelers C&S**

In 1986, Charter notified Travelers C&S of its discussions with RIDEM about the Site, and demanded coverage for its potential liability at the Site. *See* Shields Aff., Ex. 9. The parties then corresponded on coverage issues for several years. In the interim, Charter hired its own lawyers to represent it in negotiations with RIDEM, and incurred costs for those lawyers. *See id.*, Ex. 28. In 1991, Travelers C&S clearly and unequivocally denied Charter's claim for coverage under the Policies for expenses incurred in remediating the Site. *See* Velez Aff., Ex. T

at TCS 10857 ("we are denying coverage for this loss"). Charter did not respond to Travelers C&S until more than 14 years later - shortly before this suit was filed in 2006.

## ARGUMENT

### I. Summary Judgment Should Be Entered Against Charter's Complaint Because It Is Barred By The Statute Of Limitations.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Smith v. Robertshaw Control Co.*, 410 F.3d 29, 34 (1st Cir. 2005). To defeat summary judgment, the non-movant must put forth specific facts demonstrating the existence of a genuine dispute that affects the resolution of the issues remaining for trial. *See Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 6 (1st Cir. 1994). If the facts are undisputed and only legal questions remain, the court may grant summary judgment as a matter of law. *See Posadas de Puerto Rico, Inc. v. Radin*, 856 F.2d 399, 400-01 (1st Cir. 1988). Courts have frequently granted summary judgment on the purely legal question of when a claim is barred by the statute of limitations. *Geo. Knight & Co., Inc. v. Watson Wyatt & Co.*, 170 F.3d 210 (1st Cir. 1999) (affirming summary judgment on statute of limitations grounds); *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746 (1st Cir. 1994) (same); *Naples v. Acer America Corp.*, 970 F. Supp. 89 (D.R.I. 1997) (granting summary judgment on statute of limitations grounds).

### II. Massachusetts' Six-Year Statute Of Limitations Governs Charter's Claim.

The threshold issue that this Court must resolve before turning to the merits of the statute of limitations issue is whether the statute of limitations law of Massachusetts or Rhode Island determines whether Charter's claim is time-barred. The Policies do not contain choice of law

provisions. It is thus clear that, under applicable Rhode Island choice of law rules, the choice of the applicable statute of limitations should follow the choice of substantive law to be applied to the Policies, and that the applicable law is that of Massachusetts, not Rhode Island.

### A. Rhode Island's Choice of Law Rules Must Be Applied to Determine Which State's Statute Of Limitations Law Governs Charter's Claim.

Because this Court's jurisdiction is premised on diversity jurisdiction, it must apply state substantive law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). To determine which state's substantive law governs, this Court will apply the choice of law rules of its forum state, Rhode Island. *See Crellin Technologies, Inc. v. EquipmentLease Corp.*, 18 F.3d 1, 4 (1st Cir. 1994). Travelers C&S expects that Charter will argue, as a threshold matter, that this Court need not engage in a choice of law analysis to select the applicable statute of limitations because, it will argue, statutes of limitation are procedural rather than substantive and the forum's statute of limitations should thus be employed regardless of whether the Policies are governed by Massachusetts law. Charter is wrong. Rhode Island law considers statutes of limitations to be substantive, not procedural, for the purposes of choice of law analysis. "Rhode Island courts view limitations questions in kindred manner as other substantive issues giving rise to conflicts of law problems." *Montaup Elec. Co. v. Ohio Brass Corp.*, 561 F. Supp. 740, 744 (D.R.I. 1983) (Massachusetts law governed all claims, including limitations claims). Similarly, *Waters v. Walt Disney World Co.*, 237 F. Supp. 2d 162, 165 (D.R.I. 2002), held that state statutes of limitations are "substantive in nature, rather than procedural" in analyzing choice of law questions.

Charter is likely to argue that these cases are wrongly decided because they conflict with antiquated Rhode Island rulings that the statute of limitations is merely procedural or remedial and thus the forum's statute of limitations should govern. *See* Charter's Opp. to Motion to Dismiss, at 13-14 (citing *Staples v. Waite*, 76 A. 353, 354 (R.I. 1910), and *Byron v. Great*

*American Indemnity Co.*, 173 A. 546, 547 (R.I. 1934)). For several reasons, these very old cases should not control here.

The *Byron* case is no longer good law in Rhode Island. When the Rhode Island Supreme Court changed its choice of law rules in tort cases, it rejected as precedent cases decided under the prior rules, as *Byron* was. *See Brown v. Church of the Holy Name of Jesus*, 252 A.2d 176, 179 (R.I. 1969) (rejecting older precedents relating to charitable immunity laws). At the same time, the court stated that Massachusetts statute of limitations law would determine whether a cause of action under a Massachusetts wrongful death statute was time-barred. *Brown* did not reason that Rhode Island's statute of limitations would control the statute of limitations issue simply because the claim had been filed in Rhode Island state court. *See id.* at 178, n.2.

Most importantly, older cases like these have been rejected by modern courts and commentators, who have downplayed the significance of the "substantive" vs. "procedural" labels, and have focused more on which state's interest is greater in having its laws applied in a particular case. *See Servicios Comerciales Andinos, S.A. v. General Elec. Del Caribe, Inc.*, 145 F.3d 463, 479 (1st Cir. 1998) (purpose of historical dichotomy between substantive and procedural categories was to assess two state's relative interests and Restatement has abandoned these categories in favor of determining directly the question of which state's law should govern); *see also* Restatement (Second) Conflict of Laws (hereinafter "Restatement") §142, cmt. e (1988);[3] Uniform Conflict of Laws Limitations Act, 12 U.L.A. 158, §2 (1996) (statute of limitations of state whose law governs substantive aspects of claim will apply); Ibrahmin J.

[3] Restatement §142, which addresses which state's statute of limitations should govern when there is a conflict, was revised in 1988 to abandon the historical view of statutes of limitation as procedural. *See* §142, cmt. e ("Instead, the courts select the state whose law will be applied to the issue of limitations by a process essentially similar to that used in the case of other issues of choice of law. These cases represent the emerging trend. They stand for the proposition that a claim will not be maintained if it is barred by the statute of limitations of the state which, with respect to the issue of limitations, is the state of most significant relationship to the occurrence and the parties under the principles stated in §6."). One case that Charter may cite erroneously relies on the outdated version of §142 for support. *See Pinkham v. Collyer Insulated Wire Co.*, No. 92-426B, 1994 WL 385375, *4 (D.R.I. Mar. 22, 1994).

Wani, *Borrowing Statutes, Statutes of Limitation and Modern Choice of Law*, 57 U.M.K.C. L. Rev. 681, 683-84 (1989) (arguing that traditional "procedural" approach is contrary to modern choice of law analysis). To the extent that the substance versus procedure distinction remains relevant, a statute of limitations is far more a rule of substance than of procedure because it may affect the ultimate result in a case, and it circumscribes the parties' substantive rights. At issue in *Servicios* was an attorney's fees rule which the court held to be procedural because it did "not modify the parties' substantive rights under the law," and instead served only "the institutional concerns of the courts by allowing the imposition of sanctions upon parties who abuse the judicial process." *Id.* at 480. In contrast, a statute of limitations, as at issue here, bars parties from maintaining otherwise stale but justiciable claims, thus potentially affecting substantive rights of recovery, completely apart from the procedural rules of judicial necessity and efficiency which govern the parties' litigation conduct.

This Court should follow the modern view of statutes of limitations that overwhelmingly treats them as substantive for choice of law purposes because they can be outcome-determinative. *See, e.g. Nierman v. Hyatt Corp.*, 808 N.E.2d 290, 292 (Mass. 2004) (rejecting view that statutes of limitation are procedural); *Danielson v. National Supply Co.*, 670 N.W.2d 1, 9 (Minn. Ct. App. 2003) (considering both traditional and modern rules and determining that Minnesota would consider statute of limitations substantive and thus engage in standard choice of law analysis to select appropriate statute of limitations); *Merkle v. Robinson*, 737 So. 2d 540, 542 (Fla. 1999) (holding that statute of limitations is substantive for choice of law purposes and noting that the "distinction between 'procedural' versus 'substantive,' [] has been 'universally assailed' because a 'right which can be enforced no longer by an action at law is shorn of its

most valuable attribute") (citation omitted).[4] For all of these reasons, this Court should apply Rhode Island's choice of law rules to determine that here the same state's law governs both the statute of limitations issues, and the interpretation of the Policies. As discussed below, the application of those choice of law rules results in the application of Massachusetts law.

### B. Under Rhode Island's Choice of Law Rules, Massachusetts Law, Not Rhode Island Law, Governs The Statute of Limitations Issue And The Interpretation Of The Policies.

Both the majority of, and the most recent, decisions applying Rhode Island law have concluded that Rhode Island follows the traditional *lex loci contractus* rule (the rule that the law of the state in which the contract was made controls) in determining which state's law to apply in a breach of contract action like this one. *See Matarese v. Calise*, 305 A.2d 112, 118 n.4 (R.I. 1973) (applying the rule that a contract is governed by the law of the place where it is made unless it contemplates performance entirely in another jurisdiction); *Liberty Mutual Ins. Co. v. National Council on Compensation Ins., Inc.*, No. PB 02-3778, 2007 R.I. Super. LEXIS 16, at *9 (R.I. Super. Ct. Jan. 22, 2007) (concluding that "the place the contract was negotiated and signed appears to be more important [than the state in which the underlying dispute arose] in determining which state's law applied to the contracts"); *see also Providence & Worcester Railroad Co. v. Sargent & Greenleaf, Inc.*, 802 F. Supp. 680, 684 (D.R.I. 1992) (in absence of contractual choice of law provision, "Rhode Island courts will apply the law of the state where the contract was completed"); *Bartholomew v. Insurance Co. of N. Am.*, 502 F. Supp. 246, 250 (D.R.I. 1980) ("In Rhode Island, the law of the place where the insurance contract was made

---

[4] *Accord State ex rel. Wade v. Frawley*, 966 S.W.2d 405 (Mo. Ct. App. 1998) (acknowledging substantive nature of statute of limitations to protect potential defendants from the protracted fear of litigation); *Lins v. Blau*, 584 N.W.2d 183 (Wis. Ct. App. 1998) ("[s]tatutes of limitation are substantive statutes because they 'create and destroy' rights by limiting the time in which an action must be commenced"); *see also Snow v. WRS Group, Inc.*, 73 Fed. Appx. 2, 6 (5th Cir. 2003) (finding that Oregon statute of limitations and Oregon accrual rule governed when Oregon law applied under choice of law analysis); *Strong v. UnumProvident Corp.*, 393 F. Supp. 2d 1012, 1019 (D. Idaho 2005) (applying standard choice of law analysis to the selection of the applicable statute of limitations).

governs its construction."), *aff'd*, 655 F.2d 27 (1st Cir. 1981).[5]

While other Rhode Island courts have suggested that Rhode Island may follow the interest-weighing approach explained in the Restatement, no Rhode Island state court has ever adopted the Restatement's general contract choice of law provision, §188. *See Crellin*, 18 F.3d at 5.[6] Although a few federal district courts have applied the Restatement in contract cases, their questionable analysis appears to be based on the Rhode Island Supreme Court's adoption of the Restatement standard in the tort context. *See e.g.*, *Marshall Contractors, Inc. v. Peerless Ins. Co.*, 827 F. Supp. 91, 94 (D.R.I. 1993) (in surety bond case, citing tort cases for the proposition that Rhode Island follows the Restatement in contract cases, and following specific Restatement section applicable to suretyship contracts); *Albany Ins. Co. v. Wisniewski*, 579 F. Supp. 1004, 1013 (D.R.I. 1984) (arguably, but not clearly, applying interest weighing test but finding that most significant factors in determining which state's law controls insurance contract is where the policy was negotiated, where insurance broker's activities took place and where policy was issued). The better reasoned cases, and the most applicable authority, suggest that Rhode Island would continue to follow the traditional rule that insurance contracts are governed by the law of

---

[5] *Accord Union Savings Bank v. DeMarco*, 254 A.2d 81, 83 (R.I. 1969) (Massachusetts law governs loan contracted for and executed in Massachusetts); *Coderre v. Travelers Ins. Co.*, 136 A. 305, 306 (R.I. 1927) (applying to insurance contracts the general rule that "a contract is to be construed in accordance with the law of the state where it is made"); *see also Everett/Charles Contract Prods., Inc. v. Gentec, S.A.R.I.*, 692 F. Supp. 83, 89 (D.R.I. 1988) ("Although recent case law has rendered matters ambiguous, Rhode Island appears to follow the rule that the law of the place of contracting governs all questions of contract interpretation."); *SW Indus., Inc. v. Aetna Cas. & Surety Co.*, 653 F. Supp. 631, 639 (D.R.I. 1987) (same).

[6] The closest that the state Supreme Court has come is an express refusal to decide the issue. S*ee A.C. Beals Co. v. Rhode Island Hospital*, 292 A.2d 865, 870-71, n.5 (R.I. 1972) (addressing petitioner's arguments under both the *lex loci contractus* and the interest weighing tests and expressly declining to opine about which test is appropriate, or whether Rhode Island even recognizes the interest weighing test in contracts cases as both tests yield the same result given facts). Also inapplicable in this breach of contract context is the Rhode Island Supreme Court's affirmance, in dicta, of a trial court's secondary reliance on a general principles section of the Restatement in a case governed by the Rhode Island Uniform Commercial Code. *See Gordon v. Clifford Metal Sales Co.*, 602 A.2d 535, 538-39 (R.I. 1992) (stating that case "is not a simple contracts issue governed by general contract principles" because it involves the law of secured transactions and the interests of parties other than the originally contracting parties).

the state in which they are made. Even if this Court chooses to apply the Restatement approach, however, it is clear that the Policies are governed by Massachusetts law.

**1. Massachusetts Law Applies Under the *Lex Loci Contractus* Approach.**

If this Court applies the *lex loci contractus* doctrine, it must determine where the contract (here, the Policies) was made, usually the place in which the last act that formed the contract was performed. *See Crellin*, 18 F.3d at 5; *A.C. Beals*, 292 A.2d at 870-71. In the context of insurance disputes, most courts have determined that an insurance policy is governed by the law of the state where it is negotiated, issued, and delivered. *See Coderre*, 136 A. at 305 (policy written and issued in Massachusetts was governed by Massachusetts law);[7] *cf. Liberty Mutual*, No. PB 02-3778, at 16 (placing little weight on fact that indemnification dispute arose out of Connecticut lawsuit and placing greater weight on place contract was negotiated and signed).

Here, there can be no dispute that all but two of the 16 Policies were "made," for *lex loci* purposes, in Massachusetts.[8] The declarations page of each of these Policies makes it clear that they were issued and delivered to Northeast at the address of its headquarters in Massachusetts, first in Boston, and later in Chelsea, Massachusetts. *See* Fitts Aff., Exs. A-L, O-U. At the time all of these Policies were issued, Northeast was indisputably a Massachusetts corporation. *See* Shields Aff., Ex. 1. Further, there can be no dispute that these Policies were negotiated between brokers located in Massachusetts, that were acting on Northeast's behalf, and Travelers C&S employees located in its Massachusetts offices. *See* Stmt. ¶9. Finally, there can be no dispute that the premiums for these Policies were paid from Massachusetts by Northeast's Massachusetts

[7] *Accord J.C. Penny Life Ins. Co. v. Pilosi*, 393 F.3d 356, 361(3d Cir. 2004) (Pennsylvania law) (insurance contract is usually made in the state where it is delivered to the insured and from which insured pays first premium); *State Auto Prop. & Cas. Ins. Co. v. Gorsuch*, 323 F. Supp. 2d 746, 749, 751 (W.D. Va. 2004) (Virginia law) (insurance policy was governed by Virginia law because it was made in Virginia when it was secured through agent in Virginia, delivered to insured in Virginia, and provided coverage for businesses located in Virginia).

[8] As discussed in Section II.B.2, below, it appears that the last two Policies, with policy periods from September 30, 1983 to October 1, 1984, and from October 1, 1984 to October 1, 1985, may have been made in Florida or Georgia. *See* Fitts Aff., Exs. M, N.

broker. *See id.*, ¶10. Given these facts, it is clear that application of the *lex loci* standard to these Policies would result in the application of Massachusetts law.

In any event, there is no colorable basis for a claim that these Policies were issued, negotiated, or delivered in Rhode Island, and thus no basis for the application of Rhode Island law. The only connection between these Policies and Rhode Island is the fortuity that Charter now seeks to recover costs associated with one of the few Rhode Island sites that may have been covered by the Policies. Such a tenuous connection, arising years after the Policies were issued, is insignificant when determining which state's law governs them. *See Liberty Mutual*, No. PB 02-3778, at 16. There is even less of a basis for applying Texas or Pennsylvania law (the states in which Charter alleges it is headquartered and has its principal place of business), as Charter's alleged rights under the Policies are derivative of Northeast's rights, and there is absolutely no evidence that acts relevant to the issuance or negotiation of the Policies took place in either state.

### 2. Under the *Lex Loci* Approach, Even If The 1983 and 1984 Policies Are Governed By Florida or Georgia Law, There Is No Conflict With Massachusetts Law.

In February 1983, Charter acquired the stock of Northeast. *See* Velez Aff., Ex. M. In the following months, it appears that Charter began to exercise its new-found control by shifting Northeast's insurance dealings away from Boston and towards the Southeast. Charter replaced its long-term Boston insurance agent, Marsh & McLennan, with a new agent, Whilden & Associates, located in Jacksonville, Florida. *See* Stmt. ¶13. In addition, responsibility for the Northeast account shifted from Travelers C&S offices in Boston to offices in Atlanta, Georgia. *See id.*, ¶14. These changes relate only to the last two of the Policies, which had policy periods beginning September 30, 1983 (the "1983 Policy") and October 1, 1984 (the "1984 Policy"). *See* Fitts Aff., Ex. M, N. It is clear however, that the 1983 and 1984 Policies were still issued to Northeast at the address of its headquarters in Massachusetts, and that Northeast continued to

pay retrospective premiums and premiums for the 1984 Policy from its Massachusetts headquarters. *See* Stmt. ¶ 16. In any event, there is no evidence that Rhode Island had any connection to the negotiation, delivery, or issuance of the 1983 or 1984 Policies.

Even assuming, *arguendo*, that the 1983 and 1984 Policies were made in Florida or Georgia, the vast majority of the Policies at issue in this case are governed by Massachusetts law, and the application of Florida or Georgia law, rather than the application of Massachusetts law, would have no effect on the outcome of the statute of limitations analysis. First, the length of the applicable statutes of limitations are the same or shorter than Massachusetts'– six years in Georgia and five years in Florida. *Compare* Mass. Gen. Laws ch. 260, §2 (six years); *with* Fla. Stat. §95.11(2)(b) (five years); Ga. Code Ann. §9-3-24 (six years). Charter thus gains no additional time by the application of Florida or Georgia law. Furthermore, Florida and Georgia law on when the statute of limitations accrues are very similar to Massachusetts law. *See infra*, pt. III; *cf. Dinerstein v. Paul Revere Life Ins. Co.*, 173 F.3d 826, 828 (11th Cir 1999) ("a breach of contract action on an insurance contract accrues on the date the contract is breached" and that "breach occurs when an insurer first refuses to pay the claim at issue") (citing *State Farm Mut. Auto. Ins. Co. v. Lee*, 678 So. 2d 818, 821 (Fla. 1996)); *Mobley v. Murray County*, 173 S.E. 680, syl. ¶1 (Ga. 1934) (cause of action for breach of contract accrues for statute of limitations purposes when the contract is breached and plaintiff could first have maintained its action). Thus, there is no conflict between Massachusetts, Florida, and Georgia law on this issue, and the court need not undertake a separate analysis of Florida or Georgia law.

**3. Massachusetts Law Also Controls Under The Restatement Approach.**

Many of the same facts that are relevant under the *lex loci* analysis are also controlling under the Restatement's interest-weighing analysis. If this Court were to determine that Rhode Island courts would most likely apply Restatement §188, describing general contract choice of

law rules, the weighing of those factors would nonetheless dictate that Massachusetts statute of limitations law applies here. Restatement §188 generally provides that a claim will be governed by "the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in §6." *Id.* §188(1). Further, in the absence of a contractual choice of law provision, the "contacts to be taken into account in applying the principles of §6" include "(a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Id*. §188(2). When "the place of negotiating the contract and the place of performance are in the same state," that state's law will usually be applied."[9]

All of these factors point to Massachusetts as the state's law that bears the most significant relationship to the parties, the Policies, and the statute of limitations issue. As discussed above, the place of contracting for all but perhaps two of the Policies is Massachusetts, as the Policies were issued to Northeast at its Massachusetts addresses. *See* Fitts Aff., Exs. A-U. The Policies were also negotiated in Massachusetts by Massachusetts insurance brokers acting on Northeast's behalf, and by Travelers C&S employees based in Massachusetts. *See* Stmt. ¶ 9. The Policies were to be performed, on Northeast's part, by its payment of premiums from its broker's Massachusetts office, and on Travelers C&S's part, by its payment of claims to or on behalf of Northeast at its Massachusetts office. *See id.*, ¶ 10; *United Tech. Corp. v. American Home Assurance Co.*, 989 F. Supp. 128, 135 (D. Conn. 1997) (emphasizing payment of

---

[9] Another Restatement provision, §193, applies specifically to contracts of "fire, surety and casualty insurance." This section favors the application of the local law of the state "which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship . . . to the transaction and the parties." Comments to this section suggest that its test is less significant in cases where a policy insures risks located in multiple states, as here. *See id.*, cmt. b. In any event, as discussed *infra*, the principal location of the risks insured under the Policies was Massachusetts. No Rhode Island court has ever suggested that this is, or should be, the law of Rhode Island.

premiums and payment of claims as significant acts of performance under insurance policy).

Further, the location of the subject matter of the contract, or the risks for which Travelers provided coverage, were based overwhelmingly in Massachusetts. *See, e.g.* Fitts Aff., Ex. B, at TCS 8942-62, Ex. E, at TCS 9038-42 (list of named insureds or schedules listing premises owned, rented, or controlled by named insured and showing that those premises were located overwhelmingly in Massachusetts). An examination of the Policies' general liability schedules makes it clear that while several of Northeast's subsidiaries had business locations outside of Massachusetts, the substantial majority of the insured's locations were in Massachusetts. *See id.*, Ex. A at TCS 11280-90 (in 1966-67 Policy, of the 25 Northeast subsidiaries' locations listed in general liability schedule, only one is in Rhode Island, and 24 are in Massachusetts).[10] The primary location of the insured risk must be examined, not with respect to any one particular claim, but prospectively with respect to the locations and risks insured when the policy was written. *See American Employers Ins. Co. v. Coachmen Industries, Inc.*, 838 N.E.2d 1172, 1181 (Ind. Ct. App. 2005) (principal location of the insured risk is the state in which the largest number of sites insured under the policies are located). The fact that this case involves one of the few Rhode Island premises that the Policies may have insured does not shift the principal location of the insured risk to Rhode Island.

Finally, during the period that the Policies were issued, Northeast was a Massachusetts corporation with its principal place of business in Massachusetts, while Travelers C&S was a Connecticut corporation with a principal place of business in Connecticut. *See* Stmt. ¶¶ 3, 5.

[10] The data is similar for other Policy years. For instance, the primary policy effective from July 1973 to July 1974 lists 49 locations of the insured in its general liability schedules; 45 of which are in Massachusetts, three of which are in Rhode Island, and one reference which is unclear. *See* Fitts Aff., Ex. D, at TCS 11207-09. In later years, the Policies do not include lists of actual locations, but record the amount of the premium attributable to operations in each state. Again, Massachusetts operations account for the substantial majority of the premium charged. *See, e.g.*, Velez Aff., Ex. U, at TCS 11614.

This final factor weighs in favor of applying Massachusetts law because it is the insured's state of residence, and there is no connection between the Policies and the state of Connecticut other than the fact that Travelers C&S was and is headquartered there.

The only court arguably to have applied Restatement §188 under Rhode Island law emphasized that the most important factors in the context of insurance coverage disputes are: the place where the policies were negotiated, the location of the insured's broker, and the place where the policy was issued, *See Albany Ins. Co.*, 579 F. Supp. at 1013 (applying New York law to policy negotiated and issued in New York with the assistance of a New York broker). Other courts applying the Restatement have focused their analyses on the principal location of the risks insured under the policies at issue, and the place of the insured's corporate headquarters. *See, e.g., American Employers*, 838 N.E.2d at 1180-81 (principal location of the insured risk is the state in which the largest number of sites insured under the policies are located, and according little weight to place of contracting and negotiation because there was conflicting evidence on these subjects); *Clarendon Nat. Ins. Co. v. Arbella Mut. Ins. Co.*, 803 N.E.2d 750, 753 (Mass. App. Ct. 2004) (finding location of insured risk inconclusive when two policies each insured vehicle garaged in different state, and relying instead on §188 and §6 factors); *Shook & Fletcher Asbestos Settlement Trust v. Safety Nat. Cas. Corp.*, No. 04C-02-087, 2005 WL 2436193, *3 (Del. Super. Ct. Sept. 29, 2005) (relying on facts that insured's employees at corporate headquarters were very involved in obtaining insurance coverage, and that majority of insured's properties and job sites were in same state as headquarters), *aff'd*, 909 A.2d 125 (Del. 2006).

Applying these factors, Massachusetts is clearly the state with the most significant contacts to the Policies, and thus the state with the greatest interest in applying its statute of limitations to the Policies that its law governs. None of the Restatement's general choice of law

policies compel a different conclusion.[11] Both Rhode Island and Massachusetts have a clear interest in preventing the litigation of stale claims, but Massachusetts, unlike Rhode Island, has a connection to the negotiation and issuance of the Policies to a policyholder incorporated and headquartered within its borders. Further, the application of Massachusetts law results in a clear and easy rule in this case because the case turns on the accrual of the statute of limitations, which Massachusetts has addressed and Rhode Island has not. Finally, neither party could be surprised by the application of Massachusetts law to a policyholder whose Massachusetts address appears on the face of the Policies and whose operations took place primarily in Massachusetts.

## III. Under Massachusetts Law, Charter's Cause of Action Accrued In 1991, And Is Now Time Barred.

Under Massachusetts law, the statute of limitations for a breach of contract action is six years and accrues at the time the contract is breached. Mass. Gen. Laws ch. 260, §2 (2004) ("actions of contract, … shall, except as otherwise provided, be commenced only within six years next after the cause of action accrues"); *Berkshire Mut. Ins. Co. v. Burbank*, 664 N.E.2d 1188, 1189 (Mass. 1996) ("the general rule is that a contract action accrues at the time the contract is breached"). Under Massachusetts law, the statute of limitations for a claim for breach of an insurance contract begins to run from "the date the insurer disclaimed any obligation to defend or indemnify." *Travelers Ins. Co. v. Royal Ins. Co.*, 841 N.E.2d 287, 2006 WL 223854, at *2 (Mass. App. Ct. 2006) (citing *Lumbermens Mut. Cas. Co. v. Y.C.N. Transp. Co.*, 705 N.E.2d 297 (Mass. App. Ct. 1999)); s*ee also International Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc.*, 560 N.E.2d 122, 126 (Mass. App. Ct. 1990) ("a cause of action for breach of contract accrues at the time of the breach . . . . even though a specific amount of

[11] Section 6(2) of the Restatement lists general principles that may inform the analysis under §188, including factors such as "the relevant policies of the forum," "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue," "the protection of justified expectations," and "the ease in the determination and application of the law to be applied." *Id.*, §6(2)(b), (c), (d), (g).

damages is unascertainable at the time of the breach or even if damages may not be sustained until a later time"). *Travelers* affirmed a grant of summary judgment on grounds that the statute of limitations barred breach of contract claims against an insurer for failure to defend and to indemnify. *See* 2006 WL 223854 at *2. The insurer's clear and explicit denial of coverage constituted the breach that triggered the statute of limitations. *See id.* (statute of limitations began to run on "the date the insurer disclaimed any obligation to defend or indemnify").[12]

Based on its prior filings, Charter may also attempt to argue that Massachusetts law is not clear by citing federal court cases that: (1) were decided before *Travelers*, and failed to rely on the then-controlling *Lumbermens* decision, and (2) do not address the statute of limitations on claims for breach of insurance contracts. For example, Charter may try to rely on *John Beaudette, Inc. v. Sentry Ins. Co.,* 94 F. Supp. 2d 77, 102 (D. Mass. 1999) to question Massachusetts' clear rule that the statute of limitations accrues on the denial of a claim. To the extent it is inconsistent with *Travelers*, *Beaudette* has been overruled. It also noted, but improperly dismissed as dicta, the then-controlling Massachusetts precedent of *Lumbermens*. *See id.* at 102 n.26. Consistent with *Travelers*, the *Beaudette* court concluded that a duty to defend claim accrued when an insurer unequivocally refused to defend its insured. *See id.* at 102. With respect to the duty to indemnify, *Beaudette* held that, because of Massachusetts' unique failure to recognize the doctrine of anticipatory repudiation, a cause of action accrued when the insured became "legally obligated to pay damages." *Id*. at 104. Applying *Beaudette*

---

[12] Based on Charter's prior filings, Travelers C&S expects that Charter will attempt to mischaracterize the *Lumbermens* case on which the appeals court relied in *Travelers*. *See* Charter's Opp. to Motion to Dismiss, at 14. In *Lumbermens*, the court did not assume that the insured's claim accrued at the time of the insurer's denial of coverage, as Charter may assert. *See id.* Instead, the court assumed that the insurer's denial of coverage was a breach of its duty to defend (as the lower court had concluded). The court then found that the statute of limitations on that claim began to run when the insurer denied coverage. *See* 705 N.E.2d at 301 ("If we assume that the disclaimer violated Lumbermens' contractual obligation, then [the insured] had until [six years after the denial], to assert its legal claims against Lumbermens arising from the violation."). The court then concluded that Lumbermens had waived its statute of limitations defense by its subsequent conduct. *See* id. The court's finding concerning waiver does not alter its conclusion about when the statute of limitations ran.

here does not save Charter's claim from the statute of limitations bar, as the *Beaudette* rule would mean that Charter's duty to defend claim accrued in 1991 when Travelers denied coverage, and that Charter's duty to indemnify claim accrued when Charter entered into a consent agreement with RIDEM in 1992 that obligated it to incur clean up costs. *See* Shields Aff., Ex. 17; Stmt. ¶¶25-29.

Charter may also attempt to challenge the clear rule of *Travelers* by citing federal court cases that do not involve claims alleging breach of an insurance contract at all, but rather common law or statutory indemnity claims. *See* Charter Opp. at 14 (citing *Wolverine Ins. Co. v. Tower Iron Works, Inc.*, 370 F.2d 700, 702-03 (1st Cir. 1966) (claim for common-law indemnity accrued when underlying personal injury action for which indemnification is sought on grounds of negligence is settled); *Hays v. Mobil Oil Corp.*, 736 F. Supp. 387, 397 (D. Mass. 1990) (after finding that statutory indemnification claim was barred by contractual provision, observing in dicta, that statutory indemnification claim under Massachusetts environmental statute arose when liability was fixed), *vacated in relevant part*, 930 F.2d 96, 103 n.13 (1st Cir. 1991) (vacating analysis of whether indemnification claim is time barred and reopening this issue on remand)). To the extent these cases are relevant at all here, they support Travelers C&S's position. In *Wolverine*, for example, an insurer/plaintiff settled a personal injury claim brought against its insured that arose when someone was injured diving into the insured's pool that was allegedly negligently designed by the defendant. The insurer then sued the defendant as its insured's assignee. With respect to the insurer's breach of contract and breach of implied warranty claims against the defendant, the court ruled that they were barred by the statute of limitations because those causes of action accrued when the pool was delivered. *See id.* at 702. The court found that the insurer's indemnification claim, however, did not accrue until the personal injury claim was

settled, because no payment was certain until that date. *See id.* at 705. Charter's claim here is one for breach of contract, which accrued, like the breach of contract claim in *Wolverine*, at the time of the breach. It is thus time barred.[13]

This court, in interpreting Massachusetts law, must follow the controlling decision of Massachusetts' Appeals Court in *Travelers*. Applying that rule here, Charter failed to file the current action within the six years allowed by the statute of limitations. There can be no dispute that Travelers clearly and unequivocally denied coverage under the policies for environmental remediation related to the Tiverton Site on December 31, 1991. *See* Velez Aff., Ex. T, at 1, 7 ("Pursuant to the above policy definitions and conditions, we are denying coverage for this loss"). If that denial was a breach of contract, as Charter now claims, it was an absolute and total breach, and it took place on December 31, 1991. Charter thus had six years after December 31, 1991, or December 31, 1997, to bring this suit alleging that Travelers C&S breached the Policies. Having waited eight and a half years past that date, Charter's claim is now clearly time barred.

## IV. Charter's Claim Is Time Barred Even If This Court Were To Find That Rhode Island's Statute Of Limitations Applies To Charter's Claim.

Even if this Court were to apply Rhode Island's ten-year statute of limitations in this case, Charter's claim is still time barred. *See* R.I.G.L. 9-1-13 (1985). While Rhode Island courts, unlike Massachusetts courts, have not addressed the precise question that is determinative of this case, when the statute of limitations begins to run for breach of an insurance contract, the better reasoned Rhode Island decisions suggest that the statute of limitations begins to run when an insurer denies a claim, because that is when the alleged breach occurs.[14] Logic and public

---

[13] Even if the court followed Wolverine's accrual rule for common law indemnity claims, this court should find that Charter's claim against Travelers C&S accrued at the time that it settled with RIDEM by signing the Consent Agreement in 1992, because by that act, Charter indisputably agreed to assume cleanup liability, and agreed to incur cleanup costs to remediate the Site. *See* Shields Aff., Ex. 17.

[14] The Rhode Island Supreme Court has, however, strictly enforced statutes of limitations that were included within insurance policies and that expressly provided that the limitations period began to run on the date of loss. *See Hay v.*

policy, as well as decisions from other jurisdictions, support this result.

### A. The Most Applicable Rhode Island Decisions Support Travelers C&S's View That The Statute of Limitations Begins To Run When A Claim Is Denied.

Although Rhode Island state courts have not ruled when the statute of limitations accrues for breach of an insurance contract, the application of Rhode Island statute of limitations law in other cases, including federal decisions applying Rhode Island law, indicates that, if faced with the question, the Rhode Island Supreme Court would likely rule that an action for breach of an insurance contract accrues when the insurer denies coverage rather than on any other date.

In an analogous factual and legal scenario, this Court has held that the statute of limitations for an action arising out of a denial of health insurance coverage for a city employee began to run at the time the city denied coverage, and was not a continuing violation. In *Adams v. Town of Burrillville*, 249 F. Supp. 2d 151, 152 (D.R.I. 2003) (Smith, J.), the plaintiffs, a police officer and his common-law wife and son, sued the town under 42 U.S.C. §1983 and under various state law causes of action, including breach of contract and negligence. The plaintiffs' claims arose out of the town's refusal to provide health insurance benefits to the police officer's common-law wife and son. *See id.* at 152. The town informed the plaintiffs by letter that the officer's common-law wife and son would not be covered under the town's health insurance plan. *See id.* at 153. The town argued that certain of the plaintiffs' claims were barred by the three-year statute of limitations for tort and personal injury because the plaintiffs brought suit more than three years after the town's letter denying coverage. *See id.* at 154. The plaintiffs argued that their claims were not barred by the three year statute of limitations for tort and

---

*Pawtucket Mut. Ins. Co.,* 824 A.2d 458 (R.I. 2003) (observing that "[w]e have long adhered to the validity of limitations periods in insurance contracts," and applying policy's two-year limitations period to bar suit filed about five months late); *DiIorio v. Abington Mutual Fire Ins. Co.*, 402 A.2d 745, 747-48 (R.I. 1979) (applying policy's one-year limitations period to bar late-filed suit by insured). While the Policies do not contain such internal statutes of limitation, these cases support the important policy reasons to bar late-filed claims against insurers.

personal injury claims because their cause of action did not accrue at the time of denial of benefits but rather was a continuing violation, as the plaintiffs continued to incur costs and expenses as a result of the denial. *See id.* at 155.

The Court rejected this argument and held that the statute of limitations began to run at the time of the town's denial of benefits. *See id.*. The Court reasoned:

> Courts have routinely differentiated between conduct that is continuing in nature, and the injurious *consequences* of conduct that occurred in the past . . . . Here, plaintiffs clearly knew of their injuries when they received the April 1, 1998 letter denying health insurance coverage for Thomas and their son. While the Plaintiffs may have continued to suffer after that point as a result of the denial – by incurring expenses for procedures not covered by insurance or foregoing such procedures – those effects were consequences of the original denial of coverage and not additional violations.

*Id.* at 155. Applying that rationale here, Charter clearly knew it had a dispute with Travelers C&S when Travelers C&S denied coverage in 1991. While Charter incurred expenses after that date "as a result of" Travelers C&S denial of coverage, those expenses were merely "consequences of the original denial of coverage." *Adams*, 249 F. Supp. 2d at 155.

In another Rhode Island case, the Court recognized that under Rhode Island law, a breach of contract action accrues at the time of breach, even when damages occur later. *See Gail Frances, Inc. v. Alaska Diesel Electric, Inc.*, 62 F. Supp. 2d 511, 515 (D.R.I. 1999) (relying in part on statute of limitations provision in Rhode Island Uniform Commercial Code, R.I.G.L. §6A-2-725). In the *Gail Frances* case, the plaintiff brought a breach of contract action against a boat manufacturer that refused, allegedly in violation of a prior agreement, to sell the plaintiff an extended warranty for the boat engines it had purchased. Several years after the defendant refused to sell the plaintiff an extended warranty, the engines failed and the plaintiff eventually sued for breach of contract. *See id.* at 514-515. The Court rejected the plaintiff's argument that its cause of action accrued at the time it incurred calculable damages, when the engines failed,

and instead held that the cause of action accrued when the defendant refused to sell the plaintiff the extended warranty. *See id.* at 515 (citing *Blue Ribbon Beef Co., Inc. v. Napolitano*, 696 A.2d 1225, 1229 (R.I.1997)). The Court proclaimed that Rhode Island law was clear that a cause of action for breach of contract does not accrue at the time damages are incurred or calculable, but rather at the time of actual breach. *See id*.

Charter may object that those cases do not deal with the accrual of a cause of action for breach of an insurance contract. Because Rhode Island courts have not expressly addressed the accrual of a cause of action for breach of an insurance contract, however, this Court must necessarily rely on analogous cases such as *Adams* and *Gail Frances*.

### B. Rhode Island Courts Do Not Support The Only Argument That Would Save Charter's Claim – That The Statute Of Limitations Does Not Begin To Run Until The Last Dime Of Environmental Cleanup Costs Has Been Paid.

Although Charter will likely argue that this Court should not follow *Adams* or *Gail Frances* in determining Rhode Island law on the accrual of the statute of limitations, there are no other, more analogous, state cases. In its prior pleadings, Charter offered only two Rhode Island cases that, it claimed, addressed the proper rule for accrual of an analogous cause of action, *Pardee v. Consumer Portfolio Servs., Inc.*, 344 F. Supp. 2d 823 (D.R.I. 2004), and *Palazzolo v. Coastal Resource Mgm't Council of R.I.*, No. 88-297, 1988 WL 1017232 (R.I. Super. Ct. Oct. 31, 1988). *See* Charter Opp. at 5, 8, 10. Neither of these cases support the position that Charter must take here to avoid the time bar – that the statute of limitations for breach of contract cannot accrue until Charter incurs the last dime of its damages.

*Pardee* does not even address the statute of limitations. Charter may cite the case for its statement that "the general rule regarding indemnity is that no claim arises as such until the indemnitee's liability is fixed either by the entry of judgment holding the indemnitee liable or by the settlement of the underlying claim by the indemnitee on the belief that he is liable." *Id.* at

836. This statement was *not* made, however, in the context of discussing when an indemnification claim accrues for limitations purposes, but was made in a case in which it was dubious whether the duty to indemnify would *ever* arise. Neither this statement, nor the cases on which *Pardee* relies, support Charter's theory – that its indemnification claim did not accrue until its cleanup of the Site was certified as complete. To the contrary, *Pardee* and the cases it cites clearly state that indemnification claims are appropriate when the putative indemnitee has some legal liability to a third party. *See id.* at 836; *A&B Constr., Inc. v. Atlas Roofing & Skylight Co.*, 867 F. Supp. 100, 106, 113 (D.R.I. 1994) (indemnity "implied in law" may prevent unjust enrichment when one party has "some legal obligation to pay damages incurred, without active fault on his part;" distinct from claim for contractual indemnity under insurance policy); *Muldowney v. Weatherking Prods., Inc.*, 509 A.2d 441, 443 (R.I. 1986) (element of indemnity claim, is that "the party seeking indemnity must be liable to a third party"). Unlike Pardee's claim, in which there was doubt whether he would bear any of the legal liability for which he was requesting indemnification, here, there can be no dispute that: Charter incurred legal liability to RIDEM starting in 1992 when it entered into the Consent Agreement, the Consent Agreement was a settlement premised on Charter's acceptance of legal responsibility for cleaning up the site, and Charter spent millions of dollars to perform its obligations under the Consent Agreement. *See* Shields Aff., Ex.17; Ex. 25. While Charter may not have known with precision what it would ultimately spend at the site, and while details of the cleanup varied somewhat over time, it was clear by 1992 that Charter bore legal responsibility for cleaning up the site, and that it would cost millions.[15] *See id.*, Ex. 10, Ex. 29.

[15] Charter may argue that its indemnification claim against Travelers C&S did not accrue until the full amount of its legal liability was finally fixed, or otherwise it would have been forced to seek a series of partial indemnification judgments. This argument makes no sense, and improperly conflates issues of liability and damages. Charter knew in 1992 that it would incur substantial costs at the Site because it signed a Consent Agreement that obligated it to

The other Rhode Island case on which Charter may rely, *Palazzolo,* is also inapplicable. That case addressed the accrual of a Fifth Amendment cause of action for inverse condemnation. Palazzolo was a landowner who claimed that his property had been, and was being, turned from dry land into a swamp by the government's actions. *See* 1988 WL 1017232 at *3. After concluding that Rhode Island's ten-year statute of limitations applied and that it began to run "when evidence of injury resulting from the alleged wrongful acts was sufficiently significant to alert the plaintiff to the wrongful acts," the court found that it could not determine when the cause of action accrued given the gradual nature of the alleged flooding and the posture of the case at the motion to dismiss phase. *Id.* at *3, 4. This holding – that more facts were needed to determine when the flooding was significant enough to alert the landowner to his claim -- has no bearing on Charter's claim against Travelers C&S. Here, Charter clearly knew it had a claim against Travelers C&S when Travelers C&S refused to provide coverage for remediation at the Tiverton Site, and knew even more by the time Charter entered into the Consent Agreement that obligated it to perform the remediation that Travelers C&S had refused to cover. When Charter signed the Consent Agreement, it knew its clean up would cost millions of dollars, and it began incurring those expenses promptly. *See* Shields Aff., Ex. 24, Ex. 25. The nature of Charter's claim, unlike Palazzolo's, was then established, and needed no further time to "stabilize."

### C. Cases From Other Jurisdictions Compel The Conclusion That Charter's Claim Is Too Late.

Cases from many other jurisdictions support the sensible rule that Charter's claim accrued at the time that Travelers C&S denied coverage for its claim. *See, e.g., United Tech.*, 989 F. Supp. at 158 (in environmental insurance coverage case, finding that statue of limitations

---

undertake a multi-million dollar cleanup. Charter could then have sought a declaratory judgment that Travelers C&S was in breach and was liable to indemnify it for all of its cleanup costs at the Site, whatever those costs turned out to be.

began to run when policy was breached); *Loewer v. New York Life Ins. Co.*, 773 F. Supp. 1518, 1521-22 (M.D. Fla. 1991) (statute of limitation on a claim for breach of a life insurance policy begins to run when insurer denies coverage); *Montana Petroleum Tank Release Comp. Bd. v. Capitol Indem. Co.*, 137 P.3d 522, 526, n.4 (Mont. 2006) (limitations period on claim for breach of insurance contract accrues when all elements needed for insured to file claim against its insurer have taken place, but limitations period was tolled until insurer denied coverage); *Schwindt v. Commonwealth Ins. Co.*, 997 P.2d 353, 356 (Wash. 2000) ("the contract statute of limitations begins to run against an insured on the date the insurer breaches the contract of insurance" by denying coverage); *Travelers*, 2006 WL 223854, at *2.[16]

Charter will likely urge this Court to follow out-of-state decisions adopting a different rule, which Charter may characterize as dictating that claims for breach of both an insurance policy's duty to defend and its duty to indemnify accrue "when liability is fixed by final judgment or settlement." *See* Charter Opp. at 4. Charter's analysis is flawed in two significant respects. First, the cases from other jurisdictions are not nearly as simple, nor as uniform, as Charter suggests, and do not come close to constituting a majority rule. Second, applying the actual holdings of those cases to the facts of this case leads to the conclusion that Charter's claim is time barred under its own cases.

---

[16] *Accord Strauser v. Westfield Ins. Co.*, 827 N.E.2d 1181, 1185 (Ind. Ct. App. 2005) (claim for breach of insurance contract accrued when insurer denied coverage); *Shelter Mut. Ins. Co. v. Nash*, 184 S.W.3d 425, 429-30 (Ark. 2004) (applying general contract principles to running of statute of limitations for alleged breach of underinsured motorists insurance policy and concluding that limitations period began at the time of contract breach, when the insurer denied coverage); *Ehrig v. Germania Farm Mut. Ins. Ass'n*, 84 S.W.2d 320, 324 (Tex. Ct. App. 2002) ("the law is well settled that an outright denial of an insurance claim triggers commencement of the statute of limitations period for causes of action stemming from the denial of coverage"); *Wille v. GEICO Cas. Co.*, 2 P.3d 888, 892 (Okla. 2000) (limitations period on claim for breach of uninsured motorists insurance policy begins to run when the insurance contract is breached); *Clark Equip. Co. v. Arizona Prop. & Cas. Ins. Guaranty Fund*, 943 P.2d 793, 800 (Ariz. Ct. App. 1997) ("A breach of an insurance contract generally occurs when the insurer denies the insured the relevant coverage."); *Eidemiller v. State Farm Mut. Auto. Ins. Co.*, 915 P.2d 161, 169 (Kan. App. Ct. 1996) (statute of limitations for underinsured motorists claim accrued when insurer denied claim); *Palmero v. Aetna Cas. & Sur. Co.*, 606 A.2d 797, 799 (Me. 1992) (same for uninsured motorists insurance).

In its prior pleadings, Charter relied most heavily on *Dutton-Lainson Co. v. Continental Ins. Co.*, 716 N.W.2d 87 (Neb. 2006). *Dutton* held that an insured's cause of action for an insurer's breach of an insurance policy's duty to indemnify accrued when "the insured bec[ame] legally obligated to pay the damages." *Id.* at 100. Dutton, the insured, became so obligated, and the statute of limitations began to run, when it entered into a consent judgment with the EPA that obligated it to clean up environmental contamination at a number of locations. *See id.* at 93-94, 100. *Dutton* also held that a cause of action for breach of an insurance policy's duty to defend accrued when "the underlying action is resolved against the insured" because the duty to defend is a continuing obligation while that litigation is ongoing. *Id.* at 101-02.

Applying *Dutton* here means that Charter's claim is clearly time barred. First, Charter, like Dutton, became legally obligated to pay for environmental cleanup when it entered into a consent agreement with the environmental regulators in March 1992. *See* Shields Aff., Ex. 17, at CIOC 04. At that time, Charter was clearly "legally obligated to pay" for the cleanup of the Tiverton Site because it had promised to implement the approved GZA remediation plan on a fixed schedule, and until specified cleanup goals were met. *See id.*, at CIOC 03-04. The fact that Dutton's agreement with the EPA was a consent judgment rather than a consent agreement is immaterial, particularly given that Charter's Consent Agreement had "all the force and effect of a final administrative decision and order under the Administrative Procedures Act [] from which no appeal has been taken" and RIDEM had the authority to enforce it in court. *See id.*, at CIOC 06-07. Similarly, Charter's claim for breach of the duty to defend accrued in 1992 when RIDEM's demand that Charter conduct testing, investigation and cleanup at the Tiverton Site was resolved by Charter's agreement to cleanup the Site according to a RIDEM-approved work plan, on a fixed schedule. *See id.*, CIOC 02-04. From that point in time until its cleanup was

certified as complete in 2002, Charter was merely implementing the remedy to which it had agreed in 1992. Even though certain small details of that remedy may have changed, the remedy itself remained the same. *See* Stmt. ¶30. Both Charter's indemnity and defense claims are simply too late, since they were brought more than 14 years after the causes of action accrued.

Charter has also previously relied on a New Jersey case to argue that an environmental Administrative Consent Order ("ACO") cannot start the statute of limitations running because such an order is insufficiently final. *See Federal Ins. Co. v. Purex Indus., Inc.*, 972 F. Supp. 872, 880 (D.N.J. 1997). That case is readily distinguishable. In *Federal*, the insured signed an ACO that required it merely to conduct testing at the site, and to remediate contamination if any was found. *See id.* at 876. The first groundwater sampling at that site, and confirmation that the site was polluted, did not happen for two full years after the ACO was signed, and the state did not approve a cleanup plan until six years thereafter. *See id.* The court relied heavily on these facts when it ruled that the insured's liability was not finally determined by the signing of the ACO because at that time "any liability was contingent upon the discovery of contamination." *Id.* at 880. The facts here are very different. Charter had been investigating and testing the Site for years when it signed the Consent Agreement, and the existence of pollution at the Site was well established. *See* Stmt. ¶¶ 22-23. Further, Charter's Consent Agreement actually included RIDEM's approval of the remediation plan for the site. *See* Shields Aff., Ex. 17, at CIOC 02. Thus, unlike the situation in *Federal*, Charter accepted liability for cleaning up the Site when it signed the Consent Agreement. In fact, *Federal* actually supports Travelers C&S's argument as to when the statute of limitations begins to run, as it recognizes that the statute begins when an insurer denies coverage for an environmental claim, and that this rule provides important protections for an insurer concerned about "an indefinite length of future risk in a remediation

process that may consume years before the full extent is known." 972 F. Supp. at 880.

**D. Public Policy Supports A Finding That Charter's Claim Accrued At The Time of Travelers C&S's Date of Denial (The Alleged Breach of Contract).**

In addition to finding significant support in the case law, the rule that a claim for breach of an insurance contract accrues when the insurer denies coverage is supported by persuasive public policy considerations. It is the rule most consistent with basic principles of contract law that a cause of action for breach of contract accrues when the contract is breached. *See, e.g., Gail Frances*, 62 F. Supp.2d at 515 ("The cause of action [for breach of contract] accrues at the time of the breach itself."). Particularly when the Rhode Island statute of limitations is so generous, (giving a plaintiff ten years to bring its claim), it is the rule that best prevents overly stale claims from being litigated. *See* R.I.G.L. 9-1-13. Further, both the Rhode Island Supreme Court and this Court have repeatedly recognized that statutes of limitations enacted by the legislature should be strictly applied. *See Massachusetts Mut. Life Ins. Co. v. Strickland*, 667 A.2d 1267, 1268 (R.I. 1995) (explaining "this Court's policy of applying statutes of limitations stringently, thereby encouraging litigants to bring their actions during the required period").[17] This rule of stringency is indicative of the strong public policy against permitting plaintiffs to drag out the resolution of their potential claims, thus unfairly seeking to require defendants to litigate stale claims, with witnesses whose memories have faded, documents that have disappeared, and circumstances that have changed. *See Edes v. Verizon Communications, Inc.*, 417 F.3d 133, 142 (1st Cir. 2005) (purpose of statute of limitations is to "prevent[ ] plaintiffs from sleeping on their rights and [to] prohibit[ ] the prosecution of stale claims"); *Roe v.*

[17] *See also Rohm & Haas Co. v. Capuano*, 301 F. Supp. 2d 156, 162-63 (D.R.I. 2004) (finding claims time-barred and refusing to extend Rhode Island's common law discovery rule absent "compelling justification"); *Rathbun v. Autozone, Inc.*, 253 F. Supp. 2d 226, 231-32 (D.R.I. 2003) (one-year statute of limitations applied to sex discrimination claims rather than three-year period for which plaintiff argued); *Greene v. Rhode Island*, 289 F. Supp. 2d 5, 12 (D.R.I. 2003) (Native-American tribe's claims against state barred by ten-year statute of limitations).

*Gelineau*, 794 A.2d 476, 485 (R.I. 2002) ("[s]tatutes of limitation promote certainty and finality and avoid stale claims").

There is no equitable reason to extend the statute of limitations in the situation presented here. Charter clearly understood Travelers C&S's denial and thus undertook actions at the Site "on its own." Shields Aff., Ex. 2, ¶33. Travelers C&S's denial of coverage is unambiguous. *See* Velez Aff., Ex. T. Charter never responded to Travelers C&S's letter, nor took any action to dispute its position. Charter instead accepted Travelers C&S's denial, and sat on its rights for more than 14 years, until it apparently had second thoughts and filed this litigation in 2006.[18]

Charter's position is totally inequitable. It argues that, after receiving Travelers C&S's denial of coverage, it could spend time negotiating with RIDEM about the terms under which it would clean up the site, then spend a decade (or, theoretically, much more) cleaning up the site, and then have a full ten years following the certified completion of the cleanup in which to sue Travelers C&S. It divorces the events meaningful to this litigation – Travelers C&S's alleged breach of contract, the reasons therefore, and the legal validity thereof – from their context. Litigating this case now would require Travelers C&S to reconstruct cleanup decisions made ten or fifteen years ago -- now the ancient history of a luxury condominium development. Further, the most recent operations at the Site, whose history will be relevant to many of Travelers C&S' potential defenses if it were forced to litigate this case on the merits, are now twenty years old, and reach back decades from there. *See* Shields Aff, Ex. 11, at §2.0 (outlining history of Northeast's operations at Site). Adopting the rule Charter urges would harm the significant public policy that claimants should litigate their claims promptly and statutes of limitation should

---

[18] Charter's internal documentation reveals that it incurred approximately $11,000 in legal expense in 1999 and 2000 to investigate potential claims for recovery against Aetna, but apparently decided not to do anything at that time. *See* Shields Aff., Ex. 24 (showing costs spent on "recovery from Aetna"). While it is Travelers C&S's position that a claim brought in 1999 or 2000 would still have been time-barred, Charter's expenditure is further evidence that its 2006 claims against Travelers C&S are an afterthought.

be strictly enforced. Also, as demonstrated by Charter's actions here, it would have no impact on the salutary goal of encouraging polluters to clean up their waste. As the record makes clear, Charter intended to clean up the Tiverton Site regardless of whether it obtained insurance coverage from Travelers C&S. Charter's 1985 letter to RIDEM informing RIDEM that it thought the Site "has a higher and better use for residential development" and that its "objective is to address the concerns which the various agencies and residents may have on the site," predates its first notice to Travelers C&S concerning the Site by at least six months. *See* Velez Aff., Ex. S; Shields Aff., Ex. 9. Charter's claim against Travelers C&S at this Site is, at best, an afterthought that occurred years too late.

In support of its competing theory that the statute of limitations should not begin to run until it has paid the last dime of its cleanup expenses, Charter has previously argued that it would be unfair to require an insured to have to litigate both with environmental regulators and its insurer at the same time and that such a conflict may theoretically lead an insured to prioritizing its coverage dispute over deciding to remediate its property voluntarily. *See* Charter Opp. at 5-9. These arguments have no relevance to the instant case, where the Consent Agreement clearly requires Charter to clean up the Tiverton Site, and approves a specific remediation plan pursuant to which that cleanup will be conducted. *See* Shields Aff., Ex.17, at CIOC 02-04. The fact that the Consent Agreement expressly permitted changes to be made to the details of that cleanup on the basis of future developments does not mean that Charter was entitled to stop cleaning up the Site. *See id.* at CIOC 06, 08-10. It is thus not correct to say that Charter was litigating its liability to RIDEM at the same time it should have pursued its claim against Travelers C&S. The outcome of any coverage litigation, whose focus would be on the application of the Policies' terms and conditions to Charter's conduct at the site, would not change the fact that Charter had

already agreed to clean up the Site. Further, any theory that Charter might have prioritized its coverage dispute over its cleanup of the Site is contradicted by the facts of this case. Charter's intention, expressed to RIDEM in 1985 before it ever notified Travelers C&S about the Site, was to clean up the Site to permit residential development. *See* Velez Aff, Ex. S. Having embarked on that path, Charter ignored Travelers C&S's denial of coverage, proceeded with its cleanup and sale of the Site, and now seeks, in essence, a lottery ticket in this untimely litigation.

**CONCLUSION**

For the foregoing reasons, Charter's Complaint should be dismissed in its entirety because it is time-barred by the statute of limitations.

**REQUEST FOR ORAL ARGUMENT**

Pursuant to Local Rule 7.1, Travelers C&S requests that the Court hear oral argument on its Motion for Summary Judgment. Travelers C&S estimates that one and a half hours will be required for all parties to make their arguments.

TRAVELERS CASUALTY AND SURETY COMPANY

By Its Counsel,

/s/ Jason C. Preciphs
R. Kelly Sheridan (#1976)
Jason C. Preciphs (#6727)
Roberts, Carroll, Feldstein & Peirce
10 Weybosset Street
Providence, Rhode Island 02903
(401) 521-7000 (P)
(401) 521-1328 (F)

John A. Nadas (admitted pro hac vice)
Kathleen Burdette Shields (admitted pro hac vice)
Choate, Hall & Stewart LLP
Two International Place
Boston, Massachusetts 02110
(617) 248-5000 (P)

## CERTIFICATION OF SERVICE

I hereby certify that on this 30th day of April, 2007 the within *Motion by Travelers Casualty and Surety Company for Summary Judgment on the Statute of Limitations* with accompanying memorandum of law, statement of undisputed facts and affidavits, has been filed electronically through the ECF System, where it is available for viewing and downloading and will be sent electronically to the counsel of record listed below who are registered participants identified on the Notice of Electronic Filing:

**Robin-Lee Main**
Hinckley Allen & Snyder
50 Kennedy Plaza
Suite 1500
Providence, RI 02903-0819
rmain@haslaw.com

**Gerald J. Petros**
Hinckley, Allen & Snyder
50 Kennedy Plaza
Suite 1500
Providence, RI 02903
gpetros@haslaw.com

**Anna M. Piazza**
Hinckley, Allen & Snyder, LLP
50 Kennedy Plaza
Suite 1500
Providence, RI 02903
apiazza@haslaw.com

Exhibits to the affidavits filed in support of the within motion, which exhibits exceed the system capacity of the ECF system, have been conventionally filed. In addition, service of this filing by First-Class Mail, postage prepaid, has been made upon counsel listed above, as well as upon the to the following counsel of record who are not registered participants identified on the Notice of Electronic Filing:

**Brian F. Saulnier**
**James R. Segerdahl**
**Neal R. Brendel**
Kirkpatrick & Lockhart Nicholson Graham LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222

/s/ Jason C. Preciphs

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

CHARTER INTERNATIONAL OIL COMPANY,

Plaintiff,

v.

TRAVELERS CASUALTY AND SURETY COMPANY (f/k/a AETNA CASUALTY AND SURETY COMPANY),

Defendant.

Civil Action No. 06-324-S

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF TRAVELERS CASUALTY AND SURETY COMPANY'S MOTION FOR SUMMARY JUDGMENT ON THE STATUTE OF LIMITATIONS**

TRAVELERS CASUALTY AND SURETY COMPANY

R. Kelly Sheridan (#1976)
Jason C. Preciphs (#6727)
Roberts, Carroll, Feldstein & Peirce
10 Weybosset Street
Providence, Rhode Island 02903
(401) 521-7000 (P)
(401) 521-1328 (F)

John A. Nadas (admitted pro hac vice)
Kathleen Burdette Shields (admitted pro hac vice)
Choate, Hall & Stewart LLP
Two International Place
Boston, Massachusetts 02110
(617) 248-5000 (P)
(617) 248-4000 (F)

Dated: April 30, 2007

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56, Travelers Casualty and Surety Company ("Travelers C&S") submits this Statement of Undisputed Material Facts in support of its Motion for Summary Judgment on the Statute of Limitations. Travelers C&S submits that these facts are undisputed, and that these facts, applied to the legal standards discussed in Travelers C&S's memorandum, demonstrate that Travelers C&S is entitled to judgment as a matter of law because Charter's entire claim is barred by the statute of limitations.

**A. The Parties**

1. Plaintiff Charter International Oil Company ("Charter") is a Texas corporation, with a principal place of business in Pittsburgh, Pennsylvania. *See* Affidavit of Kathleen Burdette Shields ("Shields Aff."), Ex. 2, ¶4.

2. Charter claims to be the successor in interest by merger to Northeast Petroleum Corporation. *See id.*, ¶5.

3. Travelers C&S, formerly known as The Aetna Casualty and Surety Company, is a Connecticut corporation with a principal place of business in Hartford, Connecticut. *See id.*, ¶6; *id.*, Ex. 3, ¶6; Affidavit of Howard E. Fitts ("Fitts Aff."), ¶3.

**B. The Insurance Policies At Issue In This Case**

4. Travelers C&S issued a number of primary, umbrella, and excess insurance policies to Northeast Equities, Inc., Northeast Petroleum Industries, Inc. and Northeast Petroleum Corporation (collectively, "Northeast"). *See* Fitts Aff., ¶¶5-7. These insurance policies covered at least sixteen annual periods from July 1, 1965 to October 1, 1985 (collectively, the "Policies"). *See id.*

5. At the time all of the Policies were issued, Northeast was a Massachusetts corporation headquartered in Massachusetts. *See* Shields Aff., Ex. 1.

6. The stock of Northeast was purchased by Charter in 1983, and for the remainder of the time period during which the Policies were issued, Northeast remained a wholly-owned subsidiary of Charter. *See* Affidavit of Julio C. Velez ("Velez Aff."), Ex. M.

7. None of the Policies contain choice of law provisions. *See* Fitts Aff., Ex. A-U.

8. The declarations page of each of the Policies states that the Policy was issued and delivered to Northeast at the address of its headquarters, first in Boston, Massachusetts, and then in Chelsea, Massachusetts. *See* Fitts Aff., Exs. A- U.

9. All of the Policies with policy periods prior to September 30, 1983 were negotiated between brokers located in Massachusetts that were acting on Northeast's behalf, and Travelers C&S employees located in its Massachusetts offices. *See* Velez Aff., Ex. B-D, G-I, K-L (communications between employees of brokers Herbert A. Sullivan and Marsh & McLennan in Worcester and/or Boston, and employees of Travelers C&S in Worcester and/or Boston).

10. With respect to all of the Policies with policy periods prior to September 30, 1983, premiums for these Policies were paid from Massachusetts by Northeast's Massachusetts broker. *See id.*, Ex. A, E, F, J.

11. The majority of the risks for which Travelers provided coverage under the Policies were located in Massachusetts. *See, e.g.* Fitts Aff., Ex. A, at TCS 11280-90, Ex. B, at 8942-62, Ex. E, at TCS 9038-42 (list of named insureds or schedules listing premises owned, rented, or controlled by named insureds and showing that those premises were located overwhelmingly in Massachusetts). With respect to Policy Number 12 AL 002251 SR, which had a policy period from July 1, 1966 to July 1, 1967, the general liability schedules list

Northeast's locations and its subsidiaries' locations. *See* Fitts Aff., Ex. A. Of those 25 locations, only one is in Rhode Island, and 24 are in Massachusetts. *See id.* at TCS 11280-90.

12. The primary policy effective from July 1973 to July 1974 lists 49 locations of the insured in its general liability schedules; 45 of which are in Massachusetts, three of which are in Rhode Island, and one reference which is unclear. *See* Fitts Aff., Ex. D, at TCS 11207-09. In later years, the Policies do not include lists of actual locations, but record the amount of the premium attributable to Northeast's operations in each state. *See, e.g.*, Velez Aff., Ex. U, at TCS 11614. Massachusetts operations account for the majority of the premium charged. *See id.*

13. In 1983, after Charter acquired the stock of Northeast, *see* Velez Aff., Ex. M, Charter shifted Northeast's insurance dealings away from Boston and towards the Southeast. Charter replaced its long-term Boston insurance agent, Marsh & McLennan, with a new agent, Whilden & Associates, located in Jacksonville, Florida. *See* Velez Aff., Ex. M-R.

14. At about the same time, responsibility for the Northeast account shifted from Travelers C&S offices in Boston to offices in Atlanta, Georgia. *See id*., Ex. O at TCS 4035, Ex. R at TCS 3269.

15. After these shifts in responsibility, Travelers C&S issued two additional policies to Northeast (the "1983 and 1984 Policies"). *See* Fitts Aff., Ex. M, N.

16. Northeast continued to pay retrospective premiums and premiums for the 1984 Policy from its Massachusetts headquarters. *See* Shields Aff., Ex. 5 (payment of premium for 1984 Policy); Ex. 6 (payment of retrospective premium).

17. There is no evidence that any of the Policies was issued, negotiated, or delivered in Rhode Island.

**C. The Tiverton Site**

18. From the mid-1960's until about 2002, Northeast and then Charter owned a parcel of land on the shore of the Sakonnet River in Tiverton, Rhode Island (the "Site"). *See* Shields Aff., Ex. 11, at CIOC 37168. Historically, the Site was an oil and gas distribution terminal. *See id.* at CIOC 37167. Northeast continued that use of the Site until the mid-1980's. *See id.*, Ex. 16 at CIOC 17825-26.

19. Today, luxury townhomes and condominiums have been constructed at the Site. *See* Shields Aff., Ex. 4.

20. In 1985, Northeast determined that "[d]ue to the decline in petroleum demand, improvements in highway facilities and proximity of other tank farms [] the [Site] is underutilized and has a higher and better use for residential development." Velez Aff., Ex. S. Northeast thus contacted the Rhode Island Department of Environmental Management ("RIDEM") to obtain its approval of its plans for redeveloping the Site for residential use. *See id.*

21. RIDEM informed Northeast/Charter that it would not approve of residential development at the Site until appropriate testing and remediation had taken place. *See* Shields Aff., Ex. 7 ("Northeast is aware of its responsibility to provide an environmentally safe site for the possibility of condominium development at this location."); Ex. 8 (RIDEM letter requiring Northeast to submit sampling plans and location of "proposed development and improvements"); Ex. 12 (letter expressing RIDEM's concern about the site and identifying acceptable cleanup levels and procedures for pilot remediation program).

22. Charter hired a number of environmental consultants to perform testing at the Site. *See* Shields Aff., Ex 16 at CIOC 17827-30 (explaining numerous rounds of testing at the

Site). Those tests revealed that the Site was contaminated, primarily with petroleum hydrocarbons. *See id.*, Ex.11 at CIOC 37190, 37167 (1986 report from Charter's consultant, noting petroleum contamination in several areas of Site, and stating that study was initiated by Charter to determine what is necessary to "comply with requirements for rezoning of the terminal area to a classification suitable for residential construction"). Those consultants also analyzed the locations of the Site in which contaminants were located, and their relative concentrations. *See id.* at CIOC 37187-90.

23. After several rounds of environmental testing had been performed at the Site, Charter hired GZA GeoEnvironmental, Inc. ("GZA"), another environmental consulting firm, to develop a work plan for remediating the Site. *See* Shields Aff., Ex. 16. The GZA Plan focused on removing existing tanks, pipes, and equipment from the Site and then bioremediating the Site. *See id.*, at CIOC 17832-41. Bioremediation involves promoting the natural decomposition of petroleum hydrocarbons by tilling contaminated soil and increasing its exposure to oxygen and petroleum-digesting bacteria. *See id.* at 17835. The GZA Work Plan outlined the four phases of Site decommissioning, divided the Site into areas of concern, and detailed the anticipated volume of contaminants that would be treated in each area and the methods of bioremediation that would be used in each area, while noting that they expected to encounter "presently un-characterized areas of soil contamination" once the cleanup started. *Id.* at CIOC 17832-33, 17834.

24. Charter submitted the GZA workplan to RIDEM in 1991. *See id.* at CIOC 17822.

**D. Charter's Negotiations With Environmental Regulators**

25. In 1987 and 1988, Charter attempted to negotiate a consent agreement with RIDEM under which it would agree to clean up the Site. *See* Shields Aff., Ex.13-15. Those initial negotiations were unsuccessful.

26. In March 1992, Charter entered into the Consent Agreement with RIDEM. *See* Shields Aff., Ex. 17.

27. The Consent Agreement specified, in its "findings of fact," that the Site had "petroleum and/or petroleum products in the soil and groundwater subjacent thereto," and that RIDEM had "reviewed and approved the conceptual GZA Plan, with the condition that all pollutant concentrations at the Site be reduced to the levels specified in 'Exhibit A.'" *Id.* at CIOC 02. Under the Agreement, which was entered into "in lieu of [RIDEM] issuing a Notice of Violation," RIDEM approved the GZA Plan, and Charter "agree[d] to implement the GZA Plan pursuant to the terms and requirements of the schedule of activities attached hereto . . . and subject to the terms of this Agreement and any amendments thereto." *Id.* at CIOC 02-04. Charter also agreed to study and remediate any off-site contamination that was discovered. *See id.* at CIOC 04.

28. The Consent Agreement provided that if RIDEM issued new cleanup standards, those new standards would apply to the Site cleanup "where appropriate for and applicable to the remediation of the Site." *Id.* at CIOC 06. The Agreement also specified that, while it did not prevent RIDEM from taking other enforcement actions against Charter in certain circumstances, it "shall have all the force and effect of a final administrative decision and order under the Administrative Procedures Act [] from which no appeal has been taken" and that the Agreement was fully enforceable in court. *Id.* at CIOC 06-07.

29. The Consent Agreement gave Charter 60 months after its execution to complete its remediation obligations, subject to provisions that Charter could seek extensions of time in some circumstances. *See id.* at CIOC 14, 08-10.

30. The basic remediation technology described in the GZA Plan was the actual methodology used to remediate the Site. *See* Shields Aff., Ex. 26 at CIOC 1038-39.

31. While RIDEM made changes to its remediation regulations in 1996, and those changed regulations were applied to the site, the result was to *diminish* the commitments that Charter had undertaken in the Consent Agreement because the relevant cleanup standard was made *less stringent*. *See id.* at CIOC 1037.

32. The GZA Plan was also modified in 1997 to the extent that contaminated soils along the shore of the Sakonnet River were excavated and treated in upland bioremediation beds rather than bioremediating those soils in place. *See id.*, Ex. 20, at CIOC 581; Ex 19 at CIOC 27769.

33. Charter began to complete its remediation of portions of the site in 1998, and the bulk of its cleanup activities were completed by late 1998. *See id.*, Ex. 21, Ex. 26 at CIOC 1039. Charter also sought permission from RIDEM, in 1998, to cease groundwater monitoring at the Site. *See id.*, Ex. 22-23.

34. In May, 2002, RIDEM certified that Charter's cleanup of the Site was complete. *See id.*, Ex. 27.

**E. Charter's Expenses In Connection With The Tiverton Site**

35. Between 1985 and 1990, Charter hired its own lawyers to represent it in connection with environmental matters at the Tiverton Site, and incurred costs for those lawyers. *See* Shields Aff., Ex. 28 (spreadsheets showing legal costs for Tiverton).

36. By 1992, when Charter signed the Consent Agreement with RIDEM, it knew that its cleanup of the site would cost multiple millions of dollars. *See* Shields Aff., Ex. 10

(estimating cost of cleanup at $3 million), Ex. 29 (estimating cost of cleanup at about $2.625 million).

37. Charter claims that it incurred approximately $1,000,000 in expenses in 1992 and prior years in connection with remediating the Site, and that it spent approximately $3,300,000 in 1993, and approximately $5,200,000 in 1994 on remedial work at the Site. *See* Shields Aff., Ex. 24, Ex. 25 (spreadsheets showing actual costs incurred by Charter).

38. Charter incurred approximately $11,000 in legal expense in 1999 and 2000 to investigate potential claims for recovery against Aetna. *See* Shields Aff., Ex. 24 (listing costs incurred in pursuing "recovery from Aetna").

**F. Charter's Claim Against Travelers C&S**

39. In 1986, Charter notified Travelers C&S of its discussions with RIDEM about the Site, and demanded coverage for its potential liability at the Site. *See* Shields Aff., Ex. 9.

40. In December, 1991, Travelers C&S sent a letter to Charter that clearly and unequivocally denied Charter's claim for coverage under the Policies for expenses incurred in remediating the Site. *See* Velez Aff., Ex. T, at TCS 10857 ("we are denying coverage for this loss").

41. Charter clearly understood Travelers C&S's denial and thus undertook actions at the Site "on its own." Shields Aff., Ex. 2, ¶ 33.

42. There is no evidence that Charter responded to Travelers C&S's December 1991 denial of coverage letter. *See* Velez Aff., ¶ 6.

TRAVELERS CASUALTY AND SURETY COMPANY

By Its Counsel,

/s/ Jason C. Preciphs
R. Kelly Sheridan (#1976)
Jason C. Preciphs (#6727)
Roberts, Carroll, Feldstein & Peirce
10 Weybosset Street
Providence, Rhode Island 02903
(401) 521-7000 (P)
(401) 521-1328 (F)

John A. Nadas (admitted pro hac vice)
Kathleen Burdette Shields (admitted pro hac vice)
Choate, Hall & Stewart LLP
Two International Place
Boston, Massachusetts 02110
(617) 248-5000 (P)

Dated: April 30, 2007