**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| CHARTER INTERNATIONAL OIL COMPANY,<br><br>Plaintiff,<br>v.<br><br>TRAVELERS CASUALTY AND SURETY COMPANY (f/k/a AETNA CASUALTY AND SURETY COMPANY),<br><br>Defendant. | ) | Civil Action No. 06-324-S |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF TRAVELERS CASUALTY AND SURETY COMPANY'S MOTION FOR SUMMARY JUDGMENT ON THE STATUTE OF LIMITATIONS**

TRAVELERS CASUALTY AND SURETY COMPANY

R. Kelly Sheridan (#1976)
Jason C. Preciphs (#6727)
Roberts, Carroll, Feldstein & Peirce
10 Weybosset Street
Providence, Rhode Island 02903
(401) 521-7000 (P)
(401) 521-1328 (F)

John A. Nadas (admitted pro hac vice)
Kathleen Burdette Shields (admitted pro hac vice)
Choate, Hall & Stewart LLP
Two International Place
Boston, Massachusetts 02110
(617) 248-5000 (P)
(617) 248-4000 (F)

Dated: April 30, 2007

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56, Travelers Casualty and Surety Company ("Travelers C&S") submits this Statement of Undisputed Material Facts in support of its Motion for Summary Judgment on the Statute of Limitations. Travelers C&S submits that these facts are undisputed, and that these facts, applied to the legal standards discussed in Travelers C&S's memorandum, demonstrate that Travelers C&S is entitled to judgment as a matter of law because Charter's entire claim is barred by the statute of limitations.

**A. The Parties**

1. Plaintiff Charter International Oil Company ("Charter") is a Texas corporation, with a principal place of business in Pittsburgh, Pennsylvania. *See* Affidavit of Kathleen Burdette Shields ("Shields Aff."), Ex. 2, ¶4.

2. Charter claims to be the successor in interest by merger to Northeast Petroleum Corporation. *See id.*, ¶5.

3. Travelers C&S, formerly known as The Aetna Casualty and Surety Company, is a Connecticut corporation with a principal place of business in Hartford, Connecticut. *See id.*, ¶6; *id.*, Ex. 3, ¶6; Affidavit of Howard E. Fitts ("Fitts Aff."), ¶3.

**B. The Insurance Policies At Issue In This Case**

4. Travelers C&S issued a number of primary, umbrella, and excess insurance policies to Northeast Equities, Inc., Northeast Petroleum Industries, Inc. and Northeast Petroleum Corporation (collectively, "Northeast"). *See* Fitts Aff., ¶¶5-7. These insurance policies covered at least sixteen annual periods from July 1, 1965 to October 1, 1985 (collectively, the "Policies"). *See id.*

5. At the time all of the Policies were issued, Northeast was a Massachusetts corporation headquartered in Massachusetts. *See* Shields Aff., Ex. 1.

6. The stock of Northeast was purchased by Charter in 1983, and for the remainder of the time period during which the Policies were issued, Northeast remained a wholly-owned subsidiary of Charter. *See* Affidavit of Julio C. Velez ("Velez Aff."), Ex. M.

7. None of the Policies contain choice of law provisions. *See* Fitts Aff., Ex. A-U.

8. The declarations page of each of the Policies states that the Policy was issued and delivered to Northeast at the address of its headquarters, first in Boston, Massachusetts, and then in Chelsea, Massachusetts. *See* Fitts Aff., Exs. A- U.

9. All of the Policies with policy periods prior to September 30, 1983 were negotiated between brokers located in Massachusetts that were acting on Northeast's behalf, and Travelers C&S employees located in its Massachusetts offices. *See* Velez Aff., Ex. B-D, G-I, K-L (communications between employees of brokers Herbert A. Sullivan and Marsh & McLennan in Worcester and/or Boston, and employees of Travelers C&S in Worcester and/or Boston).

10. With respect to all of the Policies with policy periods prior to September 30, 1983, premiums for these Policies were paid from Massachusetts by Northeast's Massachusetts broker. *See id.*, Ex. A, E, F, J.

11. The majority of the risks for which Travelers provided coverage under the Policies were located in Massachusetts. *See, e.g.* Fitts Aff., Ex. A, at TCS 11280-90, Ex. B, at 8942-62, Ex. E, at TCS 9038-42 (list of named insureds or schedules listing premises owned, rented, or controlled by named insureds and showing that those premises were located overwhelmingly in Massachusetts). With respect to Policy Number 12 AL 002251 SR, which had a policy period from July 1, 1966 to July 1, 1967, the general liability schedules list

Northeast's locations and its subsidiaries' locations. *See* Fitts Aff., Ex. A. Of those 25 locations, only one is in Rhode Island, and 24 are in Massachusetts. *See id.* at TCS 11280-90.

12. The primary policy effective from July 1973 to July 1974 lists 49 locations of the insured in its general liability schedules; 45 of which are in Massachusetts, three of which are in Rhode Island, and one reference which is unclear. *See* Fitts Aff., Ex. D, at TCS 11207-09. In later years, the Policies do not include lists of actual locations, but record the amount of the premium attributable to Northeast's operations in each state. *See, e.g.*, Velez Aff., Ex. U, at TCS 11614. Massachusetts operations account for the majority of the premium charged. *See id.*

13. In 1983, after Charter acquired the stock of Northeast, *see* Velez Aff., Ex. M, Charter shifted Northeast's insurance dealings away from Boston and towards the Southeast. Charter replaced its long-term Boston insurance agent, Marsh & McLennan, with a new agent, Whilden & Associates, located in Jacksonville, Florida. *See* Velez Aff., Ex. M-R.

14. At about the same time, responsibility for the Northeast account shifted from Travelers C&S offices in Boston to offices in Atlanta, Georgia. *See id*., Ex. O at TCS 4035, Ex. R at TCS 3269.

15. After these shifts in responsibility, Travelers C&S issued two additional policies to Northeast (the "1983 and 1984 Policies"). *See* Fitts Aff., Ex. M, N.

16. Northeast continued to pay retrospective premiums and premiums for the 1984 Policy from its Massachusetts headquarters. *See* Shields Aff., Ex. 5 (payment of premium for 1984 Policy); Ex. 6 (payment of retrospective premium).

17. There is no evidence that any of the Policies was issued, negotiated, or delivered in Rhode Island.

**C. The Tiverton Site**

18. From the mid-1960's until about 2002, Northeast and then Charter owned a parcel of land on the shore of the Sakonnet River in Tiverton, Rhode Island (the "Site"). *See* Shields Aff., Ex. 11, at CIOC 37168. Historically, the Site was an oil and gas distribution terminal. *See id.* at CIOC 37167. Northeast continued that use of the Site until the mid-1980's. *See id.*, Ex. 16 at CIOC 17825-26.

19. Today, luxury townhomes and condominiums have been constructed at the Site. *See* Shields Aff., Ex. 4.

20. In 1985, Northeast determined that "[d]ue to the decline in petroleum demand, improvements in highway facilities and proximity of other tank farms [] the [Site] is underutilized and has a higher and better use for residential development." Velez Aff., Ex. S. Northeast thus contacted the Rhode Island Department of Environmental Management ("RIDEM") to obtain its approval of its plans for redeveloping the Site for residential use. *See id.*

21. RIDEM informed Northeast/Charter that it would not approve of residential development at the Site until appropriate testing and remediation had taken place. *See* Shields Aff., Ex. 7 ("Northeast is aware of its responsibility to provide an environmentally safe site for the possibility of condominium development at this location."); Ex. 8 (RIDEM letter requiring Northeast to submit sampling plans and location of "proposed development and improvements"); Ex. 12 (letter expressing RIDEM's concern about the site and identifying acceptable cleanup levels and procedures for pilot remediation program).

22. Charter hired a number of environmental consultants to perform testing at the Site. *See* Shields Aff., Ex 16 at CIOC 17827-30 (explaining numerous rounds of testing at the

Site). Those tests revealed that the Site was contaminated, primarily with petroleum hydrocarbons. *See id.*, Ex.11 at CIOC 37190, 37167 (1986 report from Charter's consultant, noting petroleum contamination in several areas of Site, and stating that study was initiated by Charter to determine what is necessary to "comply with requirements for rezoning of the terminal area to a classification suitable for residential construction"). Those consultants also analyzed the locations of the Site in which contaminants were located, and their relative concentrations. *See id.* at CIOC 37187-90.

23. After several rounds of environmental testing had been performed at the Site, Charter hired GZA GeoEnvironmental, Inc. ("GZA"), another environmental consulting firm, to develop a work plan for remediating the Site. *See* Shields Aff., Ex. 16. The GZA Plan focused on removing existing tanks, pipes, and equipment from the Site and then bioremediating the Site. *See id.*, at CIOC 17832-41. Bioremediation involves promoting the natural decomposition of petroleum hydrocarbons by tilling contaminated soil and increasing its exposure to oxygen and petroleum-digesting bacteria. *See id.* at 17835. The GZA Work Plan outlined the four phases of Site decommissioning, divided the Site into areas of concern, and detailed the anticipated volume of contaminants that would be treated in each area and the methods of bioremediation that would be used in each area, while noting that they expected to encounter "presently un-characterized areas of soil contamination" once the cleanup started. *Id.* at CIOC 17832-33, 17834.

24. Charter submitted the GZA workplan to RIDEM in 1991. *See id.* at CIOC 17822.

**D. Charter's Negotiations With Environmental Regulators**

25. In 1987 and 1988, Charter attempted to negotiate a consent agreement with RIDEM under which it would agree to clean up the Site. *See* Shields Aff., Ex.13-15. Those initial negotiations were unsuccessful.

26. In March 1992, Charter entered into the Consent Agreement with RIDEM. *See* Shields Aff., Ex. 17.

27. The Consent Agreement specified, in its "findings of fact," that the Site had "petroleum and/or petroleum products in the soil and groundwater subjacent thereto," and that RIDEM had "reviewed and approved the conceptual GZA Plan, with the condition that all pollutant concentrations at the Site be reduced to the levels specified in 'Exhibit A.'" *Id.* at CIOC 02. Under the Agreement, which was entered into "in lieu of [RIDEM] issuing a Notice of Violation," RIDEM approved the GZA Plan, and Charter "agree[d] to implement the GZA Plan pursuant to the terms and requirements of the schedule of activities attached hereto . . . and subject to the terms of this Agreement and any amendments thereto." *Id.* at CIOC 02-04. Charter also agreed to study and remediate any off-site contamination that was discovered. *See id.* at CIOC 04.

28. The Consent Agreement provided that if RIDEM issued new cleanup standards, those new standards would apply to the Site cleanup "where appropriate for and applicable to the remediation of the Site." *Id.* at CIOC 06. The Agreement also specified that, while it did not prevent RIDEM from taking other enforcement actions against Charter in certain circumstances, it "shall have all the force and effect of a final administrative decision and order under the Administrative Procedures Act [] from which no appeal has been taken" and that the Agreement was fully enforceable in court. *Id.* at CIOC 06-07.

29. The Consent Agreement gave Charter 60 months after its execution to complete its remediation obligations, subject to provisions that Charter could seek extensions of time in some circumstances. *See id.* at CIOC 14, 08-10.

30. The basic remediation technology described in the GZA Plan was the actual methodology used to remediate the Site. *See* Shields Aff., Ex. 26 at CIOC 1038-39.

31. While RIDEM made changes to its remediation regulations in 1996, and those changed regulations were applied to the site, the result was to *diminish* the commitments that Charter had undertaken in the Consent Agreement because the relevant cleanup standard was made *less stringent*. *See id.* at CIOC 1037.

32. The GZA Plan was also modified in 1997 to the extent that contaminated soils along the shore of the Sakonnet River were excavated and treated in upland bioremediation beds rather than bioremediating those soils in place. *See id.*, Ex. 20, at CIOC 581; Ex 19 at CIOC 27769.

33. Charter began to complete its remediation of portions of the site in 1998, and the bulk of its cleanup activities were completed by late 1998. *See id.*, Ex. 21, Ex. 26 at CIOC 1039. Charter also sought permission from RIDEM, in 1998, to cease groundwater monitoring at the Site. *See id.*, Ex. 22-23.

34. In May, 2002, RIDEM certified that Charter's cleanup of the Site was complete. *See id.*, Ex. 27.

**E. Charter's Expenses In Connection With The Tiverton Site**

35. Between 1985 and 1990, Charter hired its own lawyers to represent it in connection with environmental matters at the Tiverton Site, and incurred costs for those lawyers. *See* Shields Aff., Ex. 28 (spreadsheets showing legal costs for Tiverton).

36. By 1992, when Charter signed the Consent Agreement with RIDEM, it knew that its cleanup of the site would cost multiple millions of dollars. *See* Shields Aff., Ex. 10

(estimating cost of cleanup at $3 million), Ex. 29 (estimating cost of cleanup at about $2.625 million).

37. Charter claims that it incurred approximately $1,000,000 in expenses in 1992 and prior years in connection with remediating the Site, and that it spent approximately $3,300,000 in 1993, and approximately $5,200,000 in 1994 on remedial work at the Site. *See* Shields Aff., Ex. 24, Ex. 25 (spreadsheets showing actual costs incurred by Charter).

38. Charter incurred approximately $11,000 in legal expense in 1999 and 2000 to investigate potential claims for recovery against Aetna. *See* Shields Aff., Ex. 24 (listing costs incurred in pursuing "recovery from Aetna").

**F. Charter's Claim Against Travelers C&S**

39. In 1986, Charter notified Travelers C&S of its discussions with RIDEM about the Site, and demanded coverage for its potential liability at the Site. *See* Shields Aff., Ex. 9.

40. In December, 1991, Travelers C&S sent a letter to Charter that clearly and unequivocally denied Charter's claim for coverage under the Policies for expenses incurred in remediating the Site. *See* Velez Aff., Ex. T, at TCS 10857 ("we are denying coverage for this loss").

41. Charter clearly understood Travelers C&S's denial and thus undertook actions at the Site "on its own." Shields Aff., Ex. 2, ¶ 33.

42. There is no evidence that Charter responded to Travelers C&S's December 1991 denial of coverage letter. *See* Velez Aff., ¶ 6.

TRAVELERS CASUALTY AND SURETY COMPANY

By Its Counsel,

/s/ Jason C. Preciphs
R. Kelly Sheridan (#1976)
Jason C. Preciphs (#6727)
Roberts, Carroll, Feldstein & Peirce
10 Weybosset Street
Providence, Rhode Island 02903
(401) 521-7000 (P)
(401) 521-1328 (F)

John A. Nadas (admitted pro hac vice)
Kathleen Burdette Shields (admitted pro hac vice)
Choate, Hall & Stewart LLP
Two International Place
Boston, Massachusetts 02110
(617) 248-5000 (P)

Dated: April 30, 2007