**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| CHARTER INTERNATIONAL OIL COMPANY,<br><br>Plaintiff,<br>vs.<br><br>TRAVELERS CASUALTY AND SURETY COMPANY (f/k/a AETNA CASUALTY AND SURETY COMPANY),<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO. 06-324 S |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND IN THE ALTERNATIVE, PLAINTIFF'S REQUEST FOR CERTIFICATION**

Plaintiff, Charter International Oil Company ("Charter"), hereby objects to the motion for summary judgment filed by Defendant, Travelers Casualty and Surety Company ("Travelers"). Charter requests, in the alternative, certification of certain questions to the Rhode Island Supreme Court. In support of its opposition, Charter relies on the brief, affidavits, and exhibits submitted herewith.

CHARTER INTERNATIONAL OIL
CORPORATION

By its attorneys:

/s/ Gerald J. Petros
Gerald J. Petros (#2931)
Robin L. Main (#4222)
Anna M. Piazza (#7206)
HINCKLEY, ALLEN & SNYDER LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island 02903
Phone: (401) 274-2000
Fax: (401) 277-9600
gpetros@haslaw.com
rmain@haslaw.com
apiazza@haslaw.com

Neal R. Brendel (admitted pro hac vice)
James R. Segerdahl (admitted pro hac vice)
Brian F. Saulnier (admitted pro hac vice)
KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, Pennsylvania 15222
Phone: (412) 355-6500
Fax: (412) 355-6501
nbrendel@klng.com
jsegerdahl@klng.com
bsaulnier@klng.com

Dated: May 31, 2007.

**CERTIFICATE OF SERVICE**

**To:**

John A. Nadas, Esq.
Kathleen Burdette Shields, Esq.
Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110

R. Kelly Sheridan, Esq.
Jason C. Preciphs, Esq.
Roberts, Carroll Feldstein & Peirce
Ten Weybosset Street
Providence, RI 02903

I hereby certify that on May 31, 2007, a copy of the foregoing Plaintiff's Opposition to Defendant's Motion for Summary Judgment, and in the Alternative, Plaintiff's Request for Certification was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Gerald J. Petros
Gerald J. Petros (#2931)

804895

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| CHARTER INTERNATIONAL OIL COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | CIVIL ACTION NO. 06-324 S |
| | ) | |
| TRAVELERS CASUALTY AND SURETY COMPANY (f/k/a AETNA CASUALTY AND SURETY COMPANY), | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S ALTERNATE REQUEST FOR CERTIFICATION**

CHARTER INTERNATIONAL OIL CORPORATION

Gerald J. Petros (#2931)
Robin L. Main (#4222)
Anna M. Piazza (#7206)
HINCKLEY, ALLEN & SNYDER LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island 02903
Phone: (401) 274-2000
Fax: (401) 277-9600
gpetros@haslaw.com
rmain@haslaw.com
apiazza@haslaw.com

Neal R. Brendel (admitted pro hac vice)
James R. Segerdahl (admitted pro hac vice)
Brian F. Saulnier (admitted pro hac vice)
KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, Pennsylvania 15222
Phone: (412) 355-6500
Fax: (412) 355-6501
neal.brendel@klgates.com
james.segerdahl@klgates.com
brian.saulnier@klgates.com

Dated: May 31, 2007

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........ iii

**INTRODUCTION** ........ 1

**FACTUAL BACKGROUND** ........ 3

I. Travelers's Comprehensive Liability Insurance Policies ........ 3

II. The Underlying Regulatory Action Against Charter ........ 4

A. The Former Charter Site ........ 4

B. Charter's Pre-1992 Environmental Testing And Remediation, And Early Negotiations With RIDEM ........ 5

C. Travelers's Involvement ........ 8

D. The 1992 Consent Agreement Began A Long Process Of Negotiating With RIDEM And Remediating The Site ........ 8

E. The Ongoing, Post-1992 Disputes ........ 9

1. Project Implementation Plan Disputes ........ 9

2. Ongoing Negotiation Regarding Changes To Remediation Requirements ........ 10

3. Charter's 1993-97 Wetlands Work And Associated Regulatory Approvals From ACOE And RIDEM's Division Of Freshwater Wetlands ........ 12

4. The Railroad Right Of Way ........ 13

5. Certain Water-Related And Coastal Issues ........ 14

6. 1997 RIDEM Order Of Approval And Development Of RWAP ........ 15

7. Completion Of Remediation/Letter Of Compliance ........ 16

F. Litigation Regarding Responsibility To Pay For The Cleanup (1993-1997) ........ 16

**STANDARD OF REVIEW** ........ 17

**ARGUMENT** .......... 18

I. While A Matter Of First Impression, Rhode Island Courts Would Clearly Hold That The Limitations Period For A Third-Party Environmental Insurance Claim Begins To Run Upon Final Judgment .......... 18

A. Analogous Rhode Island Case Law Compels The Conclusion That The Limitations Period Commences After Final Judgment, Not Date Of Denial .......... 18

B. The Authority Proffered By Travelers Is Inapposite .......... 21

C. Travelers Confuses First-Policy Coverage With Third-Party Coverage .......... 23

D. Public Policy Considerations, Grounded In Rhode Island Law, Also Support A Limitations Accrual Point Of Final Judgment .......... 26

E. The Insurance Policies' "No-Action" Clause Forecloses Any Argument By Travelers That Charter's Claim Accrued Before Final Judgment .......... 31

II. The 2002 Letter Of Compliance, Not The Consent Agreement, Operated As The Final Judgment And Commenced The Limitations Period .......... 34

A. The Terms Of The Consent Agreement Evince That It Was Not A Case-Terminating Document .......... 34

B. The Remediation History Shows That Charter's Liability Was Not Fixed At Or Around The Time Of The Consent Agreement .......... 38

III. Travelers's Choice-Of-Law And Related Arguments Concerning Massachusetts Law Do Not Support Its Position .......... 40

A. Under Rhode Island Law, The Law Of The Forum Controls The Statute-Of-Limitations Issue .......... 40

B. Even If The Statute Of Limitations Were Considered "Substantive," Rhode Island Law Would Still Apply Because Of The State's Significant Interests In This Dispute .......... 45

C. This Court Need Not Decide The Choice-Of-Law Issue Because There Is No Conflict With Massachusetts Law .......... 49

IV. In The Alternative, This Court Should Certify The Questions In Dispute To The Rhode Island Supreme Court .......... 51

**CONCLUSION** .......... 53

# TABLE OF AUTHORITIES

## Federal Cases

*A & B Constr. v. Atlas Roofing & Skylight Co.*, 867 F. Supp. 100 (D.R.I. 1994) ................. 20, 21

*Adams v. Town of Burrillville*, 249 F. Supp. 2d 151 (D.R.I. 2003) ................................22, 23, 33

*Aetna Casualty & Surety Co. v. Kelly*, 889 F. Supp. 535 (D.R.I. 1995) .................................... 28

*Albany Ins. Co. v. Wisniewski*, 579 F. Supp. 1004 (D.R.I. 1984) .............................................. 48

*Carlow v. Mruk*, 425 F. Supp. 2d 225 (D.R.I. 2006)................................................................ 17

*Cole v. Mileti*, 133 F.3d 433 (6th Cir. 1998)........................................................................ 43, 44

*CPC Int'l., Inc. v. Northbrook Excess & Surplus Ins. Co.*, 839 F. Supp.124 (D.R.I. 1993) ........ 47

*CPC Int'l., Inc. v. Northbrook Excess & Surplus Ins. Co.*, 46 F.3d 1211 (1st Cir. 1995)............ 47

*Diamond Intern. Corp. v. Allstate Ins. Co.*, 712 F.2d 1498 (1st Cir. 1983) .......................... 46, 49

*Dziura v. United States*, 168 F.3d 581 (1st Cir. 1999) ............................................................. 22

*Employers Reinsurance Corp. v. Jefferson Pilot Fin. Ins. Co.*, 176 F. Supp. 2d 1183 (D. Kan. 2001) ...................................................................................................... 44

*Fed. Ins. Co. v. Purex Indus, Inc.*, 972 F. Supp. 872 (D.N.J. 1997) ...............................34, 35, 37

*Gail Frances, Inc. v. Alaska Diesel Elec., Inc.*, 62 F. Supp. 2d 511 (D.R.I. 1999) ............... 22, 33

*Gassman v. Eli Lilly & Co.*, 407 F. Supp. 2d 203 (D.D.C. 2005).............................................. 44

*Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99 (1945)...............................................41, 42, 43

*Hays v. Mobil Oil. Corp.*, 736 F. Supp. 387 (D. Mass. 1990) .......................................27, 40, 50

*Hays v. Mobil Oil. Corp.*, 930 F.2d 96 (1st Cir. 1991)...................................................... 27, 50

*Hi-Mill Mfg. Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1341, 1996 WL 571140 (6th Cir. 1996) ........................................................................................................... 6

*Isley v. Capuchin Province*, 878 F. Supp. 1021 (E.D. Mich. 1995)........................................... 44

*John Beaudette, Inc. v. Sentry Ins. A Mutual Co.*, 94 F. Supp. 2d 77 (D. Mass. 1999) ...............................................................................19, 29, 30, 50

*Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941)......................................42, 43, 44

*Moffat v. Metropolitan Cas. Ins. Co. of New York*, 238 F. Supp. 165 (M.D. Pa. 1964) ...20, 21, 29

*Montaup Elec. Co. v. Ohio Brass Corp.*, 561 F. Supp. 740 (D.R.I. 1983)................................. 41

*NW La. Fish & Game Preserve Comm'n v. United States*, 446 F.3d 1285 (Fed. Cir. 2006)........ 27

*Oliver B. Cannon & Son, Inc. v. Fidelity & Casualty Co. of N.Y.*, 484 F. Supp. 1375 (D. Del. 1980)........................................................................................................ 19, 29

*Pardee v. Consumer Portfolio Services, Inc.*, 344 F. Supp. 2d 823 (D.R.I. 2004) ................ 20, 29

*Pinkham v. Collyer Insulated Wire Co., Inc.*, Civ. A. No. 92-0426B, 1994 WL 385375 (D.R.I. Mar. 22, 1994) ........................................................................... 41, 43

*Port Authority of New York and New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226 (3d Cir. 2002) ...................................................................................23, 24, 25

*Providence & Worcester R. Co. v. Sargent & Greenleaf, Inc.*, 802 F. Supp. 680 (D.R.I. 1992)......................................................................................... 41, 43

*Reeves v. Eli Lilly and Co*., 368 F. Supp. 2d 11 (D.D.C. 2005)................................................ 44

*RMS Tech., Inc. v. TDY Indus., Inc.*, 64 Fed. Appx. 853 (4th Cir. 2003)................................... 43

*Servicios Comerciales Andinos, S.A. v. Gen. Elec. Del Caribe, Inc.*, 145 F.3d 463 (1st Cir. 1998)................................................................................................ 42

*Shapiro v. Associated Intern. Ins. Co.*, 899 F.2d 1116 (11th Cir. 1990).................................... 46

*Sinclair v. Brill*, 815 F. Supp. 44 (D.N.H. 1993) ...................................................................... 44

*Sun Oil Co. v. Wortman*, 486 U.S. 717 (1988) ......................................................................... 42

*United States v. Dickinson*, 331 U.S. 745 (1947)...................................................................... 27

*United States v. Skidmore, Owings & Merrill*, 505 F. Supp. 1101 (S.D.N.Y. 1981).................. 22

*UTI Corp. v. Fireman's Fund Ins. Co.*, 896 F. Supp. 362 (D.N.J. 1995) ............................. 32, 33

*Waters v. Walt Disney Co.*, 237 F. Supp. 2d 162 (D.R.I. 2002) ................................................ 41

*Wolf v. Preferred Risk Life Ins. Co.*, 728 F.2d 1304 (10th Cir. 1984) ....................................... 18

*Wolverine Ins. Co. v. Tower Iron Works, Inc.*, 370 F.2d 700 (1st Cir. 1966)........................ 49, 50

**State Cases**

*Am. Employers Ins. Co. v. Coachmen Indus., Inc.*, 838 N.E. 2d 1172 (Ind. Ct. App. 2005)........................................................................................................ 47, 48

*Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177 (Ill. 2002) ............. 44

*Brown v. Church of the Holy Name of Jesus*, 243 A.2d 917 (R.I. 1968) ................................... 43

*Byron v. Great Am. Indemnity Co.*, 173 A. 546 (R.I. 1934) ..........................................41, 42, 43

*Clarendon Nat. Ins. Co. v. Arbella Mut. Ins. Co.*, 803 N.E. 2d 750 (Mass. Ct. App. 2004)........ 48

*CPC Int'l., Inc. v. Northbrook Excess & Surplus Ins. Co.*, 668 A.2d 647 (R.I. 1995)................. 52

*Crest-Foam Corp. v. Aetna Ins. Co.*, 727 A.2d 1030 (N.J. App. Div. 1999) ............................. 32

*DeCesare v. Lincoln Benefit Life Co.*, 852 A.2d 474 (R.I. 2004).............................................. 45

*DiBattista v. Butera*, 244 A.2d 857 (R.I. 1968) .......................................................................... 32

*DiIorio v. Abington Mut. Fire. Ins. Co.*, 402 A.2d 745 (R.I. 1979)........................................... 21

*Dutton-Lainson Co. v. Continental Ins. Co.*, 716 N.W. 2d. 87 (Neb. 2006) ...................19, 22, 23

*Eaton Hydraulics Inc. v. Continental Casualty Co.*, 132 Cal. App. 4th 966 (Cal. Ct. App. 2005) ........................................................................................................ 19, 20

*Ervin v. Sears, Roebuck and Co.*, 469 N.E.2d 243 (Ill. Ct. App. 1984)..................................... 33

*Gilbert v. Am. Cas. Co. of Reading, Pa.*, 219 So. 2d 84 (Fla. Ct. App. 1969) ........................... 32

*Gordon v. Clifford Metal Sales Co., Inc.*, 602 A.2d 535 (R.I. 1992)......................................... 45

*Hay v. Pawtucket Mut. Ins. Co.*, 824 A.2d 458 (R.I. 2003)....................................................... 21

*Hazen Paper Co. v. U.S. Fidelity and Guar. Co.*, 555 N.E.2d 576 (Mass. 1990) ......................... 6

*Horn v. Southern Union Co.*, --A.2d--, 2006 WL 2864737 (R.I. 2006)..................................... 52

*Indust. Park Water Co v. Nat'l Fire Ins. Co.*, No. 98-4263, 2005 WL 372298 (R.I. Sup. Ct. Feb 9, 2005).................................................................................................. 6

*Johanson v. Dunnington*, 785 A.2d 1244 (Me. 2001) ........................................................... 44

*Johnson Matthey Inc. v. Pennsylvania Mfrs.' Ass'n Ins. Co.*, 593 A.2d 367 (N.J. Ct. App. 1991) ........................................................................................................ 46, 47

*Kelly v. Marcantonio*, 678 A.2d 873 (R.I. 1996) ................................................................. 52

*Kielb v. Couch*, 374 A.2d 79 (N.J. Super Ct. 1977) ..............................................20, 29, 30, 32

*Lumbermens Mut. Cas. Co. v. Y.C.N. Transp. Co.*, 705 N.E. 2d 297 (Mass. Ct. App. 1999) ........................................................................................................ 33, 50

*Luppino v. Vigilant Ins. Co.*, 677 A.2d 617 (Md. Ct. App. 1996) ........................................... 19

*Mendez v. Brites*, 849 A.2d 329 (R.I. 2004) ......................................................................... 45

*Muldowney v. Weatherking Prods.*, 509 A.2d 441 (R.I. 1986)................................................ 21

*Palazzolo v. Coastal Res. Management Council of R.I.,* No. WC NO. 88-297, 1988 WL 1017232 (R.I. Super. Ct. Oct. 31, 1988) ........................................................................ 27

*Reichhold Chemicals, Inc. v. Hartford Accident and Indemnity Co.*, 750 A.2d 1051 (Conn. 2000)......................................................................................... 47, 48

*Reinhard v. Textron, Inc.*, 516 P.2d 1325 (Okla. 1973) ......................................................... 41

*Shook & Fletcher Asbestos Settlement Trust v. Safety Nat. Cas. Corp.*, 2005 WL 2436193 (Del. Super. Ct. 2005) (unpublished)............................................................................ 48

*Staples v. Waite*, 76 A. 353 (R.I. 1910)........................................................................... 41, 42

*Textron, Inc. v. Aetna Cas. and Sur. Co.*, 754 A.2d 742 (R.I. 2000) ..............................24, 26, 27

*Travelers Ins. Co. v. Royal Ins. Co.*, No. 04-P-1776, 2006 WL 223854 (Mass. Ct. App. Jan. 30, 2006)............................................................................................... 33, 50

*Unisys Finance Corp. v. U.S. Vision, Inc.*, 630 A.2d 55 (Pa. Super. Ct. 1993).......................... 44

*Wilkinson v. Harrington*, 104 R.I. 224, 243 A.2d 745 (R.I. 1968) ........................................... 30

**State Statutes**

R.I. Gen. Laws § 23-19.14-2.................................................................................... 27

R.I. Gen. Laws § 27-5-3 .......................................................................................... 21

R.I. Gen. Laws chapter 46-12 ................................................................................... 5, 6

**Court Rules**

Fed. R. Civ. P. 56 .......... 17

Rhode Island Supreme Court Rule 6 .......... 52

**Other Authorities**

Allan D. Windt, 1 Insurance Claims and Disputes 4th § 6:5 (2007).......... 24

Allan D. Windt, 2 Insurance Claims and Disputes 4th § 9:2 (2007).......... 19

Restatement (Second) of Conflicts of Laws § 193 .......... 46, 48

Wright & Miller, 10B Fed. Prac. & Proc. Civ.3d § 2751 .......... 30

Zuckerman & Raskoff, 1 Envtl. Ins. Litig.: L. and Prac. § 2:2 (2006)..........23, 24, 25

# INTRODUCTION

In its motion for summary judgment seeking to have this action dismissed on statute-of-limitations grounds, Travelers relies on the identical arguments it raised in its opening motion to dismiss, which this Court denied. The Court allowed a period of discovery to give Travelers an opportunity to present factual support for its position. It is not surprising that Travelers finds no comfort in the factual background and simply recycles its prior arguments. The facts devastate the premise of Travelers's position in several important respects.

Travelers had hoped to be in a position to establish that the underlying environmental action initiated by the Rhode Island Department of Environmental Management (RIDEM) ended in 1992 when a Consent Agreement was executed, thus commencing the ten-year limitations period at that time. Discovery, however, has laid bare an extensive record of a heavily litigated and negotiated underlying environmental action that continued well after 1992 and did not conclude until 2002. Indeed, it was not until 2002, after more then a decade of sustained defense activity, that the action concluded, Charter's liability was fully determined, and Charter was finally released. The Consent Agreement was much closer to the beginning of the underlying regulatory action than to the end. The record leaves no doubt about this fact, and establishes that the ten-year statute would not have run until 2012.

Discovery has also revealed the various Travelers policies at issue. Although this point is ignored in its brief, those policies make it impossible for Travelers credibly to take the position that the statue of limitations (whether under Rhode Island law or Massachusetts law, as Travelers proposes) began to run before the conclusion of the underlying action in 2002. Travelers cannot credibly take this position because it included in its policies "no-action" clauses, which provided

that no action could be brought against Travelers until the amount of the insured's liability is finally determined by final judgment or settlement. That did not happen in this case until 2002. Thus, Travelers's own policies establish that the statute of limitations could neither have begun to run upon the date of denial, as Travelers contends, nor upon the preliminary Consent Agreement.

Not only do the facts take any life out of Travelers's motion, the legal arguments offered by Travelers are no stronger now than when Travelers presented them in support of its unsuccessful motion to dismiss. Even in the absence of the no-action clause, the statute of limitations in the environmental insurance context should not be deemed to run until the underlying action is over. The no-action clause puts this point beyond doubt in the context of this case. Further, many courts have recognized that strong public policy considerations require application of this approach to the statute-of-limitations issue. Travelers's attempt to backdoor a different result by creating a choice-of-law issue fails. Rhode Island law applies to this issue but the result is the same whether Rhode Island or, as Travelers contends, Massachusetts law applies.

The facts and the law simply do not support Travelers's motion. The statute began to run in 2002 when Charter's defense and the underlying action ended. This suit was filed well within the ten-year statute of limitations and in accordance with Travelers's own no-action clause. Accordingly, Charter respectfully requests that Travelers's motion be denied.

Alternatively, and in the event that there is any doubt about these issues, Charter respectfully requests certification of the issues presented by Travelers's motion to the Rhode Island Supreme Court.

## FACTUAL BACKGROUND

**I. Travelers's Comprehensive Liability Insurance Policies.**

Charter transported and stored petroleum products. It insured against liability arising from these activities through the purchase of broad, general liability policies. Over the years, it purchased at least twenty-one such policies from Travelers's predecessor, Aetna Casualty & Surety Company ("Travelers"). *See generally* Exhibits to Travelers's Affidavit of Howard E. Fitts ("Fitts Affidavit").

These policies covered Charter for liability it might incur because of "property damage" unless a specific exclusion applied. Charter contends that no exclusion is applicable in this case, and that the policies obligate Travelers to defend and indemnify Charter with respect to the underlying action described below.

The policies issued by Travelers contain the following or similar "no-action" provision:

> No action shall lie against the Company [Travelers] unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company.

*See* Affidavit of Robin Main ("Main Affidavit") ¶2, Exhibit A [Defendant's Response to Plaintiff's First Set of Requests for Admissions] (Travelers admitting that fourteen policies contain no-action clauses and that it has insufficient knowledge regarding eight policies); *see, e.g.*, Fitts Affidavit, Exhibit H [TCS 009934] (no-action clause).

Thus, through this clause, Travelers stated its expectation that no action could be brought against it until the amount of its insured's obligation had been determined either by final judgment or final settlement. Travelers cannot now credibly claim that the statute of limitations began to run before its policies provided that Charter could initiate an action against Travelers.

## II. The Underlying Regulatory Action Against Charter.

In a typical third-party liability dispute, the defense plays out on two stages—liability and damages. In the context of environmental statutes that impose strict liability on owners of contaminated property, however, that paradigm is reduced to only the second stage.[1] "Defense" in this statutory context of "status liability" means mitigating liability and the scope of remedial obligations through investigation, analysis, negotiations, and related dealings with the governmental authority and the pursuit of contribution from other potentially responsible parties. There is no liability defense; the action is all on the second stage and the question is the scope of the liability. Thus, the contested issues involve the methods and scope of soil and groundwater remediation, the impact of changing regulatory standards, and a host of other issues that arise as investigation and remediation move forward. These are the issues that determined the scope and amount of Charter's liability and nature of its defense.

In this context, Charter waged a vigorous defense right through the issuance of the Letter of Compliance in 2002, which marked the end of the action and released Charter from any further liability. Indeed, the 1992 Consent Agreement did not address or resolve most of the key issues that ultimately were addressed and resolved before Charter's release in 2002.

### A. The Former Charter Site.

The site at issue in this case is located on approximately 106 acres of land on Main Road north of Route 24 in Tiverton, Rhode Island. Initial development of the site occurred in the 1920s, with portions of the site being used by various Charter predecessors for petroleum storage and distribution. Prior site owners included Sinclair Oil, Pacific Oil, Northeast Petroleum, the

---

[1] The statutory scheme imposes liability on an owner regardless of whether that owner or one of its predecessors is responsible for the "conduct" that caused the contamination. Causation becomes irrelevant in this scheme.

Federal Government, Bay Oil, and Texaco Oil. By 1987, however, all such operations at the site ceased. During the period of remediation, the area surrounding the site consisted of a mix of residential and commercial uses. Main Street bordered the site to the east; the Sakonnet River and Mount Hope Bay to the west and north; and a residential development to the south. *See generally* Main Affidavit ¶3, Exhibit B [CIOC 17821-846].

Other notable features of the site included: a state-owned railroad line bisecting the property from north to south; inland wetlands on the property (several forming as a result of inactivity on the land and the removal of storage tanks while others being man-made by Charter as a result of additional remediation obligations imposed on it); and an on-site lagoon, "Big Louie," located on the Pacific Parcel. *Id*.

For purposes of the remediation, the site was divided into six parcels identified by their location or relationship to prior owners: Pacific Parcel, Northeast Parcel, Texaco Shore Area, Shore Area, Air Force Parcel, and Souza Road Parcel. *See id.*

**B. Charter's Pre-1992 Environmental Testing And Remediation, And Early Negotiations With RIDEM.**

In early 1985, RIDEM officials toured the site. Testing for certain chemicals ensued. *See* Main Affidavit ¶3, Exhibit C [CIOC 37141]. After some initial testing, Charter's consultant informed RIDEM that based on the nine soil samples taken from the Tiverton Tank Farm, there was no contamination at the site. *See* Main Affidavit ¶3, Exhibit D [CIOC 21693]. Upon RIDEM's review of those samples, however, the agency concluded otherwise—noting that one sample could be contaminated and requiring that the soil in that area be removed by February 14, 1986. *See* Main Affidavit ¶3, Exhibit E [CIOC 22156].

After further discussions with RIDEM, on December 18, 1985, RIDEM issued a coercive demand letter pursuant to its statutory authority under the Water Pollution Act, R.I. Gen. Laws

chapter 46-12, and the Oil Pollution Control Rules and Regulations. *See* Main Affidavit ¶3, Exhibit F [CIOC 21700-01]; Affidavit of John Ross ("Ross Affidavit") ¶2. This is how environmental enforcements actions are commenced under a statutory regime in which the governmental agency has the authority to make factual findings and impose requirements against a backdrop of virtual strict and joint and several liability for property damage as a result of contamination.[2] Concerned with possible groundwater pollution and the soil analyses provided to it, RIDEM required Charter to submit a plan for testing the site, including a "list of specific organic parameters to be tested including at least a Volatile Organic Scan for soil samples as well as water samples [and] the location of a representative number of groundwater monitoring wells including specifications for installation." *See* Main Affidavit ¶3, Exhibit F [CIOC 21700-01].

Charter retained counsel and environmental consultants to assist in the defense of the underlying action. Ross Affidavit ¶3. As noted above, "defense" in this context means mitigating liability and the scope of obligations through investigation, analysis, negotiations, and related dealings with the governmental authority and the pursuit of other, potentially responsible parties. This, of course, can be and was here a complex, long, and expensive process. *See, e.g.*, Ross Affidavit ¶¶6-10.

In this case, the consultants reviewed the data and began testing and field investigation. From 1986 through 1987, Charter and RIDEM discussed the parameters of the field testing and

---

[2] This is why a "potentially responsible party" letter or similar correspondence from an environmental agency is often considered the equivalent of a "suit," requiring a liability insurer to defend an insured that receives such a letter. *See, e.g., Indust. Park Water Co v. Nat'l Fire Ins. Co*., No. 98-4263, 2005 WL 372298, at *7 (R.I. Sup. Ct. Feb 9, 2005) (holding DEM letter that "clearly demanded that Industrial take necessary steps to remove the sand that had washed into the wetlands" triggered coverage); *Hazen Paper Co. v. U.S. Fidelity and Guar. Co*., 555 N.E.2d 576, 580 (Mass. 1990) (holding similar EPA PRP letter triggered coverage); *Hi-Mill Mfg. Co. v. Aetna Cas. & Sur. Co*., 98 F.3d 1341, 1996 WL 571140, at *4 (6th Cir. 1996) ("[P]laintiff received a PRP letter that Michigan law now makes clear constitutes a suit for purposes of triggering insurance coverage.").

Charter began testing of the site. This investigation revealed that portions of the site required remediation, and so Charter developed a proposed remediation protocol. Charter continued to negotiate with RIDEM and, eventually, on February 13, 1991, Charter submitted to RIDEM the "GZA Remedial Work Plan (Revision 2)," later incorporated into the 1992 Consent Agreement. *See* Main Affidavit ¶3, Exhibit B [CIOC 17821-846]. Importantly, and as discussed below (page 36 n.11), the Work Plan clearly recognized that it was a loose framework, subject to change.

The Work Plan provided for remediation in four phases in five years, to be completed by November 1995. Phase I concerned the removal of product from all storage tanks and piping (anticipated start date of August 1990, anticipated completion date of July 1991). Phase II concerned the identification of ground storage tanks suitable for relocation and reuse and the transportation of such tanks to other facilities (anticipated start date of August 1990, anticipated completion date of December 1991). Phase III concerned the removal of all remaining tanks, piping, building, and features, along with the excavation and disposal of underground storage tanks (anticipated start date of January 1991, anticipated completion date of December 1991). Phase IV concerned the site remediation plan (anticipated start date of November 1990, anticipated completion date of November 1995). *Id*. at CIOC 17833.

The remediation plan that Charter ultimately implemented and completed bore little resemblance to the remediation proposed by GZA in that Work Plan. In fact, as a result of numerous unresolved issues, unknown issues, changes in approach, newly discovered conditions, various ongoing disputes, and related issues, the remediation (Phase IV) was not complete until 2002, nearly seven years after the deadline contemplated by the original schedule. *See* Main Affidavit ¶3, Exhibit G [CIOC 16110-16204, at 16117-18]; Ross Affidavit ¶4. The reasons for this departure from the original Work Plan and schedule illustrate that the 1992 Consent

Agreement was not a final judgment and that Charter continued to defend this claim through 2002, with most of the important work occurring after 1992.

**C. Travelers's Involvement.**

Travelers was on notice of the underlying action and, for a time, investigated the issue and Charter's potential liability for property damage covered by its policies. In 1991, however, Travelers abandoned Charter just as Charter's need for defense and indemnity began to intensify. Charter went forward alone and defended this claim for the next eleven years while Travelers sat on the sideline, displaying no interest in that defense. *See* Ross Affidavit ¶3.

**D. The 1992 Consent Agreement Began A Long Process Of Negotiating With RIDEM And Remediating The Site.**

In March 1992, RIDEM and Charter entered into the Consent Agreement. *See* Main Affidavit ¶3, Exhibit H [CIOC 1-15]. The salient features of the Consent Agreement include:

- Adoption of the "GZA Remedial Work Plan (Revision 2)"
- Imposition of maximum levels for certain contaminants—TPH (soil; 50 mg/kg); BTEX (soil; 250 ug/kg); lead (soil; 250 mg/kg "or consistent with levels established by the Rhode Island Department of Health or the Hazardous Materials Section of DEM"); BTEX (water; 250 ug/l); TPH (water; 50 mg/l); VOC (water; 1 ppm)
- Requirement that Charter submit a Project Implementation Plan, which was loosely described and allowed RIDEM to include additional conditions at will
- Reservation by RIDEM of the right to adopt new environmental standards
- Reservation by RIDEM of the right to initiate any action against Charter for, among other things, conditions at the site constituting an immediate threat to public health or the environment
- Provision for issuance of a release by RIDEM upon completion of the remediation

The Consent Agreement did not mark the end of the underlying action. The scope and amount of Charter's "obligation to pay" at the site was not and could not be set forth in the Consent Agreement. As discussed below, this Consent Agreement "was part of a long process to

address the many issues at the Site"—in other words, it was merely a "flexible framework" to address the investigation and clean-up of the site. *See* Affidavit of Timothy O'Connor, P.E. ("O'Connor Affidavit) ¶4. Examples of the ongoing, post-Consent Agreement defense and activity are detailed below.

**E. The Ongoing, Post-1992 Disputes.**

1. Project Implementation Plan Disputes.

In October 1992, Charter's consultant submitted to RIDEM the Project Implementation Plan contemplated by the Consent Agreement ("Pre-Remedial Characterization Report (October 1992)"). In 1993, RIDEM sent a letter to Charter listing a series of purported "major deficiencies" in Charter's pre-remedial soil investigation. *See* Main Affidavit ¶3, Exhibit I [CIOC 220-22]. In response, Charter submitted a revised Project Implementation Plan ("Pre-Remedial Characterization Report, Addendum #1 (July 1993)"). In this document, Charter proposed certain additional and more aggressive testing—in particular, sampling soil at a greater depth and in additional locations. *Id.*; *see also* Main Affidavit ¶3, Exhibit J [CIOC 209-14].

In July 1993, Charter submitted to RIDEM another version of the Project Implementation Plan, this one focusing on remediation efforts ("Remedial Work-Plan, Revision 1 (NES), July 1993"). *See* Main Affidavit ¶3, Exhibit G [CIOC 16110-16204]. The Plan noted that Charter had applied for permits from the Army Corps of Engineers ("ACOE") and RIDEM division of wetlands to ascertain the boundaries and vegetation of wetlands—evincing an additional agency and division of RIDEM with which Charter had to deal (described in greater detail below). *Id.* at CIOC 16121. The Plan proposed that there should be no additional lead treatment, because existing regulations had established a higher permissible lead level. *Id.* at CIOC 16123-24.

In a November 27, 1993 letter, RIDEM expressed dissatisfaction with Charter's testing methods, requiring Charter to conduct additional sampling for BTEX contamination (BTEX refers to benzene, toluene, ethyl-benzene and xylene), which was identified in the Consent Agreement but was not being tested in certain locations. *See* Main Affidavit ¶3, Exhibit K [CIOC 487-88]. Additionally and importantly, the letter recognized the existence of new unforeseen contamination (A-farm dikes), imposed additional obligations on Charter (additional sampling at Souza Road), and hinted at completely altering the nature of the shore remediation (from in-situ to ex-situ excavation) provided that Charter was able to install a crossing over the railroad tracks. These changes and requirements were not set forth in either the original GZA Work Plan or the Consent Agreement.

2. <u>Ongoing Negotiation Regarding Changes To Remediation Requirements</u>.

The Consent Agreement called for remediation of TPH contamination to a level of 50 ppm. This was a difficult and costly standard to meet. Ross Affidavit ¶ 6. In August 1996, RIDEM passed new regulations that, as applied to the site, continued to alter the path of the remediation. *Id*; *see also* Ross Affidavit ¶6, Exhibit 4 (1996 regulations). Some standards under the new regulations applicable to the site become more onerous, while others became less so. Ross Affidavit ¶6; O'Connor Affidavit ¶7. Based in part on these new regulations, Charter negotiated major revisions to the cleanup standards contemplated by the original Consent Agreement. For example, the cleanup standard for total petroleum hydrocarbons was changed from 50 ppm to 1,000 ppm for certain upland parcels and 500 ppm for two shoreline parcels. O'Connor Affidavit ¶7. Moreover, without such renegotiation, Charter would have had to employ much more costly alternatives, such as enhanced on-site treatment or excavation with off-site disposal. Ross Affidavit ¶6. While the flexible Consent Agreement easily adopted the

new regulations, the application of those new regulations to the site proved difficult, requiring extensive negotiation with RIDEM and other agencies. *See* O'Connor Affidavit ¶¶7, 9, 10.[3] Negotiating a new standard and then altering remedial approaches to meet that new standard fundamentally altered the site clean-up. *See* Ross Affidavit ¶ 6.

The dispute over applicable standards under the revised regulations was also tied to disputes over the appropriate statistical approach in measuring compliance. *See* Ross Affidavit ¶ 6. In cleaning soil over this hundred-acre site, Charter and RIDEM had to establish compliance standards. *See id*. A number of disputed questions had to be resolved. For example, under the new compliance standards, which looked at the average of samples in an area, disputes arose over such questions as: what happens when one samples a ten-acre area and fifty samples are within the cleanup standard, but five are not? Resolution of questions like these was the subject of intense negotiations between Charter and RIDEM that continued into 2002. *See* Ross Affidavit ¶6 and Exhibit 7 thereto [Closure Report]; O'Connor Affidavit ¶7. Charter's defense of the underlying action included an insistence on proper application of an appropriate statistical sampling approach—actions that reduced its "damages" and the scope of the remedial actions. *See* Ross Affidavit ¶6.

---

[3] For instance, there were many negotiations with RIDEM over the use of the various new "Methods" under the Remediation Regulations—Methods 1, 2, and 3—for determining site cleanup. Instead of using the conservative-based, generic "look up tables" under Method 1 to determine cleanup levels, Charter worked closely with RIDEM to do a "Method 3" site-specific risk assessment on the RIDOT right of way that cut across the site, which is addressed in more detail below. Under this Method 3 assessment, Charter conducted a site-specific analysis of that area for assessing risk to human health and the environment so that an appropriate remedial objective for the right of way could then be determined. *See* Ross Affidavit ¶6 and Exhibit 7 to that affidavit [Closure Report].

3. Charter's 1993-97 Wetlands Work And Associated Regulatory Approvals From ACOE And RIDEM's Division Of Freshwater Wetlands.

Beginning in 1993, but continuing through late 1997, Charter dealt with significant wetlands issues as part of its defense and related remediation efforts. *See* Main Affidavit ¶3, Exhibit L [CIOC 29588-29590]. The removal of underground storage tanks created numerous depressions throughout the property. Some of these depressions gave rise to on-site wetlands areas. *See* Main Affidavit ¶3, Exhibit M [CIOC 29483-84]. Approximately five acres of these wetlands were determined to be contaminated and required remediation. Before the excavation of wetlands could proceed, however, Charter had to seek additional regulatory approval from ACOE and RIDEM's Division of Freshwater Wetlands. After extensive negotiations, both agencies approved Charter's proposed plan with respect to the remediation of wetlands but each imposed a number of conditions. For example, RIDEM required, among other conditions, the installation of erosion and sedimentation controls; the restoration of five acres of wetlands elsewhere on the site (including the construction of a 50-foot vegetative buffer around the restored areas); and the retention of a qualified environmental consultant to inspect the project site periodically and issue monthly progress reports. *See* Main Affidavit ¶3, Exhibit N [CIOC 29004-008]. Likewise, the ACOE permit was conditioned upon the creation of a wetlands area on the northern end of former tank location P-5 and the restoration of a salt marsh in the area identified as the sand flat in the shore area. *See* Main Affidavit ¶3, Exhibit O [CIOC 28983-85] and Exhibit P [CIOC 29237-250]. The 1992 Consent Agreement contains none of these conditions, but rather left these and many other issues for the parties to negotiate as the remediation moved forward.

In 1997, Charter applied for a renewal of the RIDEM permit regarding freshwater wetlands alterations and submitted a Proposed Freshwater Wetlands Mitigation Plan that was

subsequently approved by both RIDEM and ACOE, subject to additional conditions. *See* Main Affidavit ¶3, Exhibit Q [CIOC 48736-749]. For example, RIDEM required, among other things, that all replanted areas be covered with a minimum of four inches of loam; that the wetlands be monitored for a minimum of three years after completion; that Charter develop a plan to prevent the invasion of wetlands by undesirable, invasive vegetation; and that 15,000 cubic yards of "clean" soil being excavated from the proposed freshwater wetland area to be used as backfill for other areas be screened for TPH to ensure that the standards for the shore area is met. *See* Main Affidavit ¶3, Exhibit O [CIOC 28983-85]. ACOE conditioned its approval not only upon post-construction monitoring and annual reports for three years, but also upon proof that all plants used in the restoration came from climates similar to New England and were native to the Northeast United States. *See* Main Affidavit ¶3, Exhibit P [CIOC 29237-250].

Construction of the freshwater wetlands began in February 1998, and final grading was completed on April 10, 1998, with planting completed on May 8, 1998. Monitoring, reporting, and related corrective measures continued at least until the spring of 2001. *See* Main Affidavit ¶3, Exhibit R [CIOC 1200-14, at 1204]; Exhibit P [CIOC 29237-250].

4. The Railroad Right Of Way.

As noted above, a RIDOT, state-owned railroad right of way ran north and south through the site, dividing the shore areas from the other parcels. During remediation, it was discovered that the ground underneath the railroad line was contaminated. Ross Affidavit ¶10, Exhibit 7 [Closure Report]. In February 1997, Charter began to engage in substantive discussions with the Rhode Island Department of Transportation (RIDOT) concerning the railroad right-of-way. RIDOT agreed that it would accept an Environmental Land Use Restriction (ELUR), in lieu of

Charter remediating underneath the railroad, so long as Charter could obtain RIDEM's approval. *See id*. This would result in significant cost savings.

From 1998 through 2001, Charter negotiated with RIDEM regarding the railroad right-of-way issues. *Id*. To obtain permission from RIDEM to leave the contaminated soil in place, Charter performed a Method 3 Risk Assessment under the 1996 remediation regulations—a procedure that did not exist in Rhode Island in 1992. Charter eventually submitted at least three different comprehensive risk assessment plans to RIDEM. In June 2001, when Charter finally obtained the ELUR from RIDEM, RIDOT refused to sign. It was not until 2002, after significant negotiations with the State, that RIDOT agreed to the proposed ELUR. The parties recorded the ELUR on May 24, 2002. *See id.*; O'Connor Affidavit ¶12.

5. Certain Water-Related And Coastal Issues.

The remediation, as contemplated by the 1992 Consent Agreement, required Charter to seek approvals of various agencies and RIDEM departments. This was an ongoing and continuous process that was integral to addressing the property damage; it was far from routine. One example of this process involved various water-related and coastal issues.

In June 1997, Charter submitted to the Rhode Island Coastal Resource Management Council (CRMC) an application for assent modification to completely alter the previously contemplated remediation of the shore area. In-situ remediation was not working in light of the high TPH levels found in the soil; thus Charter, as required by RIDEM, proposed ex situ excavation to remove soil to the upper portion of the site for bioremediation—a change that represented a total redesign of the remediation effort near the shore, which implicated the need for a modified CRMC assent. *See* Main Affidavit ¶3, Exhibit S [CIOC 27766-774]; O'Connor Affidavit ¶9; Ross Affidavit ¶7. As a result, there were extensive negotiations among Charter,

RIDEM, and CRMC throughout the summer of 1997, ultimately resulting in a modified assent from CRMC and an Order of Approval from RIDEM. *See* Main Affidavit ¶3, Exhibit T [CIOC 580-83]; O'Connor Affidavit ¶ 10.

In December of 1998, CRMC approved the Salt Marsh Restoration Plan, which followed the ex situ remediation in the shore area. All of these plans and approvals required extensive preparation and negotiation. *See* Ross Affidavit ¶7. The grading and shoreline stabilization of the salt marsh restoration was completed during January 1999, and restoration plantings were installed in May 1999. From May through the end of 1999, CRMC and Charter had follow-up discussions and correspondence dealing with closure of the site. CRMC was concerned about such issues as the status of various other water-related applications; the lack of infiltration as a mechanism to manage stormwater, and the volume of groundwater being discharged via the closure plan design; the proposal to install a riprap swale on the railroad embankment; the use of a concrete box culvert to discharge stormwater on upland parcels; the ability of the site to support vegetation; and the expected flows of certain discharges. *See* Main Affidavit ¶3, Exhibit U [CIOC 7399-402]; Exhibit GG [CIOC 28018-20]. It was not until January 2000 that CRMC was satisfied with Charter's responses to these issues and considered a revised closure plan.

6. <u>1997 RIDEM Order Of Approval And Development Of RWAP</u>

The result of many of the above negotiations—much of which concerned the application of the 1996 regulations to the shore areas of the site—was Charter's development of a remedial action work plan (RAWP) to address contamination at the site. *See* O'Connor Affidavit ¶9. The development of the RAWP involved extensive negotiations with RIDEM and the submission of over a dozen documents to RIDEM between June 2, 1997 and October 15, 1997. *Id.* at ¶9 and attachment thereto. As stated above, during this same time period, Charter also had to obtain

additional approvals or extensions of permits from various state agencies, including the amended assent from CRMC. Finally, after many meetings and negotiations with RIDEM, RIDEM approved Charter's RAWP under a November 7, 1997 Order of Approval that explicitly amended the Consent Agreement. *See* O'Connor Affidavit ¶10. In the Order of Approval, RIDEM imposed new conditions on Charter including: implementing the remedy for the site as described in the 1997 RAWP for the excavation and bioremediation of contaminated soils; submitting a Fresh Water Wetlands Restoration/Replication Plan; and investigating additional contaminants in groundwater. *Id*. at ¶10 and attachment thereto.

7. Completion Of Remediation/Letter Of Compliance.

Charter submitted its Closure Report to RIDEM in June 2001. *See* Ross Affidavit ¶10, Exhibit 7 [Closure Report]. After that, Charter obtained and recorded ELUR's for certain areas of the site; the last ELUR—for the railroad right-of-way—was recorded on May 24, 2002 when the ELUR for the railroad was recorded. Six days later, on May 30, 2002, RIDEM issued its Letter of Compliance (LOC). The LOC detailed the key components and documents of the remediation. *See* Ross Affidavit ¶11, Exhibit 8 [LOC]. Furthermore, the LOC acknowledged that the site was in compliance with the 1992 Consent Agreement and the 1997 Order of Approval based on data that Charter provided to RIDEM in forty-one documents over the period from March 1992 to May 2002. *Id.* Once recorded, the LOC expressly operated as a release of all covenants and agreements set forth in the 1992 Consent Agreement. *Id.*; O'Connor Affidavit ¶ 13 ("RIDEM uses LOCs at the end of the process, much like resolving a lawsuit. . . .").

**F. Litigation Regarding Responsibility To Pay For The Cleanup (1993-1997).**

While Charter continued to defend against the underlying action through 2002 as detailed above, it also took additional steps to defend and mitigate the scope and amount of its liability.

As is typical in environmental actions, an important aspect of the defense is to try to compel other entities to share in the clean-up costs. Charter did this here. While Charter, as the most recent property owner, was the natural target for RIDEM, others used the property over the years and contributed to the contamination. Charter investigated these issues through counsel and its consultants and around 1993 filed a lawsuit against certain other potentially responsible parties seeking contribution for the amounts it was expending in defense and remediation costs. Charter litigated its contribution claims, and eventually settled them in 1997. *See* Ross Affidavit ¶ 9. This effort was a critical component of Charter's defense of the underlying action, and resulted in substantial reduction of the amount of Charter's liability for the clean-up.[4]

**STANDARD OF REVIEW**

This Court reviews a motion for summary judgment under the familiar standard of Rule 56—examining "the record evidence in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." *See Carlow v. Mruk*, 425 F. Supp. 2d 225, 231 (D.R.I. 2006) (all internals omitted). "When the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Id.* (all internals omitted). Furthermore, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial. If the evidence presented is subject to conflicting interpretations, or reasonable men might differ as to its significance, summary judgment is improper." *Id.*

---

[4] The settlement proceeds received by Charter will redound to the benefit of Travelers since the receipt of these funds lowers the claim against the Travelers policies. Clearly, however, the Consent Agreement did not, as suggested by Travelers, mark the end of the underlying action. As illustrated by the contribution litigation, the defense of that action continued in multiple facets well after 1992.

In the context of a summary judgment motion dealing with the statute of limitations, "if the statute of limitations depends on disputed facts, then summary judgment is inappropriate." *Wolf v. Preferred Risk Life Ins. Co.*, 728 F.2d 1304, 1306 (10th Cir. 1984).

## ARGUMENT

The statute-of-limitations issue, as framed by both the motion-to-dismiss papers as well as Travelers's summary judgment motion, can be distilled into two queries: (1) Does a cause of action for an environmental insurance coverage claim accrue upon final judgment or upon date of denial of the insured's claim? and (2) Is the 1992 Consent Agreement the equivalent of a final judgment?

Addressing these principal issues, Charter explains below:

- Why final judgment, rather than date of denial, must be the accrual trigger, as a matter of predicting Rhode Island law, as a matter of public policy, and in light of the no-action clause in the policies at issue;
- Why the Consent Agreement was not a final judgment, and, relatedly, why the Letter of Compliance operated as a final judgment in this case; and
- Why Travelers's choice-of-law argument is both wrong and irrelevant to the above issues.

### I. While A Matter Of First Impression, Rhode Island Courts Would Clearly Hold That The Limitations Period For A Third-Party Environmental Insurance Claim Begins To Run Upon Final Judgment.

#### A. Analogous Rhode Island Case Law Compels The Conclusion That The Limitations Period Commences After Final Judgment, Not Date Of Denial.

The Rhode Island courts have not specifically addressed when the statute of limitations begins to run for a breach-of-contract action in the insurance context, and more particularly, in the environmental insurance context. The majority of courts that have considered the issue, however, have held that in actions alleging breach of the duties to indemnify and defend, the statute of limitations commences only when liability is fixed by a final judgment or settlement.

*See* Allan D. Windt, 2 Insurance Claims and Disputes 4th § 9:2 (2007) (noting that an " insured's cause of action for the carrier's breach of its duty to indemnify will accrue on the entry of a judgment against the insured or the entering into of a settlement agreement" and that the "majority view [] is that the insured's cause of action [for breach of the duty to defend] does not accrue until the termination of the third-party action brought against the insured"); *see, e.g., Dutton-Lainson Co. v. Continental Ins. Co*., 716 N.W. 2d. 87, 100-02 (Neb. 2006) (adopting "clear majority view" that duty-to-defend claim accrues at final judgment and indemnity claim at final payment by policyholder in underlying action);[5] *John Beaudette, Inc. v. Sentry Ins. A Mutual Co*., 94 F. Supp. 2d 77, 103 (D. Mass. 1999) (holding that limitations period for duty-to-indemnify claim accrues upon "issuance of a judgment, settlement or final resolution wherein the insured becomes legally obligated to pay damages"); *Oliver B. Cannon & Son, Inc. v. Fidelity & Casualty Co. of N.Y.*, 484 F. Supp. 1375, 1389-90 (D. Del. 1980) (finding indemnity claim accrues when "liability becomes fixed . . . upon the entry of a final judgment" and defense claim accrues "only when full damages can be determined and recovered"); *Luppino v. Vigilant Ins. Co*., 677 A.2d 617, 619, 622 (Md. Ct. App. 1996) (finding breaches of both duties accrue when liability becomes fixed and all damages ascertainable); *Eaton Hydraulics Inc. v. Continental Casualty Co*., 132 Cal. App. 4th 966, 973 (Cal. Ct. App. 2005) (holding limitations period for

[5] Travelers, as in its earlier filings, insists on mischaracterizing *Dutton* as holding that a cause of action accrues from the date of an environmental consent agreement. Travelers Br. at 29. To the contrary, the *Dutton* court found that a "cause of action accrues and the statute of limitations begins to run not at the time of the underlying act causing the damage, but when the would-be indemnitee pays the judgment arising from underlying loss or damage"—in other words, at the date when all damages are fixed and paid. *See Dutton*, 716 N.W. 2d. at 100. The court in *Dutton* merely used the date of the consent agreement as the best-case scenario for the insured, finding that "[a]t the earliest," the cause of action accrued on the date of the consent agreement, thereby making the complaint timely. *Id*. Whether the consent agreement actually was the limitations trigger was neither an issue before nor decided by the court, because the complaint would have, *at a minimum*, been timely if triggered at that time. *Id*.

duty-to-defend claim accrues upon insurer's refusal to defend, but is tolled until final judgment in the underlying action); *Moffat v. Metropolitan Cas. Ins. Co. of New York*, 238 F. Supp. 165, 175 (M.D. Pa. 1964) (holding that "reason and common sense" compel that limitations period for duty-to-defend claim accrues only when the "right of action is complete" after final judgment); *Kielb v. Couch*, 374 A.2d 79, 81-83 (N.J. Super Ct. 1977) (citing numerous policy reasons and no-action clause and holding that indemnification claim accrues only upon final judgment).

If there is any doubt about whether this rule should apply in this case, it is resolved by the no-action clause that Travelers included in the policies it issued to Charter. Travelers is in no position to argue that this Court should adopt the minority view when its own policy language specifies that Travelers itself would regard any action filed before the amount of Charter's obligation to pay is finally determined to be premature. *See Kielb*, 374 A.2d 79, 82 (N.J. Super Ct. 1977) (finding one purpose of no-action clause "is to Prevent suit against the insurer by the insured until the damages have been ascertained by final judgment in a third-party proceeding.").

This Court's task is to predict whether Rhode Island would align itself with the majority view or, as Travelers urges, place itself as an outlier jurisdiction on this issue. Analogous Rhode Island cases show that Rhode Island would, in fact, adopt the majority view—even in the absence of the no-action clause in the policies at issue. Under Rhode Island law, an action seeking indemnity accrues upon final judgment or settlement of the underlying claim. *See, e.g., Pardee v. Consumer Portfolio Services, Inc.*, 344 F. Supp. 2d 823 (D.R.I. 2004) ("In Rhode Island, the general rule regarding indemnity is that no claim arises as such until the indemnitee's liability is fixed either by entry of judgment holding the indemnitee liable or by the settlement of the underlying claim by the indemnitee on the belief that he is liable."); *A & B Constr. v. Atlas Roofing & Skylight Co.*, 867 F. Supp. 100, 113 (D.R.I. 1994) (holding that indemnity arises

where one party has been compelled by reason of some legal obligation to pay damages); *Muldowney v. Weatherking Prods.,* 509 A.2d 441, 443 (R.I. 1986) (holding that a necessary element of indemnity claim is that the party seeking indemnity must be liable to a third party). It would make little sense for Rhode Island to adopt one accrual point for ordinary contractual indemnity claims and a different one for indemnity claims arising from environmental insurance contract disputes. The same policy issues and practical concerns arise in both contexts, and lead to the same conclusion: It is not prudent to require an insured or indemnitee to file an action before the underlying claim is resolved. *See, e.g., Moffat*, 238 F. Supp. at 175 (recognizing goals of judicial efficiency and referring to contrary accrual point as "absurd").

**B. The Authority Proffered By Travelers Is Inapposite.**

Instead of directly addressing the above Rhode Island precedents, Travelers elects to resurrect the inapposite cases it cited in its opening motion. Travelers cites two Rhode Island cases for the proposition that the limitations period runs from the "date of loss." Travelers Br. at 22 n.14 (citing *Hay v. Pawtucket Mut. Ins. Co*., 824 A.2d 458 (R.I. 2003) and *DiIorio v. Abington Mut. Fire. Ins. Co*., 402 A.2d 745 (R.I. 1979)). Those cases, however, dealt with the statutory suit-limitation requirement unique to the standard form fire insurance policies. *See* R.I. Gen. Laws § 27-5-3; *see also DiIorio*, 402 A.2d at 747. That specific suit-limitation provision expressly states that a suit must be brought within twelve months "after inception of the loss." R.I. Gen. Laws § 27-5-3. The general ten-year limitations statute, which is undisputedly the only limitations statute governing this case, has no similar language marking the accrual date as the inception of the loss.

Travelers also cites two Rhode Island federal district court decisions—including one by this Court—that are both inapposite and telling. Travelers Br. at 23-24 (citing *Adams v. Town of Burrillville*, 249 F. Supp. 2d 151 (D.R.I. 2003) (Smith, J.) and *Gail Frances, Inc. v. Alaska Diesel Elec., Inc.*, 62 F. Supp. 2d 511, 515 (D.R.I. 1999)). According to Travelers, *Gail Frances* holds that a cause of action for breach of contract accrues at the breach even when damages occur later. While this might be true for certain contractual breaches, it is not true for third-party contractual claims seeking indemnification, as *Gail Frances* itself illustrates. The court in *Gail Frances* relied heavily on *United States v. Skidmore, Owings & Merrill,* 505 F. Supp. 1101 (S.D.N.Y. 1981) ("*Skidmore*"), to reach its holding—and in *Skidmore*, the court recognized that while the government's ordinary breach-of-contract claims were time-barred, its contractual indemnity claim was not, as a claim seeking indemnification accrues upon final judgment fixing liability—the same position Charter advocates and Rhode Island courts have adopted. *Skidmore*, 505 F. Supp. at 1106-07 (holding "Government's third cause of action, based on the indemnity provision in the contract, is thus timely made" because a "cause of action for indemnity does not arise until the party seeking indemnification suffers a loss, [which] occurs when the indemnitee's liability is fixed by a judgment against it or payment by it" (all internals omitted)).

*Adams*—a decision by this Court—concerned tort claims, not an ordinary contract claim. And the plaintiff there sought to bootstrap those tort claims into the statute of limitations, arguing for an unprincipled expansion of the "continuing violation" doctrine, which this Court correctly declined to adopt, as the plaintiffs' position there would have rendered any tort subject to an unlimited limitations period. *Adams*, 249 F. Supp. at 155. Because "'[c]ontinuing violation' jurisprudence is drawn from tort law," the analysis in *Adams* makes little sense outside of the tort context. *See Dziura v. United States*, 168 F.3d 581, 583 (1st Cir. 1999); *see also Dutton-Lainson*

*Co.*, 716 N.W. 2d. at 100 (rejecting insurer's focus on "continuing duty cases," finding them inapposite and duty-to-defend claim unique). But even if that analysis were to apply to an insurance contract, it certainly would not apply to a third-party insurance claim. Unlike *Adams*, Charter's losses do not emanate from Travelers's denial of coverage, but instead from the remediation liabilities imposed on it by RIDEM, which Charter defended through 2002.

That is why third-party situations, like claims for indemnification, are treated differently than first-party insurance or ordinary breach-of-contract claims. *See Port Authority of New York and New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233-34 (3d Cir. 2002) (holding that "the time-honored distinction between the two types of insurance coverage is valid and should be maintained" and that third-party claims are different because "first-party matters are generally determined by reliance on traditional contract principles"). In a case like the present one, the harm is tied to and derived from third parties (RIDEM and the public), not the insurer.

**C. Travelers Confuses First-Policy Coverage With Third-Party Coverage.**

In this regard, one of Travelers's most significant misapprehensions is confusing third-party and first-party insurance cases in advancing its date-of-denial position. "In first party insurance, the contract between the insurer and the insured is designed to indemnify the insured for a loss suffered directly by the insured. In contrast, liability insurance is described as third-party insurance because the interests protected by the contract are ultimately those of third-parties injured by the insured's conduct." Zuckerman & Raskoff, 1 Envtl. Ins. Litig.: L. and Prac. § 2:2 (2006). The difference between the two types of insurance is significant for statute-of-limitations purposes for at least three reasons.

***First***, because third-party policies affect the public in the insurance context, public policy considerations are a factor in how they are interpreted—a reason why the Rhode Island Supreme Court interpreted the pollution exclusion as it did in *Textron*. *See Port Authority of New York and New Jersey*, 311 F.3d at 233. In this case, the interest in ensuring that companies have an incentive to promptly remediate polluted property in vindication of the public interest is a "strong factor" in finding that the limitations period accrued upon final judgment. *Id*.

***Second***, the nature of the harm is typically more finite in a first-party setting than in the third-party one, demonstrating that an earlier accrual date in the latter situation is unworkable. That is, date of denial as a limitations trigger may arguably make sense for a first-party policy in certain contexts, because the typical covered losses, like fire or theft, are: (i) readily apparent, (ii) of limited duration, (iii) which begin and end at identifiable points in time, (iv) resulting in obvious damage, *e.g*., total destruction of a building, (v) to obviously covered property, *e.g*., a house, and (vi) easily repaired, *e.g*., rebuild. Thus, upon loss or date of denial, the insured generally has incurred its full loss and the insurer can take immediate steps to make the insured whole again—which is why many first-party suit-limitation statutes or policy provisions trigger accrual upon inception of the loss.

On the other hand, a third-party claim involves alleged harm (often disputed) to third parties outside of the policyholder's control, and thus liability and damages may not be incurred or determined, let alone fixed, until the underlying action is finally settled. Allan D. Windt, 1 Insurance Claims and Disputes 4th § 6:5 (2007) (noting differences between first and third-party insurance and acknowledging that third-party claim does not accrue until final judgment or payment); Zuckerman & Raskoff, 1 Envtl. Ins. Litig.: L. and Prac. § 2:2 (2006) (noting difference between first and third-party insurance and acknowledging that third-party liability

insurers "only pay the claim after a settlement is reached between the claimant or when the insured is found liable by means of a judgment"). While there is typically no "defense" obligation in a first-party claim, a defense is often the most critical aspect of a third-party claim and creates a continuing duty on the part of the insurer. Third-party *environmental* claims are even more uncertain given that such environmental losses often involve: (i) progressive damage spanning more than one policy period; (ii) damage that often goes undetected for years; (iii) damage to soil and groundwater as opposed to damage to a discrete building or piece of equipment; (iv) a remediation process, as in this case, that takes years, if not decades, to accomplish; and (v) consequently, the inability to assess final costs associated with the loss until many years after the loss is first discovered. This case is a prime example of the uncertainty involved in third-party environmental claims and why the limitations period must run only when liability is fixed by judgment or settlement. *See also* Ross Affidavit ¶ 11 (remediation remained "uncertain and subject to change" until Letter of Compliance).

***Third***, a first-party claim pits the insurer and insured against each other, whereas in the third-party setting, theoretically, the insurer and insured are allies. *See Port Authority of New York and New Jersey*, 311 F.3d at 233. This is important because, as adversaries, it makes sense to tie the limitations trigger to actions of the parties, such as inception of the loss or denial of the claim. But as allies, the actions of the insured and insurer matter much less than that of the underlying claimant, such as RIDEM in this case. Thus, tying accrual to the underlying action, such as issuance of the Letter of Compliance here, is more sensible than an accrual of the date of denial, which discounts the third-party nature of the claim altogether.

For these, as well as other, important distinctions between the two types of insurance, Traveler's reliance on first-party insurance cases and ordinary contract cases is misguided and should carry no weight in discerning the limitations law applicable to the policies here.

**D. Public Policy Considerations, Grounded In Rhode Island Law, Also Support A Limitations Accrual Point Of Final Judgment.**

Rhode Island courts consider public policy in fashioning rules of law in the environmental insurance context. For example, in *Textron, Inc. v. Aetna Cas. and Sur. Co*., 754 A.2d 742 (R.I. 2000), the Rhode Island Supreme Court interpreted a pollution-exclusion clause in order to further "sound public policy" of encouraging environmental remediation. In that case, the court held that the term "sudden" in the pollution-exclusion clause should be interpreted as meaning "unexpected," because such an interpretation would "reward[] manufacturers with coverage if they undertake a good-faith effort to dispose of contaminants safely yet suffer an unexpected discharge despite these efforts, thus providing them with an incentive to arrange for the disposal of toxic waste with great care." *Id*. at 754. Taking into account the public policy issues at stake here, fixing the accrual date at final judgment rather than date of denial furthers several important policy goals.

***First***, Rhode Island—as a matter of public policy—prefers rules that encourage parties to promptly clean-up contaminated sites in the state. Travelers's proposed rule triggering the statute of limitations upon denial of the claim would frustrate the *Textron* court's goal by discouraging corporations, like Charter, from promptly remediating its property in a cooperative resolution of the government's claims. A policyholder faced with a two-front war of litigating with its insurer and negotiating with RIDEM, might prioritize resolving its insurance coverage dispute over productive early discussions with RIDEM and active remediation of the property.

The earlier accrual date advanced by Travelers would only "encourage or reward recalcitrance on the part of liable parties," thereby frustrating the public policy expressly endorsed by the Rhode Island Supreme Court in *Textron*. *See Hays v. Mobil Oil. Corp*., 736 F. Supp. 387, 397 (D. Mass. 1990) (rejecting date of discovery as accrual date and finding date of DEM release letter as triggering statute of limitations, since "barring plaintiff's action. . . because he freely complied with DEQE's requests, but did not sue until receiving a final release letter, would punish the plaintiff for his voluntary cooperation and frustrate the statute's purpose 'to compel the prompt and efficient cleanup of hazardous material'"), *partially reversed on other grounds by Hays v. Mobil Oil. Corp*., 930 F.2d 96 (1st Cir. 1991)[6]; *see also* R.I. Gen. Laws § 23-19.14-2 (one of the express statutory purposes behind the Rhode Island Industrial Property Remediation and Refuse Act is to assure that "cooperative clean-up actions are encouraged to the greatest extent possible").[7]

***Second***, in many cases, it may be simply cost-prohibitive for an insured to pursue both litigations at once, effectively rendering the broad insurance protection it purchased worthless.

---

[6] Travelers misleadingly cites the district court decision in *Hays* as being overruled by the First Circuit on the limitations issue. Travelers Br. at 21. Not so—the First Circuit remanded due to confusion as to what costs (tank-removal costs or clean-up costs) were subsumed in the district court's analysis. The First Circuit expressed no opinion on the district court's marking of the accrual date as the date of the release letter. *See Hays*, 930 F.2d at 103 n. 13. The Letter of Compliance here was the equivalent of the release letter in *Hays*.

[7] In addition, the "stabilization doctrine," first announced by the U.S. Supreme Court in *United States v. Dickinson* provides support that a gradual environmental cause of action cannot accrue until the environmental conditions have stabilized to a point where "a final account may be struck." *United States v. Dickinson*, 331 U.S. 745, 749 (1947); *Palazzolo v. Coastal Res. Management Council of R.I.*, No. WC NO. 88-297, 1988 WL 1017232, at *3 (R.I. Super. Ct. Oct. 31, 1988) (applying *Dickinson* and denying motion to dismiss on limitations grounds); *NW La. Fish & Game Preserve Comm'n v. United States*, 446 F.3d 1285, 1290-91 (Fed. Cir. 2006) (same). The environmental conditions here did not reach full stabilization until issuance of the Letter of Compliance in 2002, which released Charter from further clean-up obligations.

The action against the insurer would involve coverage for defense costs and possible indemnity payments that would be uncertain in amount and ongoing, thus, among other things, making any meaningful cost-benefit analysis as to whether to pursue or settle the coverage action virtually impossible. For example, here, Charter envisioned early on in the remediation process that it would likely incur approximately $3 million in remediation costs. *See* Main Affidavit ¶3, Exhibit V [CIOC 79911]. By the end of the remediation, however, the actual costs incurred were many times that total. *See* Main Affidavit ¶3, Exhibit W [CIOC 52115]. Charter's 1992 assessment of whether it should pursue a coverage action would necessarily have been based on woefully incomplete (and perhaps incorrect) information. Public policy does not support a rule of law that would require such action.

***Third***, if a two-front war is required, insurers may well, as they almost always do, raise defenses in the coverage action (for example, a defense based on the alleged intentional nature of releases) that could be harmful to insureds in the underlying environmental actions. Policyholders buy liability insurance to protect against liability, not to compound it. Yet requiring a coverage suit while the underlying action is pending would risk exactly that. In *Aetna Casualty & Surety Co. v. Kelly*, 889 F. Supp. 535, 541-42 (D.R.I. 1995), the court recognized this conflict-of-interest dilemma. There, the court stayed a declaratory action by the insurer seeking a declaration that it had no obligation to defend or indemnify defendants in an underlying tort action. The court reasoned that since the insurer would essentially be "taking action that makes a policy holder liable for such claims, an insurer would subvert the purpose of the policy and violate one of the most fundamental duties it owes to its insured" if allowed to proceed with the declaratory action. *Id*. at 541-42.

***Fourth***, courts have adopted the date of final judgment or settlement as the accrual date as a matter of common sense and judicial efficiency. That is, if a policyholder had to pursue damages from an insurer before liability became fixed in the underlying action, the policyholder could end up recovering first from the insurer in the coverage action, but potentially not paying anything in the underlying action or paying less than the amount recovered in the contract action against the insurer.[8] *See Oliver B. Cannon and Son, Inc.*, 484 F. Supp. at 1389 ("If the defendant's position were adopted, [the policyholder] might have recovered for damages, for 'liability,' which it ultimately did not have to pay."). Recognizing this potential dilemma, the court in *Pardee*, relying on Rhode Island's indemnity rules as described above (*see* page 20-21), granted a motion to stay an indemnification action for legal costs incurred in pending underlying actions until completion of the underlying actions. *Pardee*, 344 F. Supp. 2d at 836. The court reasoned that "the final amount, if any, of the indemnification is almost certain to be unknown until the. . . [underlying] cases are concluded." *Id.* at 837.

***Finally***, using the conclusion of the underlying action as the limitations trigger affords an insurer the flexibility to change its mind or to react to new developments in an underlying action—in other words, giving it the option of easily rescinding an earlier (perhaps wrongful) denial of coverage. *See John Beaudette, Inc.*, 94 F. Supp. 2d at 103 ("Moreover, up until entry of a judgment, settlement or final resolution against the insured, the insurer may rescind an

[8] The alternative—a series of declaratory judgment actions to recover costs as they accrue—wastes judicial and private resources and is, as such, heavily disfavored. *See Kielb*, 374 A.2d at 81 ("Although plaintiff could have started an action against defendant prior to the completion of the third-party litigation for the then accrued costs, such a procedure would have resulted in piecemeal litigation and a multiplicity of suits, both of which are looked upon with disfavor in the law."); *Moffat*, 238 F. Supp. at 175 (finding earlier accrual point pre-final judgment to be "absurd" and "lead[ing] to the multiplicity of suits, long in disfavor in law").

earlier denial of coverage and agree to pay the judgment."). The elimination of this flexibility is contrary to sound public policy—it would create an incentive for an insurer to stand by an early denial of coverage no matter what happens in the underlying action in hopes that the statute of limitations may moot any earlier mistake and prevent any realistic exposure on a valid claim.

In light of these policy considerations, Travelers's suggestion of a declaratory judgment action rings hollow. *See* Travelers Br. at 26 n.15. As an initial matter, merely because a policyholder *may* be able to file a declaratory judgment action does not mean that it *must* file one. *See* Wright & Miller, 10B Fed. Prac. & Proc. Civ.3d § 2751 (declaratory judgment designed to pursue action *before* action accrues); *Kielb*, 374 A.2d at 81. Requiring an insured to seek declaratory relief before the amount of liability is finally determined would undermine every single one of the policy considerations listed above.

Against Charter's compelling policy considerations, Travelers advances only one countervailing consideration—staleness.[9] While staleness might be a concern in some cases, it is not as serious an issue in contract cases, where the terms of the contracts, as applied to the well-documented underlying action, control. *Kielb*, 374 A.2d at 82-83 (rejecting date-of-denial trigger and staleness argument, because staleness concerns "are always present and have no relationship to the lapse of time between an event and the commencement of a law suit concerning the event[;] such factors should not be controlling in the present case in view of the

[9] Contrary to Travelers's contention (Br. at 31-32), avoidance of stale claims is not a rigid and unyielding principle under Rhode Island law. The Rhode Island Supreme Court has recognized that the avoidance of stale claims is a policy that must yield to other important interests, particularly public ones. *See Wilkinson v. Harrington*, 104 R.I. 224, 243 A.2d 745, 752-53 (R.I. 1968) (endorsing discovery rule in medical malpractice cases and finding protection of public interest as trumping staleness concern, while acknowledging that "[t]o require a man to seek a remedy before he knows of his rights, is palpably unjust").

factual and legal issues involved."). This is likely why the Rhode Island legislature enacted a lengthy ten-year limitations period for contract claims. Further, Travelers's belief that it will be prejudiced by the delay in Charter's clean-up is disingenuous—discovery has revealed that the entire remediation process was well-documented, allowing Travelers to raise the same defenses it could have raised before. *See* Ross Affidavit ¶ 12 (remediation was well-documented). And finally, Travelers could have filed a declaratory judgment action if it had any genuine concern regarding "staleness." Travelers ran from this claim; the Court should not reward such conduct.

**E. The Insurance Policies' "No-Action" Clause Forecloses Any Argument By Travelers That Charter's Claim Accrued Before Final Judgment.**

Travelers's own carefully crafted insurance contracts defeat its claim that the law required Charter to file this coverage case before the underlying claim was resolved in 2002. Indeed, the policies purport to expressly prohibit such an action, and certainly reflect Travelers's intent that any cause of action by the insured could only accrue when the amount of the insured's liability had been finally determined by final judgment or settlement. At least fourteen of the policies in this case contain no-action clauses, which state or substantially state:

> No action shall lie against the Company [Travelers] unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company.

*See* Main Affidavit ¶2, Exhibit A [Defendant's Response to Plaintiff's First Set of Requests for Admissions] (Travelers admitting that fourteen policies contain no-action clauses and that it has insufficient knowledge regarding eight policies). In the face of this clear language, the Court should summarily dismiss Travelers's contradictory and self-serving claim that Charter was required to ignore this provision and file before the "amount" of its obligation to pay was finally

determined.[10] Indeed, the no-action clause's purported prohibition of any claim until the "amount" of liability is finally determined underscores that claims are not resolved until liability and damages are determined. Thus, Travelers cannot now claim that Charter's complaint was too late when its policy makes clear that Travelers itself considers that no cause of action accrued under these facts until 2002. Further, it cannot claim that it is "prejudiced" by a filing in accordance with its own policy language.

Before a cause of action accrues, all conditions precedent to sue must be satisfied. *See DiBattista v. Butera*, 244 A.2d 857, 859 (R.I. 1968) (noting that "the demand being an integral part of a cause of action, or a condition precedent to the right to sue, the statute does not begin to run until a demand is made"). In light of the no-action clause—a contractual condition precedent—Travelers cannot contend that Charter's cause of action accrued before final judgment. *See Gilbert v. Am. Cas. Co. of Reading, Pa.*, 219 So. 2d 84, 86 (Fla. Ct. App. 1969) (holding that cause of action did not accrue until final judgment in light of no-action clause); *Crest-Foam Corp. v. Aetna Ins. Co*., 727 A.2d 1030, 1035-36 (N.J. App. Div. 1999) (rejecting insurer's statute-of-limitation defense based on no-action clause); *Kielb*, 374 A.2d at 82 (rejecting date-of-denial accrual point and holding that no-action clause "operate[s] as a condition precedent to an action seeking reimbursement of defense costs," thereby foreclosing insurer's statute-of-limitations defense).

To the extent that Travelers insists on pressing its statute-of-limitations claim, it should be estopped. *See, e.g., UTI Corp. v. Fireman's Fund Ins. Co*., 896 F. Supp. 362, 369 (D.N.J. 1995) (denying insurers' motion for summary judgment on limitations ground and holding that,

[10] An action filed by Charter in 1992 would have surely been met with a motion to dismiss based on this same no-action clause.

in light of no-action clause, "the defendants should not be permitted to argue, at least with regard to the breach of contract claim, that the statute of limitations began running at any earlier time"). Travelers may well have raised the no-action clause as a defense had Charter brought its claim before issuance of the 2002 letter of compliance; Travelers should not be allowed to now disavow the clause because it no longer suits its interests.

Indeed, the fact that the policies here have no-action clauses effectively renders every single one of Travelers's limitations cases inapposite. For instance, cases such as *Gail Frances* and *Adams* under Rhode Island law (*see* pages 22-23 above) and *Travelers* and *Lumbermens* under Massachusetts law (*see* pages 50-51 below) clearly do not concern contracts containing similar suit- limitation provisions—which would have dramatically altered the analysis in those cases. *See, e.g., Ervin v. Sears, Roebuck and Co*., 469 N.E.2d 243, 250-51 (Ill. Ct. App. 1984) (holding that, because of no-action clause, cause of action did not accrue until "Sears expended its final attorney fees and costs in connection with the Ervin suit" and distinguishing limitations case citing same rule as that in *Gail Frances*).

Moreover, the no-action clause undercuts Travelers's claim that it was left in the dark for fourteen years while Charter was undertaking its extensive clean-up action. Travelers Br. at 1. The no-action clause should have put Travelers on notice to monitor the course of the remediation up through final judgment. And it appears from Travelers's document production, which contained remediation-related documents, that it did monitor Charter's remediation efforts. *See, e.g*., Main Affidavit ¶3, Exhibit X [TCS 010610-682 (February, 1996 Draft Site Ownership and Operation History Report for Tiverton Air Force petroleum station, prepared for U.S. Army Corps of Engineers)]; Exhibit Y [TCS 010702-705 (1993 Assent between CRMC and Charter allowing construction and maintenance of long term biological site remediation

project)]; Exhibit Z [TCS 010708-709 (October, 1993 letter from RIDEM to Army Corps of Engineers regarding Charter bioremediation project)]; Exhibit AA [TCS 010710-715 (August, 1993 correspondence from RIDEM to Charter regarding wetlands permit)]; Exhibit BB [TCS 010534-536 (September, 1993 letter from Kenneth Reich to U.S Air Force)]; Exhibit CC [TCS 010537-546 (October, 1993 Air Force summary document regarding Tiverton site)]; Exhibit DD [TCS 010594-609 (ACOE Report from June 1995)]. Having deliberately chosen to abandon its insured, Travelers should not be heard to complain that the insured then failed to keep it informed when both the facts and the no-action clause in the policies belie such a grievance.

## II. The 2002 Letter Of Compliance, Not The Consent Agreement, Operated As The Final Judgment And Commenced The Limitations Period.

### A. The Terms Of The Consent Agreement Evince That It Was Not A Case-Terminating Document.

The terms of the Consent Agreement and the subsequent proceedings establish that that agreement operated as a loose framework analogous to an agreed case management order, framing the issues and identifying various targets. It was neither intended to nor operated as a final judgment. Charter continued to vigorously defend this claim through 2002 in an attempt to mitigate liability. In fact, most of the disputes in the underlying action were addressed and resolved well after 1992.

The case law recognizes that Consent Agreements are not final judgments if, in fact, they are not intended as such and do not operate as such. *See Fed. Ins. Co. v. Purex Indus, Inc.*, 972 F. Supp. 872 (D.N.J. 1997). In *Purex*, the court held that an administrative consent order (ACO) between the environmental agency and insured did not finally fix liability. Even though the insured in that case, pursuant to the ACO, had “submitted a cleanup plan and begun remediation under the plan,” the court refused to use the ACO as the limitations trigger because the ACO was

still subject to modification, and the agency could still sue the insured under a number of environmental statutes. *Id*. at 880. Thus, it was important to the court in *Purex* that the ACO still allowed the environmental agency to modify the clean-up plan and bring suit under a number of environmental statutes, and that not all contamination was confirmed when the parties executed the ACO. *See id.*

As in *Purex*, the Consent Agreement here gave RIDEM the right to initiate any action against Charter for, among other things, conditions at the site constituting an immediate threat to public health or the environment—a feature that is clearly inconsistent with a final resolution. *See* Main Affidavit ¶3, Exhibit H [Consent Agreement (Remediation ¶16)]. The agreement also expressly refused to relieve Charter of its obligation to comply with other RIDEM rules that may not have been covered by the agreement. *See* Consent Agreement (Remediation ¶13). Contamination was not fully confirmed upon execution of the agreement, as evidenced by Exhibit B to the agreement, which referred to the GZA Work Plan, and noted that part of the immediate remediation would be "detailed field screening of the shore area" and "bench or laboratory scale bio-degradation evaluations." *See* Consent Agreement (Exhibit B, ¶1(b)); *see also* Ross Affidavit ¶5. Similarly, Exhibit B specified that RIDEM had the authority to modify the terms and conditions of the clean-up plan if dissatisfied. *See* Consent Agreement (Exhibit B, ¶2(b)).

In addition to these *Purex*-based factors, the Consent Agreement contained other features evincing that it was no more than a loose framework that commenced the remediation:

- The Consent Agreement was "in lieu of issuing a Notice of Violation." A Notice of Violation is tantamount to a complaint or a case-initiating document. Thus, since the Consent Agreement was, according to its terms, the functional equivalent of a notice of violation, it too was, at most, a case-initiating, rather than

case-ending, document. *See* Consent Agreement (Findings of Fact, "Accordingly" Paragraph).

- The Consent Agreement expressly adopted the GZA Work Plan. The GZA Work Plan, by its own terms was a flexible document.[11] Thus, to the extent that the Work Plan was a broad, malleable outline, so too was the Consent Agreement. *See* Consent Agreement (Remediation ¶5). In fact, the GZA Work Plan was substantially modified, if not abandoned, in subsequent years.

- The Consent Agreement allowed for a flexible approval process if off-site contamination related to the remediation was discovered. *See* Consent Agreement (Remediation ¶7). And it was subsequently discovered under the RIDOT railroad right of way and the A-farm dikes, as well as other places. *See* pages 10, 13-14 above.

- The agreement provided for issuance of a release upon completion of the remediation, which would void the consent agreement. Thus, and as explained below, the release operated as a final judgment dismissing the underlying action. *See* Consent Agreement (Remediation ¶20).

- Exhibit A to the Consent Agreement had an open-ended standard for lead, requiring lead to be remediated to a maximum level of 250 mg/kg "or consistent with levels established by the Rhode Island Department of Health or the Hazardous Materials Section of DEM." *See* Consent Agreement (Exhibit A). Indeed, permissible lead levels changed during the remediation process, allowing Charter to dispense with some lead testing. *See* page 9 above.

- Although the Consent Agreement was enforceable by RIDEM for failure to comply (*see* Consent Agreement (Remediation¶26)), as a practical matter, such agreements likely are rarely enforced because they are merely flexible frameworks, allowing the agency and property owner to work out any disputes

[11] For instance, the cover page to the Work Plan specified that "certain portions of the proposed remedial program are general in nature. GZA understands that the RIDEM may require submission of additional support and/or descriptive information as the project progresses." *See* Main Affidavit ¶3, Exhibit B [CIOC 17821-46, at 17822]. The Work Plan also accounted for the discovery of other contaminants or areas of contamination: "It is important to note that, based on the site's long history of use as a petroleum handling facility, GZA's anticipates that during the facility decommissioning phases described above, other presently un-characterized areas of soil contamination will be encountered." *Id*. at 17834. Further, the Work Plan also left open the possibility of future groundwater remediation: "Based on our knowledge of site conditions, GZA does not anticipate the need for active groundwater treatment at the site. . . . Should it be determined that groundwater quality has not improved as a result of these activities, alternate remedial approaches targeted toward saturated zone contamination will be evaluated." *Id*. at 17840-41.

> and otherwise deal with unanticipated developments and issues. *See* O'Connor Affidavit ¶4.

Furthermore, as one former RIDEM official has confirmed, RIDEM considers consent agreements as broad guidelines establishing the parameters of remediation. These agreements are designed to ensure that all parties and agencies are on the same page, while maintaining continuous dialogue in order for the parties to be able to deal promptly with unexpected environmental and regulatory changes. They certainly do not finally determine liability. *See* O'Connor Affidavit ¶4.[12] Finally, the detailed and extensive post-Consent Agreement defense activity belies any notion that the amount and scope of Charter's liability was fixed in 1992.

Travelers attempts to distinguish *Purex* and the terms of the Consent Agreement by claiming that Charter had been testing the site for years and knew of the existence of property damage at the site by the time it signed the Consent Agreement. *See* Travelers Br. at 30. The relevance of this argument in response to *Purex* is unclear—the court in *Purex* was concerned with when liability was "finally determined," not when some reports of contamination were known or confirmed. *Purex*, 972 F. Supp. at 880. While it is certainly true that Charter had knowledge of potential liability, that limited knowledge is insufficient to begin the limitations clock. Such a theory of accrual misapprehends the nature of environmental remediation, which is an ongoing process where the policyholder's goal is not to "win" or "lose" up front on the issue of some "liability," but instead to mount a defense necessary to minimize the scope and amount of the liability.

---

[12] Recognizing that the remediation was vastly different than the Consent Agreement, RIDEM, in the July 2001 Settlement Agreement and Covenant Not To Sue, defined the "Consent Agreement" as being "modified pursuant to the Remediation Regulations, the Summary Letter dated 10/29/97, and the Order of Approval dated 11/7/97. . . ." O'Connor Affidavit ¶11 and attachment thereto.

Further, Charter's knowledge of contamination in the 1980s did not reflect its knowledge of the *extent* of that contamination, as the remediation history demonstrates. As noted above, Charter estimated its environmental liability at around $3 million in 1986; after all clean-up was completed, Charter incurred over $20 million in remediation and defense costs. *Compare* Main Affidavit ¶3, Exhibit V [CIOC 79911] *with* Exhibit W [CIOC 52115]. In the environmental-remediation regime, liability may be strict, but the details defining the *extent and scope* of the insured's liabilities and responsibilities are often subject to wide swings depending on the facts, legal standards, and related issues affecting an insured's position—issues that, in this case, were not resolved merely when Charter first had knowledge that there was contamination that would have to be remediated.

**B. The Remediation History Shows That Charter's Liability Was Not Fixed At Or Around The Time Of The Consent Agreement.**

The proceedings that followed the Consent Agreement also confirm that it was not a final judgment. As detailed above, the remediation, which was completed ten years after execution of the Consent Agreement, was the subject of numerous ongoing disputes as new issues were encountered. *See* Ross Affidavit ¶¶6-8. As the costs reflect, much of the remediation was not even started, let alone complete, by 1992. Until Charter was released in 2002, the scope of its obligations, and the amount of its ultimate liability, was subject to potentially huge swings, which , in fact, occurred.

The remediation history, as described in great detail above and highlighted here, demonstrates, among other things, that: (1) RIDEM, in 1993, required Charter to submit various versions of the project implementation plan contemplated by the consent agreement and governing the remediation; (2) RIDEM, in late 1993 and after execution of the Consent

Agreement, discovered unexpected levels of contaminants in the Souza Road parcel and dikes in the A-farm area and consequently imposed additional obligations on Charter; (3) RIDEM amended its regulations in 1996—and while lowering the permissible levels of TPH, the new regulations created disputes over the permissible levels of TPH at the shore area versus upland areas, and also offered a new and more complex form of compliance-formula testing;[13] (4) RIDEM was dissatisfied with the results of the remediation near the shore, dramatically altering the shore-area remediation in 1997 and requiring Charter to apply for and receive a new CRMC Assent in late 1997; and (5) Charter spent four years dealing with RIDOT and RIDEM and the remediation near the railroad right of way—eventually agreeing, after RIDOT had previously backed out of the deal, on the execution of ELUR's, which were not finalized and recorded until days before the issuance of the letter of compliance in 2002. *See* Ross Affidavit ¶¶6-10; *see also* pages 9-16 above.

Additionally, the Consent Agreement, as a loose framework, did not specifically cover many significant aspects of the remediation—such as Charter's extensive remediation of wetland areas, its negotiations with RIDOT and RIDEM on the railroad, and the 1997 Order of Approval, which imposed new conditions on Charter and expressly modified the Consent Agreement. *See* O'Connor Affidavit, ¶4 ("[I]nvestigation required under such an agreement necessarily meant that not all environmental conditions were known at the time the agreement was entered into but would be addressed as discovered and the cleanup then negotiated.").

---

[13] The new regulations were also significant because, absent the less stringent standard, Charter likely could not have complied with RIDEM's requirements and would have been forced to engage in a much more costly remediation procedures. *See* Ross Affidavit ¶6. Thus, Charter, through notice and comment with RIDEM, provided important input on the new regulations. *See* Main Affidavit ¶3, Exhibit EE [CIOC 25768-25783]. And after the new regulations were adopted, Charter had to ensure that they would apply to the site. *See* Main Affidavit ¶3, Exhibit FF [CIOC 546-49].

The Consent Agreement expressly indicates that the Letter of Compliance would effectively serve as the "final judgment" in this case. *See* Consent Agreement (Remediation ¶20) ("The recording of such a release shall cause this Agreement to expire and be void thereafter."). Thus, the date of full compliance (March 20, 2002) is when Charter's obligations became finally fixed, it was released of liability through the recorded Letter of Compliance, and the underlying action terminated. *See Hays v. Mobil Oil. Corp*., 736 F. Supp. at 397; *see also* O'Connor Affidavit ¶ 13 ("RIDEM uses LOCs at the end of the process, much like resolving a lawsuit, when it determines that no further action is necessary and the area or site at issue is compliant with the Remediation Regulations."). Only then did the statute of limitations begin to run. Any earlier trigger would have frustrated Rhode Island public policy by forcing Charter to litigate two, conflicting disputes at once without an accurate assessment of the costs it incurred.

## III. Travelers's Choice-Of-Law And Related Arguments Concerning Massachusetts Law Do Not Support Its Position.

In sum, the statute of limitations did not begin to run until final judgment in 2002. Under Rhode Island's ten-year statute of limitations, this action was timely. This action is also timely under the six-year statute that would apply if Massachusetts law governed this issue. Because Travelers has attempted to inject Massachusetts law into the case, however, it is necessary to address Travelers's choice-of-law and related arguments under Massachusetts law.

### A. Under Rhode Island Law, The Law Of The Forum Controls The Statute-Of-Limitations Issue.

Travelers argues that Massachusetts law applies to the statute-of-limitations issue even though this case is pending in Rhode Island. Specifically, Travelers restates its prior argument that the statute of limitations is substantive, not procedural, and thus a choice-of-law analysis is necessary and results in application of Massachusetts law. To the contrary, because the statute of

limitations is considered procedural under the law of the forum state, the law of the forum, Rhode Island, governs.

Under well-established Rhode Island precedent in effect for almost a century, the statute of limitations of the forum applies—Rhode Island in this case. *Staples v. Waite*, 76 A. 353, 354 (R.I. 1910) (holding that "no rule is better settled than that the statute of limitations of the state in which the action is brought is to prevail, and not that of the state in which the contract was made"); *Byron v. Great Am. Indemnity Co*., 173 A. 546, 547 (R.I. 1934) (finding that "an action is controlled by the statute of limitations of the state where the action is commenced, and not by the statute of the state where the cause of action accrued," but holding that insurance policy containing specific suit-limitation provision controlled); *Pinkham v. Collyer Insulated Wire Co., Inc.*, Civ. A. No. 92-0426B, 1994 WL 385375, at *4 (D.R.I. Mar. 22, 1994) (finding statute of limitations as being "procedural" under Rhode Island law); *Providence & Worcester R. Co. v. Sargent & Greenleaf, Inc.*, 802 F. Supp. 680, 689 (D.R.I. 1992) (noting that under Rhode Island law, forum statute of limitations applies); *accord Reinhard v. Textron, Inc*., 516 P.2d 1325, 1326 (Okla. 1973) (interpreting Rhode Island law as holding that statutes of limitation are procedural and forum law controls).

Travelers's attempt to suggest otherwise is misguided and premised on two incorrectly decided cases: *Waters v. Walt Disney Co*., 237 F. Supp. 2d 162 (D.R.I. 2002) and *Montaup Elec. Co. v. Ohio Brass Corp*., 561 F. Supp. 740 (D.R.I. 1983). Travelers and these courts confuse an *Erie* issue with a conflicts issue between two states' laws. *See Waters*, 237 F. Supp. 2d at 165-66 (relying on *Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99, 110 (1945)); *Montaup*, 561 F. Supp. at 744 (same). Indeed, in *Pinkham v. Collyer Insulated Wire Co., Inc.*, Civ. A. No. 92-0426B, 1994 WL 385375, at *4-5 (D.R.I. Mar. 22, 1994), the court criticized *Montaup* for this reason, as

well as for its misreading of Rhode Island law. *Erie* is, of course, concerned with conflicts between federal and state law. Under *Erie*, the statute of limitations is usually considered substantive. *See Guaranty Trust Co. of N.Y.*, 326 U.S. at 110; *Servicios Comerciales Andinos, S.A. v. Gen. Elec. Del Caribe, Inc.*, 145 F.3d 463, 478 (1st Cir. 1998). Therefore, if, for example, this Court had to resolve a conflict between a federal statute of limitations and a state one, it would apply the state statute, which, as the Supreme Court has declared, is substantive because it is likely outcome determinative. *See Guaranty Trust Co. of N.Y.*, 326 U.S. at 110.

By contrast, a conflicts question concerns a conflict between two or more states' laws. Unlike an *Erie* issue, the court looks to the forum state precedents (such as *Staples* and *Byron*) to determine how the statute of limitations is characterized before engaging in a conflict analysis. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941). This is so because, unlike *Erie*, which seeks to resolve issues of federalism and secure uniformity between all the courts of a state, a conflicts analysis seeks to delimit spheres of state legislative competence. *Sun Oil Co. v. Wortman*, 486 U.S. 717, 727 (1988). As both the First Circuit and Supreme Court have held, merely because an issue, such as the statute of limitations, may be substantive for *Erie* purposes, does not mean that it is substantive for conflicts purposes. *See Servicios Comerciales Andinos, S.A.*, 145 F.3d at 479 (citing *Sun Oil Co.*, 486 U.S. at 722, and finding that "the U.S. Supreme Court has rejected the notion that there is an equivalence between what is substantive under *Erie* doctrine and what is substantive for purposes of conflict of laws" (all internals omitted)).

Another, perhaps simpler, way to look at the issue is without regard to the procedure/substantive dichotomy. *Klaxon* requires a federal court sitting in diversity to apply the choice-of-law rules of the forum. *Klaxon*, 313 U.S. at 496. Rhode Island's choice-of-law rules

hold that the statute of limitations of the forum applies. *See, e.g., Providence & Worcester R. Co.*, 802 F. Supp. at 689 (applying this analysis). Federal *Erie* precedents suggesting otherwise, like *Guaranty Trust Co. of N.Y*, do not control. *See Klaxon*, 313 U.S. at 496-97 ("Subject only to review by this Court on any federal question that may arise, Delaware is free to determine whether a given matter is to be governed by the law of the forum or some other law.").

Travelers raises two arguments to the contrary—neither of which is persuasive. First, Travelers claims that the Rhode Island Supreme Court overruled *Byron* in *Brown v. Church of the Holy Name of Jesus,* 243 A.2d 917 (R.I. 1968). Travelers Br. at 9. However, as the Court in *Pinkham* correctly held, *Brown* merely rejected the lex loci rule for examining substantive tort claims; the decision did not address, let alone overrule, *Byron* and the well-established choice-of-law rules concerning the statute of limitations. *See Pinkham*, 1994 WL 385375, at *4.[14]

Second, Travelers asks this Court to depart from precedent and join the states that "overwhelmingly" treat limitation statutes as substantive for choice-of-law purposes. Travelers Br. at 10. While some courts consider the statute of limitations as substantive, it is far from an "overwhelming" number. Many states, like Rhode Island, maintain the view that statutes of limitation are procedural, and thus apply the forum's statute.[15] Travelers's invitation to overturn Rhode Island precedent should be rejected.[16]

[14] Travelers's claim (Br. at 9) that "the court [in *Brown*] stated that Massachusetts statute of limitations would determine whether a cause of action under a Massachusetts wrongful death statute was time-barred" is belied by that court's own view that the limitations issue was "immaterial[]" and thus not at issue. *Brown*, 243 A.2d at 178.

[15] *See, e.g., RMS Tech., Inc. v. TDY Indus., Inc.*, 64 Fed. Appx. 853, 857 (4th Cir. 2003) (holding that statutes of limitation are considered procedural in Virginia, and Virginia choice-of-law rules mandate application of forum law in procedural matters); *Cole v. Mileti*, 133 F.3d 433, 437 (6th Cir. 1998) (applying Ohio law and holding that "[a]bsent an express statement that the

Under Rhode Island law, this court should apply Rhode Island's statute of limitations. As discussed below, if this Court were to accept Travelers's invitation to predict a change in Rhode Island law and to consider the statute of limitations as a substantive issue, Rhode Island law would still apply.

---

parties intended another state's limitations statute to apply, the procedural law of the forum governs time restrictions on an action for breach . . ."); *Gassman v. Eli Lilly & Co.*, 407 F. Supp. 2d 203, 208 (D.D.C. 2005) ("In the District of Columbia . . . limitations arguments have long been considered procedural, thereby mandating application of the filing forum's statute of limitations."); *Employers Reinsurance Corp. v. Jefferson Pilot Fin. Ins. Co.*, 176 F. Supp. 2d 1183, 1188 (D. Kan. 2001) ("Kansas applies its own statutes of limitations, and any exception must be found in those statutes."); *Isley v. Capuchin Province*, 878 F. Supp. 1021, 1025 (E.D. Mich. 1995) ("Under Michigan conflicts law, statutes of limitation are deemed to be procedural, rather than substantive, and are to be governed by the law of the forum."); *Sinclair v. Brill*, 815 F. Supp. 44, 46 (D.N.H. 1993) (stating that under New Hampshire law, statutes of limitation are procedural and therefore will be applied in the forum state under New Hampshire's choice-of-law rules); *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177, 194 (Ill. 2002) (holding that statutes of limitations are procedural and therefore forum law would apply); *Johanson v. Dunnington*, 785 A.2d 1244, 1246 (Me. 2001) ("Under traditional choice of law rules, the forum state generally applies its own statute of limitations to a cause of action . . ."); *Unisys Finance Corp. v. U.S. Vision, Inc.*, 630 A.2d 55, 58 (Pa. Super. Ct. 1993) ("The long-standing rule of Pennsylvania is that the law of the forum determines the time within which the cause of action shall be commenced. . . .").

[16] "While defendant asks this court to pioneer a path towards a more narrow choice of law analysis to the forum's statute of limitation approach, that is not the role for this federal court. This court must faithfully apply the same law the District of Columbia courts would apply if this case was presently before them. . . . The decision to approach a forum choice of law statute of limitation analysis as a substantive matter—applying a different forum's statute of limitation time limit—is best left to the District of Columbia Court of Appeals." *Reeves v. Eli Lilly and Co.*, 368 F. Supp. 2d 11, 26-27 (D.D.C. 2005); *see also Klaxon*, 313 U.S. at 497 ("And the proper function of the Delaware federal court is to ascertain what the state law is, not what it ought to be.").

**B. Even If The Statute Of Limitations Were Considered "Substantive," Rhode Island Law Would Still Apply Because Of The State's Significant Interests In This Dispute.**

Even if one were to view the statute of limitations as substantive under Rhode Island law, this Court should still apply the limitations law of the forum based on the interest-weighing analysis employed by the Rhode Island Supreme Court in its decision in *Gordon* in 1992 and reaffirmed in *Mendez* three years ago.

In *Gordon v. Clifford Metal Sales Co., Inc.*, 602 A.2d 535, 537-39 (R.I. 1992)—a case "concerning the priority and perfection of a secured transaction"—the court employed an interest-weighing analysis in resolving a conflict of laws, evincing that lex loci in a dispute assessing commercial documents no longer applies. More recently, the Rhode Island Supreme Court in *Mendez v. Brites*, 849 A.2d 329 (R.I. 2004), recognized the viability of interest weighing in assessing conflicting laws governing an insurance-contract dispute. Although the Court did not have to reach the end analysis, finding instead that there was no conflict between the two states' laws, the Court nonetheless recognized the applicability of interest weighing in an insurance contract case. *See id.* at 340. ("We agree with the holding of *Sullam* that when a court undertakes a conflict-of-law analysis, and the law of a foreign jurisdiction conflicts with a strong public policy of the forum state, the public policy of the forum state may prevail.").[17]

[17] In *DeCesare v. Lincoln Benefit Life Co.*, 852 A.2d 474 (R.I. 2004), the Court applied Nebraska law to contracts it found were made there. But in that case the primary issue was whether there was a valid choice-of-law provision in the contracts (the court held there was not), and the court was not presented with an argument that some other state had a more significant interest. Thus, it did not engage in any review of choice-of-law rules or competing state interests, as that endorsed by the same court in *Mendez*. Here, of course, there is not even a single state in which all of the policies can be said to have been made, and, as described below, Rhode Island has the overwhelmingly greater interest in this litigation.

Weighing the competing interests here, it is clear that Rhode Island's statute of limitations must apply, given the Rhode Island-locus of this dispute. Travelers spends most of its brief manipulating the various Restatement factors to reach its end result of applying Massachusetts law—but omits from its calculus the most crucial, outcome-determinative factors: that the location of the site is in Rhode Island and that the public interest in environmental remediation rests solely in Rhode Island.

Under the Restatement, the principal location of the risk is the *presumptive* choice of law. *See* Restatement (Second) of Conflicts of Laws § 193. What this means for policies involving multiple risks in different states, such as the policies here, is that the principal location of the risk is the site at issue in the litigation—here, Rhode Island. Contrary to Travelers's contention, the principal location of the risk is not calculated by adding up all of the policy locations and declaring the majority state the winner. As the Restatement makes clear, the only risks that matter are the ones at issue in the case at hand. *See id.*, cmt f. ("Presumably, the courts would be inclined to treat such a case, at least with respect to most issues, as if it involved three policies, each insuring an individual risk. So, if the house located in state X were damaged by fire, it is thought that the court would determine the rights and obligations of the parties under the policy, at least with respect to most issues, in accordance with the local law of X.").[18]

---

[18] *See, e.g., Diamond Intern. Corp. v. Allstate Ins. Co.*, 712 F.2d 1498, 1501 (1st Cir. 1983) ("With respect to multiple risk policies, such as the one in issue here, the court held that the New Hampshire risk insured is to be treated as though it were insured by a separate policy and the validity of and rights under the multiple risk policy as to this risk are to be governed by the laws of this State.") (all internals omitted)); *Shapiro v. Associated Intern. Ins. Co.*, 899 F.2d 1116 (11th Cir. 1990) ("Thus, although the risks covered under the Associated umbrella policy were spread out over several states, the Restatement advises application of the substantive law of the state in which each individual risk is located when adjudicating issues concerning that risk, treating the comprehensive policy effectively as several different policies."); *Johnson Matthey Inc. v. Pennsylvania Mfrs.' Ass'n Ins. Co.*, 593 A.2d 367, 373 (N.J. Ct. App. 1991) ("We hold

As the courts considering the issue have held, applying the law of the principal place of the risk furthers the state's strong interests in protecting its citizens, encouraging environmental remediation, and deterring hazardous environmental harms. *See, e.g., CPC Int'l., Inc. v. Northbrook Excess & Surplus Ins. Co.*, 839 F. Supp.124, 125-26 (D.R.I. 1993) (applying Restatement § 193 and holding that law of site, Rhode Island, controls because of Rhode Island's interest in protecting its citizens from environmental harms), *aff'd* 46 F.3d 1211 (1st Cir. 1995); *accord Reichhold Chemicals, Inc. v. Hartford Accident and Indemnity Co.*, 750 A.2d 1051, 1057 (Conn. 2000) ("Washington courts have recognized that the state in which the hazardous waste site is located has a compelling interest in the application of its own law. 'Washington has a paramount interest in the health and safety of its people. … The existence or absence of insurance proceeds can determine whether or not a hazardous waste site is remediated. Washington, therefore, has a significant interest in [the plaintiff's] insurance coverage." (all internals omitted)).

Rhode Island has an obvious interest in ensuring prompt clean-up, protection of the State's soil and groundwater, and protection of the State's residents from environmental harm. Travelers's contrary cases do little to undermine the presumptive application of Rhode Island law. The only environmental insurance case Travelers cites is an Indiana case that, in fact, held that the most important factor is the principal location of the risk. *See Am. Employers Ins. Co. v. Coachmen Indus., Inc.*, 838 N.E. 2d 1172, 1180 (Ind. Ct. App. 2005). The court there, however, departed from the Restatement by adopting the so-called "uniform contract interpretation

---

that a casualty insurance policy, wherever written, which is purchased to cover a New Jersey risk, alone or along with risks in other states, is subject to interpretation of its coverage and exclusion language according to New Jersey local law. Although this rule is peculiarly suitable to environmental litigation, in which large numbers of casualty insurance policies are involved, it is not limited to that setting.").

approach" in assessing what constituted the principal location of the risk. *Id*. at 1181. There is no evidence that Rhode Island courts, which look to the Restatement in assessing conflicts, would then eschew the Restatement's single-site presumption.

The other cases Travelers relies on do not concern environmental or property issues, but instead chattels (boat,[19] automobile[20]) and bodily injury[21]—placing those cases, according to the Restatement, on different footing. *See* Restatement (Second) Conflicts § 193, cmt. b (noting difference between movable and immovable objections and recognizing that "[i]n the case of chattels, the significance of the state of the risk's principal location diminishes with the length of time that it can be anticipated the chattel will be in other states during the term of the insurance.").

Additionally, Travelers's attempt to shift the focus from the site and onto less significant factors fares no better. Travelers claims that the place of contracting, negotiation, and premium payments should control. Travelers Br. at 16. As an initial matter, there is a material dispute over whether these policies were contracted and negotiated in Massachusetts. *See* Charter's Disputed Statement of Facts, ¶¶1-2. But even if that were not the case, under the Restatement, to overcome the presumption of applying the law of the site, Travelers must show that Massachusetts has a "sufficiently compelling" interest. *See Reichhold Chemicals*, 750 A.2d at 1056. Travelers cannot make such a weighty showing.

---

[19] *Albany Ins. Co. v. Wisniewski*, 579 F. Supp. 1004 (D.R.I. 1984).

[20] *Clarendon Nat. Ins. Co. v. Arbella Mut. Ins. Co*., 803 N.E. 2d 750 (Mass. Ct. App. 2004).

[21] *Shook & Fletcher Asbestos Settlement Trust v. Safety Nat. Cas. Corp*., 2005 WL 2436193 (Del. Super. Ct. 2005) (unpublished).

Neither party currently resides in Massachusetts. Travelers never resided there. The Consent Agreement was signed by Charter, in its role as a Rhode Island property owner, and thus the remediation that followed, which is the subject of Travelers's coverage breaches, overwhelmingly concerns Rhode Island interests. As Travelers admits, policy negotiation shifted away from Massachusetts to Florida and Georgia. Travelers cannot even establish that any of the policies were "made" in Massachusetts, since Travelers was based in and the policies were issued from Connecticut. There is nothing in the policies, such as a choice-of-law or choice-of-forum clause, suggesting that the parties viewed Massachusetts as being the center of any future disputes. *See Diamond*, 712 F.2d at 1502 (absent choice-of-law clause, parties intentions were unexpressed). Even regarding the factors Travelers mechanically applies in its brief, it does not give any reasons, let alone compelling ones, *why* those factors evidence Massachusetts's significant interests in this dispute. Rhode Island choice-of-law rules, premised on the Restatement, point directly to Rhode Island, the lone state here with any significant interest in having its laws applied. Thus, even if this Court accepts Travelers's invitation to break new ground and declare the statute of limitations as "substantive," Rhode Island's statute of limitations applies.

### C. This Court Need Not Decide The Choice-Of-Law Issue Because There Is No Conflict With Massachusetts Law.

Regardless of which choice-of-law paradigm this Court applies, application of Massachusetts law here would not change the outcome. Contrary to Travelers's claim, Massachusetts law does not hold that an insurance action accrues on the date of denial of the claim. *See, e.g., Wolverine Ins. Co. v. Tower Iron Works, Inc.*, 370 F.2d 700, 702-03 (1st Cir. 1966) (holding that under Massachusetts law, common-law indemnity action accrues at final

settlement)[22]; *Hays*, 736 F. Supp. at 397 (holding that under Massachusetts law, date of DEM release letter was accrual date for action for environmental reimbursement), *partially reversed on other grounds by Hays*, 930 F.2d 96; *John Beaudette, Inc.*, 94 F. Supp. 2d at 103 (holding that under Massachusetts law, indemnity claim accrues at final judgment or settlement). Moreover, Travelers does not cite any Massachusetts case addressing the issue in the context of a no-action clause such as the clause at issue here.

The principal case Travelers relies on for its limitations trigger—the unpublished decision of *Travelers Ins. Co. v. Royal Ins. Co.*, No. 04-P-1776, 2006 WL 223854 (Mass. Ct. App. Jan. 30, 2006)—is poor contrary authority. The court there, citing *Lumbermens Mut. Cas. Co. v. Y.C.N. Transp. Co*., 705 N.E. 2d 297 (Mass. Ct. App. 1999), found that a breach-of-insurance-contract claim accrues when the insurer denies the claim. *Travelers*, 2006 WL 223854, at *2. The court in *Lumbermens*, however, never decided this issue, instead opting to *assume* the claim accrued at the time of disclaimer by the insurer. 705 N.E. 2d at 301 ("If we assume that the disclaimer violated Lumbermens' contractual obligation, then YCN had until February 27, 1993, to assert its legal claims against Lumbermens arising from the violation."). The issue of accrual in *Lumbermens* was never decided by the court and, in fact, was entirely irrelevant, because the court went on to conclude that the insurer waived any statute-of-limitations defense by partially paying the claim. *Id.*; *see also John Beaudette, Inc.*, 94 F. Supp. 2d at 102 n.6 (finding *Lumbermens's* discussion on accrual to be "not necessary to its decision").

[22] Travelers attempts to distinguish *Wolverine* by claiming that that case concerned an indemnification claim, as opposed to an ordinary contract claim. The indemnification claim there—a quintessential third-party claim—is equivalent to Charter's third-party insurance claim in this case.

Travelers preemptively tries to save *Lumbermens* by claiming that the "the court did not assume that the insured's claim accrued at the time of the insured's denial of coverage [but instead] the court assumed that the insurer's denial of coverage was a breach of its duty to defend. . . ." Travelers Br. at 20 n.12. This argument, however, is flawed. Even accepting Travelers's distinction that the court assumed the latter, that assumption encompassed both whether *and* when such a cause of action accrued. At no point in that decision did the court expressly decide any accrual issue, because it did not have to—the insurer waived its statute-of-limitations defense.

Even assuming, however, that Travelers is correct and there is a split in Massachusetts case law on the limitations issue, there remains no Massachusetts case dealing with the limitations issue in the context of a third-party environmental insurance claim. Such a dispute is unique—and must be resolved in favor of fixing accrual at final judgment or settlement based on the numerous important policy reasons described above, *see* pages 26-31. Further, there are no cases—including the ones cited by Travelers—that hold that the limitations period commences before final judgment where a no-action clause is found in the policies. The existence of a no-action clause in the policies in this case is controlling, even if this Court were to adopt Travelers's misguided interpretation of Massachusetts law, *see* pages 31-34 above.

## IV. In the Alternative, This Court Should Certify The Questions In Dispute To The Rhode Island Supreme Court.

Because this case presents a novel legal question, involves important public interests, and concerns an issue where there is no direct controlling authority, if there is any doubt in predicting Rhode Island law, Charter respectfully requests that this Court certify the following question to the Rhode Island Supreme Court:

> When does a cause of action accrue and the statute of limitations begin to run for an environmental insurance claim alleging breaches of the duties to indemnify and defend under the circumstances presented here, particularly in light of the no-action clauses contained in the policies?

Moreover, if the Court has any doubt about the application of Rhode Island law, it should likewise certify the following question to the Rhode Island Supreme Court:

> Does Rhode Island or Massachusetts law apply under the facts and circumstances of this case?

This Court has previously certified limitations and environmental-insurance questions pursuant to Rhode Island Supreme Court Rule 6,[23] and if there is uncertainty on the issues presented here, it should not hesitate to do so in this case.

---

[23] *See, e.g., Horn v. Southern Union Co*., --A.2d--, 2006 WL 2864737 (R.I. 2006) (limitations question); *Kelly v. Marcantonio*, 678 A.2d 873 (R.I. 1996) (limitations question); *CPC Int'l., Inc. v. Northbrook Excess & Surplus Ins. Co*., 668 A.2d 647 (R.I. 1995) (environmental insurance issue).

## CONCLUSION

For the foregoing reasons, Charter respectfully requests that this Court deny Travelers's motion for summary judgment, or, alternatively, certify the relevant questions to the Rhode Island Supreme Court.

CHARTER INTERNATIONAL OIL CORPORATION

Respectfully submitted by its attorneys:

/s/ Gerald J. Petros

Gerald J. Petros (#2931)
Robin L. Main (#4222)
Anna M. Piazza (#7206)
HINCKLEY, ALLEN & SNYDER LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island 02903
Phone: (401) 274-2000
Fax: (401) 277-9600
gpetros@haslaw.com
rmain@haslaw.com
apiazza@haslaw.com

Neal R. Brendel (admitted pro hac vice)
James R. Segerdahl (admitted pro hac vice)
Brian F. Saulnier (admitted pro hac vice)
KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, Pennsylvania 15222
Phone: (412) 355-6500
Fax: (412) 355-6501
neal.brendel@klgates.com
james.segerdahl@klgates.com
brian.saulnier@klgates.com

Dated: May 31, 2007

**CERTIFICATE OF SERVICE**

**To:**

John A. Nadas, Esq.
Kathleen Burdette Shields, Esq.
Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110

R. Kelly Sheridan, Esq.
Jason C. Preciphs, Esq.
Roberts, Carroll Feldstein & Peirce
Ten Weybosset Street
Providence, RI 02903

I hereby certify that on May 31, 2007, a copy of the foregoing Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Alternative Request for Certification was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Gerald J. Petros
Gerald J. Petros (#2931)

805317v1