# EXHIBIT 7

# CLOSURE REPORT

FOR THE

NORTHEAST PETROLEUM TERMINAL
TIVERTON, RHODE ISLAND
SITE REMEDIATION

SUBMITTED BY
CHARTER INTERNATIONAL OIL COMPANY

TO THE

RHODE ISLAND DEPARTMENT OF
ENVIRONMENTAL MANAGEMENT

JUNE 26, 2001

# Closure Report

I. Introduction. The purpose of this document is to summarize the manner in which regulatory requirements were met in completing an environmental remediation of the former Northeast Petroleum Corporation storage terminal located in Tiverton, Rhode Island ("Site"). The Site is owned by Charter International Oil Company ("CIOC"), as the successor by merger to Northeast Petroleum Corporation.

Because this document is a summary, very detailed, technical and voluminous information may be presented in an abbreviated or approximate manner for clarity and simplicity. Further information is available in the Site file maintained by the Rhode Island Department of Environmental Management ("RIDEM").

Portions of the Site were operated for petroleum terminal purposes as far back as the 1920s and 1930s, while other areas were not developed until the 1960s. The Site was operated by different entities over the years, but over time the entire Site was acquired by Northeast Petroleum Corporation, with the most recent acquisition occurring circa 1985. All petroleum storage operations were terminated by 1987.

The Site is located on Main Road north of Route 24 in Tiverton. It is comprised of approximately 106 acres, approximately 96 acres of which lie between Main Road or Old Main Road and the Sakonnet River/Mt. Hope Bay. For purposes of the remediation project, the Site was divided into six parcels identified by their location and/or the names of certain former owners. The 96 acres of the Site which lies to the west of Main Road and Old Main Road includes approximately 3,000 feet of waterfront on the Sakonnet River/Mt. Hope Bay, and is divided (i) by a railroad right-of-way ("ROW") which runs north and south near the Site's western boundary, dividing the shore areas from the upland portions of the Site, and (ii) by Carey's Lane, which runs east and west from Main Road to the shoreline. The five parcels located west of Main Road are shown on Figure 1. The sixth parcel, east of Main Road, is on the corner of Souza Road and is referred to as the "Souza Road" parcel.

II. Regulatory Overview. An important objective of an environmental regulatory program is to ensure that people are not exposed to levels of contamination in soil or groundwater that would present an unacceptable risk to human health.

This objective can be met in a number of ways. "Look up tables" are commonly provided by regulatory agencies to provide a level of contamination for different substances which is conservatively calculated to be protective of human health under virtually any circumstances. Such tables typically provide a lower acceptable level of contamination for residential property, where exposure is likely to be greater or occur over a more extended period, than for industrial and commercial property. Alternatively, a risk assessment may be calculated specifically to determine whether (i) contamination in soil or groundwater presents a human health risk that is acceptable, or (ii) the reduction

of contamination that must be achieved through remediation to reach that goal. This can be done through a standardized formula provided by a regulatory agency that includes relevant assumptions regarding such variables as the amount and duration of exposure. A complete risk assessment also can be performed utilizing site specific information and assumptions regarding such issues. In Rhode Island, the foregoing three approaches to determining an acceptable level of contamination are referred to in RIDEM's regulations as Methods 1, 2 and 3, respectively.

Other approaches to ensuring an acceptable risk from exposure to contamination utilize institutional or engineering controls. In Rhode Island, for example, certain soil contamination may remain in place so long as the potential for human exposure is minimized by an environmental land use restriction ("ELUR"), which is filed in appropriate public land records and restricts the disturbance of such soils without RIDEM's approval. This is an institutional control. Engineering controls involve physical barriers to contaminant exposure, such as the placement of a clay, geotextile or asphalt barrier over contaminated soils, or the placement of a physical barrier in the ground to prevent the migration of contaminated groundwater.

Due to the nature of the terminal operations conducted at the Site, petroleum hydrocarbons were the focus of regulatory concern. Crude oil is comprised of thousands of individual petroleum hydrocarbon components. Petroleum products refined from crude oil may contain a few or many of such petroleum hydrocarbons. Individual petroleum hydrocarbons range from those with some level of known toxicity to those which are very benign, such as petroleum jelly which is routinely used as a salve for skin application. "Most petroleum hydrocarbons are not particularly harmful with respect to groundwater or to human health." (Cole, 1994).

Laboratory tests are available to determine the total of all petroleum hydrocarbons present in a soil or groundwater sample ("TPH"). Other laboratory procedures are used to determine the presence and amount of petroleum hydrocarbon fractions of known toxicity, such as (i) benzene, toluene, ethylbenzene and xylene ("BTEX") and (ii) certain polycyclic aromatic hydrocarbons ("PAHs"). Because lead was used historically in gasoline to increase octane ratings, it is also a potential contaminant of concern at a petroleum site. As the science of toxicology has developed more information regarding petroleum compounds, there has been less regulatory reliance on TPH measurements and increased focus on, and regulation of, the constituents with known toxicity.

III. Site Remedial Standards. In March 1992, CIOC and RIDEM entered into a Consent Agreement providing for the remediation of the Site ("Consent Agreement"). The Site is located on a steep hillside. Accordingly, there existed the possibility that rainfall might percolate through contaminated soils and, by way of leaching contamination into the groundwater, result in the migration of contamination down-gradient to the Sakonnet River/Mt. Hope Bay. Accordingly, the remediation of contaminated soils pursuant to the Consent Agreement was intended to decrease the risk from direct human contact with contaminated soils, and to decrease the risk of contaminant migration from such soils into the groundwater.

The Consent Agreement included remedial criteria for soils and groundwater for BTEX, TPH, lead (only for soils), and volatile organic compounds (only for groundwater). The soil and groundwater criteria for TPH was 50 parts per million ("ppm"). These criteria were negotiated with RIDEM in order to allow, upon completion of the necessary remediation, use of the Site for unrestricted purposes including residential development.

In August 1996, RIDEM adopted comprehensive amendments to its Rules and Regulations for the Investigation and Remediation of Hazardous Material Releases (as amended, the "Remediation Regulations", individual provisions of which will be referred to as "Rule ____.") The Remediation Regulations added a significant number of specific petroleum-related constituents in groundwater, and added PAH's as new potential contaminants of concern in soil. With regard to TPH, Rule 8.02.A.iv. states that:

> "[A]lthough not a single hazardous substance, TPH can be useful as an indicator of potential adverse impacts to human health from a release of hazardous materials....Accordingly, the department shall require that soil objectives for TPH as described in this rule be applied to a contaminated-site <u>in conjunction with</u> soil objectives for the [specific] hazardous substances established pursuant to this section." (emphasis in original)

The Remediation Regulations then provided Method 1 standards for TPH of 500 ppm or 1,000 ppm for residential settings, and 2,500 ppm for industrial/commercial settings.

Rule 8.10, "Compliance Sampling", sets forth alternative methods for determining when soil remedial objectives have been met at a contaminated site. One of these alternatives allows a statistical methodology for determining compliance. It requires that an average of all samples be below the soil criteria, and does not allow (i) any single sample result to exceed the criteria by a factor of 5, or (ii) more than 10% of the individual sample results to exceed the soil criteria ("Compliance Formula").

Paragraph 15 of the Consent Agreement provided that in the event of RIDEM's adoption of soil and groundwater contamination standards that conflicted with the terms of the Consent Agreement, the new standards would control the remediation of the Site. Therefore, CIOC and RIDEM held a series of meetings in the fall of 1996 to determine the manner in which the Remediation Regulations would be applied to the Site. It was ultimately concluded that each of the six parcels of the Site would be evaluated separately for soil remediation compliance. For unrestricted use of the Site, including residential purposes, a TPH compliance standard of 1,000 ppm would be required in the four upland parcels, and a standard of 500 would be required in the two shore parcels of the Site to protect marine organisms that could be sensitive receptors.

For each separate parcel, RIDEM determined that the Compliance Formula would have to be met with respect to three separate sets of data. First, the Compliance Formula

would have to be met with respect to all soil samples from areas that were not affected by remedial activities or, in other words, which were not excavated. Second, the Compliance Formula would have to be met for the averages of samples taken on the boundaries of the soil excavation areas. If, for example, in a parcel only one area of contaminated soil was excavated and removed, leaving a bowl shaped depression in the ground, samples around the edge of the bowl would be averaged to determine compliance. If the parcel had more than one excavation, the averages of all the excavations had to meet the Compliance Formula. Such compliance samples were required to be taken every 25 linear feet around the excavation boundary and for every 2,000 square feet of excavation floor. These excavation confirmation samples generally are referred to as "excavation grave" samples. Third, the Compliance Formula had to be met with respect to each batch of contaminated soil that was excavated and subjected to remedial treatment.

The type and amount of specific hazardous substances in different petroleum products varies substantially. Due to the nature of the petroleum products that were stored at the Site, the natural degradation or "weathering" of certain TPH compounds in soil over time, and the samples that had been taken to date, in 1997 RIDEM determined that no further BTEX, PAH, or lead sampling would be required at the Site. Thus, in samples including those that were taken even before remediation of the soil to reduce TPH concentrations, the specific hazardous substances potentially associated with petroleum contamination were found to meet the RIDEM Method 1 soil criteria. Arsenic was also briefly considered as a new constituent of concern due to the levels found in a few historical samples, however, a study demonstrated that the naturally occurring arsenic levels in Site soils were no different than in the petroleum-impacted soils. This result was expected since arsenic is not a constituent of petroleum products. Accordingly, RIDEM also determined in 1997 that no further sampling for arsenic would be required.

Sampling of groundwater at the Site over time, in more than 30 monitoring wells, and specifically after the completion of soil remediation in September 1998, established that the remediation had achieved all relevant groundwater criteria. RIDEM therefore concluded in July 1999 that no further groundwater sampling would be required at the Site.

In light of the RIDEM determinations described above, the following discussion of remedial activity and compliance will focus on TPH.

IV. <u>TPH Remediation</u>. Petroleum hydrocarbons are formed over long periods of time from decaying organic matter. Due to their organic carbon composition, bacteria found in the soil are capable of using petroleum hydrocarbons as a food source. This process, called bioremediation, is analogous to the breakdown of yard wastes and garbage in a compost pile. However, it is an aerobic process, which means that the bacteria need oxygen to turn their food source into energy just as humans do. The bioremediaton of petroleum hydrocarbons therefore requires that adequate oxygen be made available to the

soil bacteria, as well as certain trace elements supplied through the application of common lawn or agricultural fertilizers.

The field bioremediation process begins with the excavation of contaminated soil, which is dumped through a shaking mechanical sieve to remove rocks (which do not require remedial treatment). The sieved soil is then spread out in large flat areas known as "biobeds." The soils placed in the biobed are tilled periodically in order to provide the oxygen necessary for bioremediation. Different types of tilling equipment can be used. At the Site most of the soils were tilled by a Brown Bear tractor with a front-mounted horizontal screw auger or paddle auger. The Brown Bear would progress through the contaminated soils, mixing them and moving them to the side much in the same manner as a truck-mounted snow blower. The bioremediated soils and the sieved rock were then used to backfill the areas from which the contaminated soils had been excavated.

Excavation activities began at the Site in the summer of 1993. In 1993, 1994 and 1995, the Air Force, Pacific and Souza Road parcels were excavated to 50 ppm limits based upon the Consent Agreement. Due to slow remedial progress in reaching the 50 ppm criteria in the biobeds, large volumes of such excavated soils were placed in stockpiles to await remedial processing. During the summer of 1996, with CIOC anticipating from public comment drafts that the Remediation Regulations would include a TPH criteria of either 500 or 1,000 ppm, some of the stockpiled soils were bioremediated so that all soil samples were below 500 ppm. After the Remedial Regulations were adopted in August 1996, the balance of the stockpiled soils and further excavated soils were remediated to the 1,000 ppm standard using the Compliance Formula.

In the spring and summer of 1997, contaminated soils were excavated from a small remaining area of the Pacific parcel and from the Northeast parcel. The Shore parcel and Texaco Shore parcel were excavated in the fall and winter of 1997-1998, and all remaining excavated soils were bioremediated by September 1998. This completed the required TPH remediation at the Site to the specified RIDEM Method 1 levels. Thereafter, final Site grading was performed, as well as the placement of grass seed, drainage swales and holding ponds in order to minimize soil erosion.

V. <u>Post-Remedial Status</u>. The Site remediation involved the excavation and bioremediation of approximately 750,000 cubic yards of TPH contaminated soil. The remediation was conducted utilizing a Method 1 approach, which sets forth specific allowable levels of contamination, and is the most conservative way to establish remedial goals. Known hazardous substances that can be contained in petroleum products were determined to be below their respective Method 1 criteria even before remediation, and therefore were determined not to be constituents of concern under the Remediation Regulations.

With respect to TPH contaminated soils, the two shore areas were remediated to the most conservative of RIDEM's Method 1 criteria, 500 ppm. Three of the four upland areas of the Site were excavated to boundaries of 50 ppm pursuant to the Consent

Agreement, a level 20 times lower than the 1,000 ppm criteria ultimately allowed by RIDEM for those parcels under the Remediation Regulations. Due in part to the large volumes of relatively clean soil that such excavations included, and the remedial activity that took place prior to adoption of the Remedial Regulations in 1996, a rough calculation indicates that the average TPH level of all soils that were remediated was approximately 570 ppm.

Only the Northeast parcel was excavated to the 1,000 ppm criteria allowed by RIDEM for the upland areas. Again, CIOC proceeded in a very conservative way. Although a large number of samples had already been taken from the Northeast area, CIOC established a grid of new sampling locations to ensure that no area of high level or large volume TPH contamination was overlooked. A total of 11 excavations were performed in the Northeast area, which is approximately 18 acres in size. The excavation grave, or boundary, samples ranged from averages of 59 ppm to 874 ppm per excavation, with an average for all 11 excavations of 471 ppm.

Although the Compliance Formula did permit certain soils above the 1,000 ppm criteria to remain in place, this does not present an unacceptable risk to human health for the following reasons.

The statistical approach embodied in the Compliance Formula is based on a mass balance approach. This means that, in determining risk, the soils that an individual is exposed to over time will be, on average, below 1,000 ppm. This is particularly true in the case of the excavation grave samples for three reasons:

1. The excavation grave samples represent the shell of an excavated "bowl" which has been backfilled with soil of an average below 1,000 ppm.

2. As the excavation proceeds, contamination is pursued from areas of higher contamination toward areas of lower contamination. Thus, to the extent contamination extends beyond the boundary of the excavation, rapidly declining contamination levels are expected as the contaminant plume approaches nearby grid sample points known to have very low levels of TPH.

   The excavation identified as NEPR14 demonstrates this effect. Although the Northeast parcel excavation grave sample averages met the Compliance Formula post-remediation, the boundary samples for NEPR14 individually exceeded an average of 1,000 ppm. RIDEM requested that additional excavation be performed so the excavation grave samples for NEPR14 itself would average below 1,000 ppm. This was done by extending the excavation 15 feet to the east, removing only 230 cubic yards of soil. The sample points from the original excavation grave that were removed by this process averaged 2,540 ppm, and the new samples added by extending the excavation averaged 655 ppm. This shows that the mass of soils over 1,000 ppm remaining around the excavation graves is very low compared to the large mass of soils (i) remediated and backfilled into the excavation, and (ii)

represented by the samples left in the Northeast parcel that were not excavated, which had an average TPH level of 247 ppm.

3. CIOC used a biased sampling approach in performing its excavation boundary samples. As contamination from a spill, tank leak, or other release of petroleum reaches the ground, it does not spread out in a uniform way. Due to the fact that the Site is on a steep hillside, as the petroleum sinks into the ground it begins to migrate down-gradient, typically following the groundwater level (because petroleum is lighter than water), or a soil layer that is more permeable than the soil types around it. Sampling had to be performed at intervals of 25 feet around the excavation boundary. Although only one sample was required at such intervals, CIOC sampled each geologically separate soil horizon or every several vertical feet, whichever produced more samples. If only a small portion of one or more such soil horizons over the 25 linear feet of excavation boundary was contaminated, due to the limited migration pathway of the petroleum, CIOC would sample the area of highest contamination based on visual evidence of staining and either olefactory or field screening device evidence of contaminant concentration.

In order to affirm that the Method 1 post-remedial soils do not present an unacceptable human health risk, a Method 3 risk assessment calculation was performed. This was done by using the same procedure for evaluating Site TPH toxicity as used in the ROW risk assessment (described in VII., below), and United States Environmental Protection Agency ("EPA") default assumptions for soil exposure in a residential setting which are very conservative. The result indicated acceptable human health risks up to 23,700 ppm of TPH.

Additionally, inherent in the entire discussion of risk from contaminated soils is the concept of exposure. When the currently-planned development of the Site is completed, as an age-restricted, 55-years or older community, it will be entirely covered by buildings, road surfaces, drainage swales and holding ponds, or grass and other landscape vegetation. It has been found that the high level of bacterial and fungal activity associated with grass and other vegetative roots will result in the further degradation of TPH soil contamination. This process, known as phytoremediation, is now an accepted process for the bioremediation of surface soils. Thus, when the Site is developed, there will be little, if any, meaningful exposure pathway from the post-remedial soils to residents.

Finally, the concept of bioavailability limits the risk associated with any post-remedial soils over 1,000 ppm TPH under the Compliance Formula. Bioavailability represents the accessibility of a chemical for assimilation and possible toxicity to an individual. Current science indicates that:

> As they persist, or age, in soil, organic compounds become progressively less available for uptake by organisms, for exerting

> toxic effects....[Thus], awareness now is growing among environmental toxicologists, risk assessors, and regulatory agencies that the total concentration of a toxicant...frequently overestimates the risk of pollutants to humans,....(Alexander, M. 2000, also, e.g. Northcott and Jones, 2001)

This principle clearly would apply to the Site, where any petroleum releases are at least 14 years old and could be as much as 80 years old.

In sum, the contamination associated with petroleum constituents of the most significant known toxicity was found to meet RIDEM's Method 1 criteria even pre-remediation. The TPH contaminated soils were remediated to RIDEM's Method 1 criteria, which is the most conservative approach both conceptually and as demonstrated by comparison to a much higher risk-assessment based level. Further, due to the timing of the Consent Agreement and the Remediation Regulations, substantial portions of the Site were remediated to levels even below the Method 1 criteria. Finally, the planned residential development of the Site and the reduced bioavailability of aged TPH will mitigate any risk that could be associated with post-remedial soils.

VI. Environmental Land Use Restrictions. Due to the difficulty in accessing certain contaminated soils at the Site or on adjacent property, several areas were closed under the Remediation Regulations by the use of an ELUR rather than by remediation. There were three such areas, two of which are located on the Site. The third is the ROW, which is owned by the Rhode Island Department of Transportation ("RIDOT"), and which also was the subject of the risk assessment discussed in VII., below.

The first of the two ELURs located on the Site is in the Texaco Shore area. A 36 inch concrete storm drain runs underground to provide for the discharge of storm water from Main Road. During excavation on the Texaco Shore area, this storm drain was located approximately 5 feet underground. It was deemed impractical to remove the concrete storm drain in order to access contaminated soils beneath it. Accordingly, contaminated soils were excavated up to the storm drain on each side, but not underneath. After the excavation was completed, it was back-filled and a large volume of additional soils from other parts of the Site were transported to the Texaco Shore area to increase the elevation of its overall surface. Therefore, the contaminated soils beneath the storm drain are now approximately 10 feet or more below the ground surface. The ELUR filed for this area precludes the disturbance of such soils without prior approval of RIDEM.

The second ELUR on the Site relates to a small building near the shoreline, west of the ROW and immediately north of Carey's Lane. This building was historically used as an oil/water separator to ensure that during terminal operations any petroleum spills or soils contaminated thereby would not be carried down-gradient by surface water runoff and discharged into the Sakonnet River/Mount Hope Bay. With the planned development of the Site, this facility will continue to be used as a discharge point from drainage swales and holding ponds, as part of a comprehensive storm water management plan.

During the Site Remediation, it was determined that some contaminated soils were located underneath the oil/water separator, and thus were not accessible to excavation. Additionally, certain soils around the outside base of the oil/water separator building could not be excavated without structural damage to the building. Accordingly, these soils also are restricted from disturbance without the approval of RIDEM.

The third ELUR covers the railroad ROW. As a result of terminal operations at the Site, there was migration of petroleum underneath the ROW that divides the shore parcels from the upland parcels. The ROW is located near the bottom of the Site slope, just above the shore parcels. Since the track is on top of an elevated berm and gravel rail-bed, underground migration of TPH from the Site under the ROW was greater at significant depths than at the soil surface. Specifically, the arithmetic mean of detected concentrations for TPH was 248 ppm for 122 samples at depths of 0-2 feet, 633 ppm in 269 samples between 0-6 feet, and 911 ppm for 172 samples taken below 6 feet. Due to the inaccessibility of these soils for remediation, and a Method 3 risk assessment (described in VII. below) which demonstrated that these soils do not present an unacceptable risk to human health, it was determined that they could be left in place with an ELUR. The ELUR will preclude any disturbance of the ROW soils without RIDEM's approval.

VII. <u>ROW Risk Assessment</u>. In summary description, a human health risk assessment involves several steps. Chemicals or constituents of concern are identified, and the quantity and distribution of them over the subject property is evaluated. An exposure assessment is performed (i) to evaluate human populations that could potentially come into contact with the chemicals of concern, (ii) to determine whether there are complete exposure pathways for such chemicals to contact the subject human receptors, and (iii) to quantify the amount of human exposure to the chemicals through such pathways. A toxicity assessment is performed for chemicals of concern that may have carcinogenic or other adverse effects on human health (<u>e.g.</u>, cause damage to the kidney or nervous system). A quantitative risk characterization is then performed, based on the above factors, to determine whether the chemical exposures would cause an unacceptable risk to the potential receptor populations. If so, the risk assessment would then proceed to calculate a remedial objective that would remove the unacceptable risk.

Because the ROW was impacted by petroleum-related contamination from the Site, but was not remediated, a RIDEM Method 3 risk assessment ("Risk Assessment") was performed in order to ensure that the unremediated ROW soils would not present an unacceptable risk to human health. RIDOT has indicated that the most likely future use of the ROW is conversion to a bike path or for commuter rail services. Since the bike path involves more exposure to ROW soils than commuter rail operations, that was the future use evaluated in the Risk Assessment for both child and adult bike path users. Additionally, for potential risks prior to bike path conversion, a nearby young child resident who might play in the ROW was evaluated as well as an older child trespasser. Finally, because it was contemplated that the ROW might be used for the placement of a

24-inch sanitary sewer, the risks to a construction worker were evaluated. Subsequently, it has been determined that the sewer line will not involve construction in the ROW.

The Risk Assessment was prepared using EPA and RIDEM guidelines for such studies. Regulatory guidelines and specified assumptions for Risk Assessments tend to be conservative, reflecting the obligation of regulators to err on the side of caution when evaluating human health risks. The Risk Assessment for the ROW did not find unacceptable levels of human health risk, despite the conservatism inherent in the regulatory protocols and other major conservative assumptions that were adopted by CIOC for the Risk Assessment.

In the Risk Assessment a number of extremely conservative assumptions were used regarding exposure of the subject individuals to potentially contaminated soil. For example, for current trespasser purposes a 95% upper confidence level on the mean ("95% UCM") value of 195 ppm for soils 0-2' in depth was used for the risk calculation. This is because a trespasser would be exposed to surface soils. For the future bike path users, a 95% UCM value of 2,245 ppm was taken from 0-6' depth samples to account for the possibility that sewer line construction might result in some of the deeper soils being brought to the surface. The ROW is approximately 70' wide, and it is absurd to think that its entire surface would be replaced by deeper, higher contamination level soils from the installation of a 24" sewer line. This is the assumption that was used, however, even after it became known that the proposed sewer line will not be installed in the ROW. Furthermore, when bike paths are developed from former railways, they are typically covered with asphalt, grass and other vegetation for useability, which also serves to minimize any exposure to the potentially contaminated underlying soil.

The amount of time that each category of subject individuals would be exposed to soils in the ROW also was conservatively estimated. For example, an exposure frequency for a 12-year old child trespasser of 56 days per year was assumed. That is the highest end of a range recommended by EPA Region 1. CIOC further assumed, however, that <u>all</u> of an individual's soil exposure per day comes from the ROW. This means that, for the 12- year old child, the calculation assumed that he or she would spend 56 <u>full</u> days in the ROW. This is highly unlikely because (i) there is nothing in the ROW that would make it desirable for extended play, as opposed to being used merely for access to the more attractive shore area, and (ii) during warmer months, when children would be spending more time outside, the ROW is nearly impassable due to poison ivy and other dense vegetation.

Similar conservatisms were used in evaluating the potential exposure of a young child (3-year old) nearby resident. The amount of time spent outdoors away from home was taken from a study of children ages 5-12, who are much more mobile and independent of parental guidance in outdoor play than a 3-year old. It was then assumed that <u>all</u> of the time of such a child spent outdoors away from home would be spent in the ROW, excluding the possibility of any time being spent at a neighbor's home, a schoolyard, park, playground or in time spent elsewhere with parents. This approach

leads to an assumption that a 3-year old child would spend 44 total days per year, or 13% of their total waking hours, in the ROW.

For the future adult and child bike path user, the 94th percentile for the frequency of visits to the future ROW bike path was derived from a study of Rhode Island's East Bay Bike Path (200 days per year). This is more than the 180 days per year that most children attend school and indicates that 94 out of 100 bike path users would have fewer visits to the future bike path. For the adult, when combined with a conservative exposure duration (30 years), it is implied that an adult will spend approximately one-quarter of an entire lifetime in the future bike path (6,000 days out of 25,550 days in a 70 year lifetime). Such an assumption is bound to overestimate lifetime exposure frequency for any individual.

The foregoing example also demonstrates the cumulative effect of separate, independent conservative assumptions. The 94th percentile of the number of visits that adults make to the East Bay Bike Path is 200 visits per year. This is combined with an assumption that such an adult will live in the area for 30 years, which is the EPA's 90th percentile calculation for how long adults will live in one place. This means that the probability of an individual exceeding the assumed lifetime visits is .0006 or 0.6% [(1-0.94) x (1-0.90) = .006]. Thus, the probability that an adult will visit the proposed bike path 6,000 times in a life time (30 years x 200 visits per year) is 0.6%. In contrast, using the average number of visits to the East Bay Bike Path (63 per year) and the 50th percentile of residence time (9 years) would result in 567 lifetime visits. This is less than 10% of the upper bound estimate of 6,000 used for the Risk Assessment calculations. When conservative estimates also used by CIOC for other exposure parameters are factored into the estimate of soil exposure, it is likely that the resulting exposure estimate is too high to represent any person who may ever use the bike path.

For future bike path users, the Risk Assessment also assumed that the future bike path was located only in the ROW. This assumes that a future bike path would be only 3,000 feet long and that bike path users would travel back and forth down such the path. In fact, it is likely that any future bike path would be considerably longer than 3,000 feet (0.57 miles). According to the Rails-to-Trails Conservancy (at www.traillink.com), five recreational trails exist in Rhode Island. They vary in length from 1 mile (Phenix-Harris Riverwalk-Charter Oak Greenway) to 14.5 miles (the East Bay Bike Path). These trails average 6.4 miles in length. Even if the future bike path in the ROW is as short as the shortest of these trails (1 mile), soil exposure would be reduced 43% if it is assumed that a person's soil exposure is represented by the entire length of the path and not just the fraction of the path in the ROW adjoining the Site (i.e, 3,000 feet out of 5,280 feet). If an average path length is assumed (6.4 miles), the fraction of soil exposure attributable to the ROW would be only 9% of that calculated in the Risk Assessment. Thus, the assumption that all soil exposure will occur in the ROW overestimates the risk.

Other conservative assumptions regarding exposure that are used in the Risk Assessment, such as the amounts of soil ingestion, and dermal soil adherence and absorption, are described in the Risk Assessment and Table 18 thereto.

The assumptions described above were used in the Risk Assessment for all of the chemicals evaluated, including TPH, BTEX, PAH's, and lead, as well as non-petroleum related chemicals which, although they would not be attributable to operations at the Site, also might be present in the ROW.

Sample results for BTEX, PAH's and lead from the ROW indicate that even the maximum detected concentrations for most of these chemicals were below RIDEM's Method 1 residential criteria. Using the Compliance Formula, all of these chemicals meet the Method 1 residential criteria. Although the detected concentrations therefore did not present unacceptable human health concerns, these chemicals were retained for consideration in the Risk Assessment along with TPH to assess the cumulative risk that could result from simultaneous exposure to them and other chemicals that might be present in the ROW although not attributable to Site petroleum operations.

ROW soil samples were not analyzed for chemicals unrelated to petroleum contamination because the Site would not have been the source of such chemicals. In theory, however, sources of chemical contamination unrelated to the Site may have impacted the ROW. To address this uncertainty, a combination of site-specific data from the ROW and data collected from other railroad rights-of-way in Rhode Island ("Other ROWs") were used to assess risk in the ROW.

The addition of chemicals detected in Other ROWs to the chemicals detected in the ROW is associated with two conservatisms. First, a chemical detected in any of the Other ROWs was assumed to be a chemical of concern for the ROW. This is an important conservatism since any chemical detected in any of the Other ROWs does not mean that the chemical was found in all of the Other ROWs. For example, low levels of PCBs (0.06 to 0.28 ppm) were detected in soils in Cranston along two segments of an Amtrak right-of-way, but not along other segments in Cranston. PCBs were also not detected along three segments of the Blackstone River Bikeway in Lincoln, Cumberland, and Woonsocket. Second, with the exception of arsenic, the maximum detected concentration of non-petroleum related chemicals detected in any of the Other ROWs was used in the Risk Assessment. For example, the highest detected level of PCBs in the Other ROWs (Amtrak ROW in Cranston, 0.28 ppm) was used to assess theoretical exposure and risk to PCBs in the ROW. Due to the widespread detection of arsenic in Other ROW soils, the more typical 95% UCM soil concentration was used for the Risk Assessment.

The oral bioavailability of the chemicals of concern in ROW soil was conservatively assumed to be the same as that in water or food. However, V. above, the oral bioavailability of chemicals in soil may be less than chemicals in food or water. In particular, the oral bioavailability of petroleum constituents adsorbed to soil relative to that in water or food may be considerably lower (Brainard and Beck, 1992). This means that, although the chemical in soil may be ingested from breathing dust or hand to mouth contact, less than 100% of the chemical will be taken up by the body.

In particular, a recent study indicates that for polycyclic aromatic hydrocarbons (PAHs) in soil, the amount of absorption from the gastrointestinal tract is reduced relative to PAHs in food (Bordelon et al. 2000). Rats were fed diets containing a mixture of PAHs or the same diet containing PAHs and soil. The presence of soil in the diet reduced the amount of gastrointestinal absorption of PAHs (measured by the amount of binding of potentially carcinogenic PAHs to DNA) by 56% to 63% versus that of the diet with no soil added. According to this study, the extent of oral uptake of PAHs assumed in the Risk Assessment may be overestimated by a factor of 2 or more. This is another conservatism that may not be fully appreciated in the ROW.

The above study involved pure PAH's that were freshly added to soil. Other scientific research indicates that organic compounds such as TPH and PAH's become even less bioavailable if they have been present in the soils over time. (See the discussion in V. above).

Much research has recently been conducted on the oral bioavailability of arsenic in soil. Exposure to arsenic in soil drives most of the calculated lifetime cancer risk for the receptors of concern in the ROW. Published studies of the bioavailability of arsenic are summarized in the table below.

**Published Bioavailability Studies for Arsenic**

| Bioavailability (%)* | Test Condition | Reference |
|---|---|---|
| 50 | Relative oral bioavailability by gavage | Freeman et al., 1993a, 1993b |
| 24 | Relative As oral bioavailability in test soil | Freeman et al., 1993a, 1993b |
| 10-30 | Range of relative As oral bioavailability (in soil and house dust) | Freeman et al., 1995 |
| 10-18 | Relative oral bioavailability of arsenic in soil in the nonfasted animal | Ruoff et al., 1995 |
| 13.5 | Relative oral bioavailability of arsenic in calcine material | Rodriquez et al., 1999 |
| 24.8 | Relative oral bioavailability of arsenic in all media tested except calcine | Rodriquez et al., 1999 |
| 21.0 (range 2.7-42.8%) | Average relative oral bioavailability of all media | Rodriquez et al, 1999 |

Bioavailability studies of arsenic in soil versus the bioavailability of arsenic in food or water indicate that the relative bioavailability of arsenic in soil may range from 10% to 50%. The 100% bioavailability assumption used in the Risk Assessment would result in the overestimation of arsenic bioavailability by 2- to 10-fold.

The calculated risks associated with arsenic exposure in the ROW, which is not attributable to petroleum-related operations at the Site, are responsible for 87% of the overall calculated cancer risk which was still found not to be a level that would result in unacceptable human health risk. The highest of the calculated lifetime arsenic intakes was calculated for the future adult bike path user exposed to soils in the bike path for 200 days per year for 30 years. The lifetime average daily intake for arsenic from the ingestion, skin uptake, and inhalation pathways was calculated to be $5.9 \times 10^{-6}$ ppm/day. For a 70 kilogram (154 pound) adult, this amounts to an arsenic intake of 0.41 parts per

billion ("ppb") per day. In contrast, the unavoidable intake of inorganic arsenic from background sources such as food and water is 18 ppb/day (USEPA, 1988). A pie chart comparing the background intake from arsenic versus that obtained from exposure to soils in the ROW is presented below.




As shown in the figure, arsenic intake from the ROW is dwarfed by background intake of arsenic from food, water, and other natural sources. Put in another way, the lifetime cancer risks from background arsenic intake (3.9 E-04) is 44 times greater than that associated with exposure to ROW soils ($8.9 \times 10^{-6}$). Placed in proper perspective, the risks posed by arsenic in soil are inconsequential when compared to the unavoidable risks resulting from eating and drinking background amounts of arsenic in food and water.

In sum, the Risk Assessment concluded that contaminated soils in the ROW do not present unacceptable health risks to current or future potential human receptors. This conclusion is reached despite the conservatisms in the regulatory guidance for such risk assessments, and the numerous conservative assumptions adopted by CIOC for the Risk Assessment. These conservatisms resulted in Risk Assessment calculations that substantially overstated the risk from ROW soils, and still found no unacceptable human health risks.

VIII. Conclusion. For many years the Site was an unsightly petroleum terminal, with the consequence of actual or potential contamination of soil, groundwater, and nearby surface water bodies. CIOC chose to remediate the Site to residential standards, rather than the more lenient industrial/commercial standards. CIOC further chose to use RIDEM's Method 1 standard, rather than a Method 3 approach that would have allowed much higher post-remedial concentrations of TPH in soil. The outcome of these choices is a contract to sell the Site for a development which, if completed as anticipated, will result in (i) a high quality residential development, (ii) increased public access to the shore (handicapped accessible), with commercial, fishing and marina amenities, and (iii) construction of a sewer line that will not only serve the Site, but also reduce pollution to

Mt. Hope Bay from leaking septic tanks in North Tiverton and enhance the value of Tiverton's industrial park.

IX. References.

Alexander, M., Aging, Bioavailability, and Overestimation of Risk from Environmental Polluants. Environmental Science & Technology. 2000; 34(20): 4259-4265.

Bordelon, N.R., Donnelly, King, L.C., Wolf, D.C., Reeves, W.R., and George, S.E. Bioavailability of the genotoxic components in coal tar contaminated soils in Fischer 344 rats. 2000; Toxicol Sci 56(1):37-48.

Brainard, J. and Beck, B. A review of the bioavailability of petroleum constituents. J. Soil Contamination. 1992; 1(3): 273-307.

Cole, G.M., Assessment and Remediation of Petroleum Contaminated Sites, CRC Press, 1994, p. 37.

Holmes, K.K., Shirai, J.H., Richter, K.Y., and Kissel, J.C. Field measurement of dermal soil loadings in occupational and recreational activities. Environ. Res. 1999; 80:148-157.

Freeman, G. B.; Johnson, J. D.; Killinger, J. M.; Liao, S. C.; Davis, A. O.; Ruby, M. V.; Chaney, R. L.; Lovre, S. C., and Bergstrom, P. D. Bioavailability of arsenic in soil impacted by smelter activities following oral administration in rabbits. Fundam Appl Toxicol. 1993a; 21:83-88.

Freeman, G.B., Johnson, J.D., Liao, S.C., Schoof, R.A., Bergstrom, P.D. Pilot study of absolute bioavailability of arsenic in soil impacted by smelter activities following oral administration in rabbits and monkeys. Presented at the SEGH International Conference on Arsenic Exposure and Health Effects, New Orleans, 1993b.

Freeman, G. B.; Schoof, R. A.; Ruby, M. V.; Davis, A. O.; Dill, J. A.; Liao, S. C.; Lapin, C. A., and Bergstrom, P. D. Bioavailability of arsenic in soil and house dust impacted by smelter activities following oral administration in cynomolgus monkeys. Fundam Appl Toxicol. 1995 Dec; 28(2):215-22¤.

Northcott, G.L., and Jones, K.C., Partitioning, Extractability, and Formation of Nonextractable PAH Residues in Soil. 1. Compound Difference in Aging and Sequestration. Environmental Science & Technology. 2001; 35(6): 1103-1117.

Rodriguez, R. R.; Basta, N. T.; Casteel, S. W., and Pace, L. W. An in vitro gastrointestinal method to estimate bioavailable arsenic in contaminated soils and solid media. Environ Sci Technol. 1999; 33(4):642-649.

Ruoff, W. L.; Diamond, G. L., and Velazquez, S. F. Consideration of small intestine (SI) status (empty vs. contains ingesta) may prevent overestimating bioavailability of inorganics. Poster presented at. SEGH Second International Conference on Arsenic Exposure and Health Effects; 1995.

USEPA. Special Report on Ingested Inorganic Arsenic. Skin Cancer; Nutritional Essentiality. Washington, DC: United States Environmental Protection Agency, 1988.

18774



SHORE AREA
PACIFIC PARCEL
NORTHEAST PARCEL
AIR FORCE PARCEL
TEXACO SHORE AREA
TO SOUZA ROAD PARCEL
PROJECT
FORMER NORTHEAST PETROLEUM TERMINAL
TIVERTON, RHODE ISLAND
DRAWING
SITE LAYOUT
REVISION NO.
DOCUMENT CONTROL NO.