# EXHIBIT B

14.001.67

GZA

**REMEDIAL WORK PLAN**
**(REVISION 2)**
**FORMER DEP TERMINAL**
**TIVERTON, RHODE ISLAND**

PREPARED FOR:
NP Corporation
Exton, Pennsylvania

PREPARED BY:
GZA GeoEnvironmental, Inc.
Providence, Rhode Island

February 1991
File No. Y-30389

Copyright© 1991 GZA GeoEnvironmental, Inc.

GZA
GeoEnvironmental, Inc.

*Engineers and Scientists*

February 13, 1991
File No. Y-30389-C,PC

Michael Mulhare
RI Department of Environmental Management
Division of Water Resources
291 Promenade Street
Providence, RI 02908

Re: Remedial Work Plan (Revision 2)
NEP Terminal Site
Tiverton, Rhode Island

140 Broadway
Providence
Rhode Island 02903
401-421-4140
FAX 401-751-8613

Dear Mr. Mulhare:

As a follow-up to our January 31, 1991 meeting, this document has been prepared to address the Department's review comments of our December 31, 1990 **Northeast Petroleum Terminal - Remedial Work Plan (Revision 1)**. Consistent with that plan, revised sections presented herein are highlighted with underline.

Per our discussions, because of the nature of the site, certain portions of the proposed remedial program are general in nature. GZA understands that the RIDEM may require submission of additional support and/or descriptive information as the project progresses.

Should you have any questions concerning this plan, or the project as a whole, please feel free to call us at 421-4140.

Very truly yours,

GZA GEOENVIRONMENTAL, INC.

John P. Hartley
Senior Project Manager

Albert Ricciardelli
Project Reviewer

A Subsidiary of GZA
GeoEnvironmental
Technologies, Inc.

Frank W. Clark, P.E.
Associate Principal

JPH/FWC:cln

cc: S. Coffey (Licht & Semonoff)
M. Aqualina (NEPCO)
A. Rothchild (GZA-AET)

An Equal Opportunity Employer M F V H

GZA

## TABLE OF CONTENTS


| | | Page |
|---|---|---|
| 1.00 | INTRODUCTION | 1 |
| 2.00 | BACKGROUND | 1 |
| 2.10 | SITE DESCRIPTION AND FORMER OPERATION | 1 |
| 2.20 | TOPOGRAPHY AND DRAINAGE | 3 |
| 2.30 | PREVIOUS SITE INVESTIGATION | 3 |
| 2.31 | D. Reed Study | 3 |
| 2.32 | Camp Dresser & McKee Study | 3 |
| 2.33 | GZA Groundwater Study | 5 |
| 2.40 | FORMER REDEVELOPMENT PROGRAM | 6 |
| 3.00 | PROPOSED SITE DECOMMISSIONING AND REMEDIATION | 8 |
| 3.10 | TERMINAL DECOMMISSIONING | 8 |
| 3.20 | PROPOSED REMEDIAL PROGRAM (SOILS) | 9 |
| 3.21 | The Shore Area | 10 |
| 3.22 | Big Louie | 13 |
| 3.23 | Other Characterized and Uncharacterized Areas | 14 |
| 3.24 | Underground Storage Tanks | 15 |
| 3.30 | PROPOSED REMEDIAL PROGRAM (GROUNDWATER) | 16 |
| 4.00 | VERIFICATION OF SITE REMEDIATION | 17 |
| 4.10 | SITE-WIDE SOIL CONDITIONS | 17 |
| 4.20 | CENTRALIZED TREATMENT AREA AND IN-SITU SHORE AREA | 19 |

## TABLE OF CONTENTS (CONT'D)


FIGURES

FIGURE NO. 1 LOCUS PLAN

FIGURE NO. 2 EXPLORATION LOCATION PLAN

APPENDICES

APPENDIX A LIMITATIONS/STATEMENT OF TERMS AND CONDITIONS

## 1.00 INTRODUCTION

In accordance with our proposal dated March 23, 1989, GZA GeoEnvironmental, Inc. (GZA) has prepared this Remedial Work Plan for the Northeast Petroleum Terminal (NEP) site in Tiverton, Rhode Island. This report presents a brief history of the site, summarizes previous environmental studies and describes a proposed plan to remediate petroleum contaminated soils. The remedial measures described herein are considered the final phase of a four phase project being undertaken at the site. Phases I, II and II are not subject to this work plan, but are briefly described in Section 3.10.

This report has been prepared in accordance with the Limitations set forth in Appendix A. No other warranty, expressed or implied, is made.

## 2.00 BACKGROUND

The proposed remedial activities described herein are based, in part, on the operational history of the terminal and past environmental studies. The following sub-sections serve to summarize our understanding of site conditions based on existing information. Throughout the report key features and areas of the site are identified based on prior operations. These location-specific descriptions are depicted on Figure No. 2.

### 2.10 SITE DESCRIPTION AND FORMER OPERATION

The NEP site is located on approximately 100± acres of land in Tiverton, Rhode Island. The area of the site, which can be described as suburban, is characterized as a mix of residential and commercial uses. As shown on the attached Figure No. 1, Site Locus, the immediate neighborhood is delineated by Main Street (Route 138) to the east, by the Sakonnet River and Mount Hope Bay to the west and north, and by a residential development to the south.

The site is an inactive petroleum storage and distribution facility with an approximately 70 year history with this use. Initial development of the site as an oil facility began in the 1920s. The site was developed thereafter by various operators in a series of discrete phases. Prior site owners/operators included, but were not limited to; Sinclair Oil, Pacific Oil, Northeast Petroleum, the Federal Government, Bay Oil and Texaco Oil. Since approximately 1986 all operations at the site have ceased.

Site activities included the distribution of petroleum products stored in 32 above ground steel storage tanks providing 20,000 to 172,000 barrel capacities. Products stored historically at the site have been limited to petroleum products including, No. 2 fuel oil, kerosene, diesel and unleaded and regular gasoline. Petroleum products were delivered to the site via tanker ships and rail cars. Product distribution involved the transfer of petroleum from the storage tanks to three rack areas where product was dispensed to tanker trucks or rail cars.

Presently the site features 25 above-ground storage tanks (AGSTs), 15 underground storage tanks (USTs), and miscellaneous structures which served to support office, supply and maintenance operations. Asphalt paved roads, generally in poor repair, access much of the site and a public road, Carey Lane, bisects portions of the site in an east-west direction. An inactive rail line passes through the western section in a north-south direction, roughly separating much of the former tank storage from the beach areas. Two piers, formerly used in support of product unloading operations, are present along the Shore Area of the site.

The site can be approximately subdivided into five specific areas, based partially on past operations. These areas are described as the Pacific Area, Northeast Area, Texaco Area, Texaco Shore Area
and Shore Area. Refer to Figure No. 2, Exploration Location Plan, for the general site layout.

The northern most portion of the site was operated by the Pacific Oil Company. This operation utilized seven of the "P" series AGSTs currently present at the site and the settlement basin referred to as "Big Louie". A product distribution rack, the "Pacific Rack", was formerly present in the northeastern area of the site. Surface features associated with the rack have been dismantled.

The former Northeast operation encompassed the central portions of the site, including seven "Numbered" series tanks and a product distribution rack, the "Northeast Rack". Overhead petroleum loading fixtures are still in-place at this rack location. Additionally, a rail tank car loading and unloading rack, located to the north of Carey Lane and east of the rail line, was operated in this portion of the site.

The former Texaco operation is located in the southern area of the site. This operation involved the use of six "A" series AGSTs located east of the rail line, as well as two tanks located along the beach identified on Figure No. 2 as the "Texaco Shore Area".

The shoreline of the site, west of the rail line and north of Carey Lane is identified as the "Shore Area". It is separated from the product storage operations by a steep, extensively vegetated embankment. The beach supports some vegetative growth with the density of growth increasing in a south to north direction. Portions of the shore area were reportedly hydraulically filled with dredge spoils from the Sakonnet River.

GZA

2.20 TOPOGRAPHY AND DRAINAGE

The site slopes steeply in a westerly direction from a high of 210 feet above mean sea level in the northeastern corner of the property to a low along the site's shoreline border. Based on a preliminary review of the area's topography and the topographic contours depicted on the U.S. Geological Survey topographic quadrangle map of the area (Fall River, Massachusetts-Rhode Island Quadrangle, photorevised 1979), GZA anticipates that surface and groundwater flow patterns at the site are to the west towards the Sakonnet River and Mount Hope Bay (see Figure No. 1).

Northeast Petroleum initiated a variety of construction programs in 1965 to contain product release and control runoff at the site. Included among these programs were extensive diving, channeling of runoff and, in 1975, the installation of an API Separator.

2.30 PREVIOUS SITE INVESTIGATIONS

Prior environmental evaluation studies have been performed at the NEP site. This section presents summaries of the those investigations, with focus on findings with regard to soil and groundwater conditions.

2.31 D. Reed Study

In 1985 and 1986 an initial field investigation was conducted by D. Reed. This program included the installation of 16 monitoring wells and 33 soil borings. Soil samples collected at approximately 1-foot intervals during these efforts were screened for the presence of volatile organic compounds (VOCs) using an HNU photoionization detector. Twelve groundwater and 11 soil samples were subjected to laboratory analysis which included petroleum hydrocarbons, VOCs and metals. GZA is not aware of the existence of a formal report prepared by Reed. As noted below, CDM relied on Reed's data as part of their investigation.

2.32 Camp Dresser & McKee Study

In February 1986, Camp Dresser & McKee (CDM) began a subsequent investigation of the NEP site. The purpose of the investigation was "..to establish the hydrogeological conditions at the terminal and to assess the presence of on-site contamination." The scope of that study was based, in part, on the findings of the

get copy!

D. Reed investigation. The reader is referred to CDM's April 22, 1986 draft report entitled A Preliminary Assessment of Environmental Contamination At The Northeast Petroleum Terminal In Tiverton, Rhode Island for a comprehensive description of the project.

The CDM project involved two phases of study which resulted in the performance of 34 borings and 24 test pits, the installation of two additional observation wells, and the screening and/or analytical testing of 300 soil and three groundwater samples. The screening and analytical testing program consisted of HNU and organic vapor analyzer headspace analysis, petroleum hydrocarbons (PHC), gasoline constituents (benzene, toluene, ethyl benzene, xylene [BTEX]) and metals.

Based on CDM's field and analytical testing results, five specific "major areas of contamination" at the site were identified. Each is described separately below.

-1- **Shore Area** - 19 soil borings, 16 test pits and seven monitoring wells were completed in this area of the site. Groundwater samples were found to contain up to 130 ppm PHC and soil PHC concentrations ranged from non-detectable (<1 ppm) to 1,200 ppm. During the performance of test pits at the toe of the railroad tracks, observations of hydrocarbon contamination were observed. Testing data associated with samples obtained from this area were not available to GZA. CDM reported that the shore area clearly represents the largest area of contamination (270,000 ft2) with an estimated soil volume 100,00 $yd^{3}$.

-2- **Pacific Rack Area** - 12 borings, three test pits and one monitoring well were completed in this approximately one and one half acre area. No groundwater testing results are reported for the well installed in this area (CDM-6), and this well is no longer present at the site. Floating product was, however, observed by CDM in a test pit in this portion of the site. PHC soil concentrations ranged from non-detectable (<43 ppm) to 20,000 ppm. Soil PHC contamination was found at a depth of approximately 5 feet and concentrations generally increase in a westerly direction. The area of contamination (61,000 ft2) was estimated to involve a soil volume of 11,000 $yd^{3}$.

-3- **Northeast Rack Area** - soil conditions were assessed in this area through the performance of 8 soil borings. No ground-water observation wells were installed. Soil PHC contaminant levels ranged from non-detectable (<43 ppm) to 15,000 ppm. PHC soil contamination was found in the southwestern portion of this area. The area of contamination (50,000 ft2) was estimated to involve a soil volume of 11,000 $yd^{3}$.

-4- **Texaco Shore Area** - the area near the Texaco Shore tanks was evaluated through the completion of four borings, two test pits and eight monitoring wells. The Texaco Shore tanks were found to be built on fill extending into the Sakonnet River. Floating product was observed in two of the Texaco Shore Area wells. PHCs were found in groundwater samples from two wells at concentrations of 4 and 130 ppm. Soil PHC levels are reported to be considerably higher, with contamination expected to extend to depths of 12 feet. The area of contamination (20,000 $ft^2$) was estimated to involve a soil volume of 8,900 $yd^3$.

-5- **Big Louie** - through the performance of three borings, CDM found that the lagoon contains a discrete 1-foot layer of oily "muck" in the northern end, with residual contamination extending into the till layers to depths of 5 to 6 feet. PHC concentrations of "muck" samples reached 32,000 ppm, while samples of till exhibited levels of 2,900 to 3,200 ppm. The area of contamination (15,000 $ft^2$) was estimated to involve a soil volume of 3,400 $yd^3$.

2.33 GZA Groundwater Study

In January 1990, GZA performed a single groundwater sampling round involving 12 existing groundwater monitoring wells at the NEP site. Subsequently, on April 24 and 25, 1990, GZA completed a field exploration program to assess groundwater conditions in the northeastern portion of the site. Two borings and two observation wells were completed during this phase of the investigation and these wells were sampled for analytical testing. The results of these field activities are presented in our reports entitled Groundwater Monitoring Report - NEP Terminal Site, (April 1990) and, Groundwater Monitoring Addendum Report - NEP Terminal Site, (July 1990).

The groundwater testing program involved measuring certain field parameters (pH, and specific conductance), laboratory screening for volatile organic compounds (VOCs) and analytical testing for petroleum hydrocarbons (Petroleum Hydrocarbon Fingerprint and Total Petroleum Hydrocarbons). The findings of our groundwater quality monitoring program and those reported by CDM are summarized below.

-1- Groundwater samples obtained from the two wells completed in the northeastern portion of the site did not provide information indicating groundwater degradation from petroleum sources.

-2- Groundwater samples collected from the site in 1986 (Reed and CDM) and in 1989 (GZA) generally did not provide evidence of VOC contamination. The only exceptions to this trend was CDM's reporting of xylene(s) at 250 ug/l (ppb) in well MW-10, and our screening results which indicated the presence of Freon 113 at the method detection limit (0.02 ppm) in MW-6.

GZA

-3- CDM's and GZA's data illustrate that petroleum hydrocarbons are present in the groundwater along the beach areas of the site. Generally, wells in the "Texaco Shore Area" provided evidence of higher PHC levels then those located along the "Shore Area" to the north (e.g. 100 to 320 ppm vs. <1 ppm). The PHCs were characterized as either diesel fuel or No. 2 fuel oil

-4- CDM's metals testing results from three wells (MW-1, MW-2 and MW-12) indicate that, with the exception of iron and manganese, the remaining 13 metals were not detected above the detection limit. Iron concentrations ranged from 0.27 to 24 mg/l and manganese was found at 3.5 to 20 mg/l.

-5- No floating products were recorded by GZA in any of the 14 wells and field water quality measurements did not provide evidence of other non-characterized sources of groundwater contamination.

## 2.40 FORMER REDEVELOPMENT PROGRAM

In June 1988, CDM prepared for submission to the Rhode Island Department of Environmental Management (RIDEM), a site remediation plan entitled Tiverton Terminal Redevelopment Program. That document specifies "remedial activities for individual locations where petroleum hydrocarbons exceed levels defined by RIDEM as acceptable for unrestricted land use." The plan was developed based on discussions with RIDEM, CDM's understanding of site conditions, and an evaluation of planned alternate land use patterns at the property.

Plans for the NEP site, at that time, was redevelopment for residential and recreational uses. A development plan for the site was prepared and specific "use areas" of the site were assigned. The proposed remedial approach targeted these areas, with clean-up objectives designated for specific "use areas". The remedial plan outlined "permissible levels for residuals" which were clean-up goals that must be achieved before unrestricted land use was acceptable. These goals are outlined below.

GZA

| MEDIA | | CRITERIA | | |
|---|---|---|---|---|
| | TPH (max.) | TPH (ave.) | TVOC | Napthalene |
| Soil | 100 mg/l | 50 mg/l | 250 ppb | 1 ppm |
| Groundwater | 1 mg/l | NA | 250 ppb | NA |

NOTE: TPH refers to total petroleum hydrocarbons (as the aggregate concentrations of oil and grease, light fuel fractions [diesel, heating fuel] and gasoline) and TVOC refers to total volatile organic compounds.

Additionally, with regard to clean-up goals, the plan indicates that,

"..any specific purgeable organic or inorganic contaminant shall not exceed proposed and final maximum contaminant levels or long term health advisories as established by the U.S. Environmental Protection Agency" and, "In no case shall any soil constituent exceed metal concentrations in excess of concentrations established as EP toxic by the E.P. Toxicity Characteristics Leaching Procedure (TCLP) 40 CFR 261, Appendix II".

GZA understands that RIDEM has determined that soils at the site which provide visual and/or olfactory indications of petroleum products will be considered "contaminated" and subject to remediation. The redevelopment plan proposed additional soil sampling and analysis at the site. Data resulting from these efforts would be used to detail the site-wide areal extent and depth of PHC contamination in soils. This program involved the collection of shallow soil samples from a 150-foot by 150-foot grid overlay of the entire site.

For the present remedial project, RIDEM has noted that the criteria naphthalene may be replaced with other fuel oil indicators. GZA's testing program will be modified to address these changes. Additionally, RIDEM has expressed that total lead concentration in soils at the site should be considered. As described in Section 4.10, total lead testing will be performed on certain soil samples. Sample selection for lead testing will be based on the area and conditions of concern (i.e. potential sources). "Clean" soils may also be selected for total lead testing to evaluate background soil-lead concentration.

CDM's proposed remedial program included the removal and off-site disposal of soils and sludges which exceed the contaminant levels outlined above, the construction of groundwater containment and soil biotreatment systems, and the designation of locations as "Alternate Use Areas" for areas "necessitated by residual levels of petroleum hydrocarbons." Specific areas of the site targeted for remediation are outlined below.

GZA

| AREA | REMEDIAL APPROACH |
|---|---|
| Big Louie | dewatering -> excavation -> bioremediation |
| Shore Area (soils) | excavation -> bioremedation |
| Shore Area (groundwater) | groundwater collection system -> API separator |
| Pacific Rack<br>Northeast Rack<br>Rail Tank Car Rack | excavation -> stockpiling -> area preparation -> re-placement of soils -> cap (clay, geotextile, gravel, asphalt or soil) -> "Alternate Use Area" designation |

## 3.00 PROPOSED SITE DECOMMISSIONING AND REMEDIATION

Economic and logistical considerations related to changes in the oil industry have rendered the NEP site no longer viable as a location for the storage and distribution of petroleum products.

The NP Corporation seeks to modify conditions of the site such that the property becomes an attractive location for sale, with no specific future use restrictions. Accordingly, the objectives of the proposed site redevelopment program are consistent with those described by CDM. That is, the implementation of an environmental clean-up program that will support unrestricted use of the property.

Some elements of the proposed remedial approach differ from those presented by CDM. Some have resulted from advances in remedial technologies since 1988, others relate to concerns identified by GZA in review of prior site studies. All proposed changes, however, have been completed to meet the objectives of the project. Specifically, since plans are to sell the property with no anticipation of future uses, the proposed clean-up will be more comprehensive and will not involve capping wastes in-place at "Alternate Use Areas". NP Corporation has established a five year timetable to prepare the site for market resale. The following subsections described the programs proposed to meet these site development objectives.

### 3.10 TERMINAL DECOMMISSIONING

The redevelopment plan for the site involves a four-phase project to be completed over a five year period. Phases I, II and III generally involve mechanical efforts to remove storage tanks, associated pipework and other man-made site features. Each project phase and an anticipated project schedule is summarized below. Note that some of these activities require certain approvals from local (building and fire departments) and state (CRMC) officials. Applications have been submitted to these agencies and approvals for the majority of the work have been granted.

GZA

Phase I - the objective of the first year of the project is to complete removal of product from all storage tanks (above and underground) and piping. This will be accomplished with support from a hazardous contractor. The interior portions of the tanks will be washed and all removed materials will be sampled and analyzed prior to off-site transportation. Gas free certifications will be received from a Certified Marine Chemist.

Phase II - the objective of the second phase of the project is to identify above ground storage tanks suitable for relocation and reuse. Such tanks will be sectioned, transported and re-erected at other out-of-state NEPCO facilities.

Phase III - the objective of the third phase of the project is to remove all remaining tanks, piping, buildings and other features. This phase will also involve the excavation and disposal of underground storage tanks (refer to Section 3.25).

Phase IV - the final phase of the project involves the site remediation plan presented in Sections 3.20 to 4.20 below.

ANTICIPATED PROJECT SCHEDULE

| TITLE | START DATE | COMPLETION DATE |
|---|---|---|
| Phase I | August 1990 | July 1991 |
| Phase II | August 1990 | December 1990 |
| Phase III | January 1991 | December 1991 |
| Phase IV | November 1990 | November 1995 |

## 3.20 PROPOSED REMEDIAL PROGRAM (SOILS)

This section describes GZA's approach to remediate areas of the site which have or may exhibit PHC contamination in soils. This program is based on the evaluation studies and the redevelopment plan described above. Notably, we have focused on specific locations at the site identified by CDM as the "major areas of contamination." These areas, and CDM's contaminated soil volume estimates are summarized below.

GZA

| Location Description | Area ($ft^2$) | Depth of Contamination (ft) | Soil Volume ($yd^3$) |
|---|---|---|---|
| Pacific Rack | 61,000 | 5 | 11,000 |
| Northeast Rack | 50,000 | 6 | 11,000 |
| Texaco Shore | 20,000 | 12 | 8,900 |
| Shore Area | 270,000 | 10 | 100,000 |
| Big Louie | 15,000 | 6 | 3,400 |

It is important to note that, based on the site's long history of use as a petroleum handling facility, GZA's anticipates that during the facility decommissioning phases described above, other presently un-characterized areas of soil contamination will be encountered. Remediation of these areas will be undertaken in accordance with the approaches outlined below in Section 3.22.

Additionally, this report outlines steps to excavate and remove USTs at the site. GZA will be present during UST removal activities to evaluate soil conditions. Should contaminated soils be encountered during these efforts, those materials will also be subject to remediation.

3.21 The Shore Area

Remediation of contaminated soils in the Shore Area will require special considerations to limit the degree of disturbance to this sensitive environment. As such, our remedial program for Shore Area soils will be conducted separate from the site-wide remedial approach described below.

Two areas of contamination have been observed to be present along the site's western Shore Area. These include:

1. Surface staining which appears to be limited to inland portions of the beach and is characterized surficially as dredge spoils. Based on conversation with facility personnel, GZA understands that this area of contamination may have resulted from historical petroleum disposal (prior to NEP's operation).

2. Subsurface contamination identified by CDM and D. Reed at depths of 2 to 10 feet below the soil surface. Groundwater has been measured at 3 to 6 feet below the soil surface in this area, and based on monitoring data is expected to be

subject to tidal influences. Much of the subsurface contamination appears to be associated with groundwater contamination. Measured TPH concentrations in subsurface soils ranged up to 300 ppm in the beach area and up to 1,400 ppm in an area just inland of the beach area.

GZA

The proposed remedial approach for the Shore Area focuses on surface contamination (i.e., 0 to 3 feet beneath ground surface). We anticipate that removal of contaminant sources from upgradient former operational areas will result in dissipation of the deeper contamination associated with groundwater.

Surface contamination will be remediated using in-situ bio-remediation techniques. Petroleum hydrocarbons biodegrade readily under aerobic (i.e., oxygenated) conditions. The end products of petroleum hydrocarbon biodegradation is carbon dioxide and water. The proposed remedial program will provide the oxygen and other nutrients needed to support and enhance this process.

Specifically, the following general steps will be completed:

- Detailed field sampling and analysis to assess the extent of surficial contamination and designate the boundaries of the area to be subjected to biotreatment.

- Lab-scale biodegradation tests to assess whether toxic conditions may exist (that would hinder bioremediation) and to assess the need for supplemental nutrients (i.e., fertilizer).

- Construct a treatment area in which rainwater run-on and run-off will be controlled.

- Mechanical tilling of the area to aerate the soil. Based on the findings of the lab-scale tests, fertilizer may also be added to support the treatment process.

- Periodic sampling and analysis of the treated soil to evaluate the status of bioremediation with regard to reduction of PHC concentrations.

The specific tasks are detailed below:

GZA

**Task 1 - Field Sampling and Analysis**

A grid will be established over the Shore Area. Discrete surficial (0 to 3 feet) soil samples will be collected at the grid nodes. Samples will be analyzed in the field laboratory by EPA Method 418.1 for TPH. Field analyses will allow quick sample turnaround so that the sampling grid can be modified if necessary. The results of this Task will be used to establish the lateral extent of the area to be bioremediated.

**Task 2 - Lab-Scale Bioremediation Testing**

Two of the surficial soil samples representing the highest TPH levels collected during Task 1 will be selected for laboratory scale biodegradation testing. The soil samples will be placed in test flasks where hydrocarbon-free air will be introduced across the soil samples. The amount of carbon dioxide in the exiting air will be measured to assess the biological activity and thus the success of biodegradation. In addition to flasks with contaminated soil, flasks with no soil and flasks with "clean" soil will be tested as controls. Flasks with contaminated soil and varying amounts of fertilizer will be tested to assess the effectiveness of these additives.

**Task 3 - Preparation of Land Treatment Area**

The area to be treated will be separated from surrounding areas by berms constructed of clean soil from the site. The berms will function to control rainwater run-on and run-off. Because of the environmental sensitivity of the Shore Area, our object is to treat soils in-place, with minimal disturbance of the present setting of the area.

**Task 4 - Operation**

The treatment area will be periodically tilled (e.g., monthly during the "warm" months) to aerate the soil. The depth of tilling will depend on the depth at which contamination is found during Task 1. We currently believe that "deep tilling" (i.e., down to 1 to 3) using a ripper or similar equipment may be appropriate because of the presence of relatively deep contamination. Fertilizer will also be added periodically (e.g., annually) if found to be supportive of bioremediation.

Surficial soil samples will be collected periodically (e.g., quarterly to semiannually) to monitor the progress of remediation. Composite samples will be analyzed for TPH (EPA Method 418.1).

GZA

3.22 "Big Louie"

The lagoon currently contains several feet of water over approximately six feet of PHC contaminated materials described by CDM as "muck" and till. Samples of the lagoon sludge indicate approximately 3,000 ppm TPH, and 1,000 ppm VOCs using a flame ionization detector (FID) and headspace method. CDM reports that the surface area of the lagoon is approximately 15,000 $ft^2$ and the volume is approximately 3,400 $yds^3$

Water that has accumulated in the lagoon appears to be accumulated rainwater and site runoff diverted from uphill tank storage areas. On August 3, 1990 the lagoon water was observed to be clear with no evidence of a hydrocarbon sheen. Plumbing the bottom of the lagoon showed a black material underlying the brown muddy bottom.

The remedial approach proposed involves draining "Big Louie", allowing it to dry, excavating and staging the contaminated soil/sludge, and biological treatment of contaminated sediments on- site within the centralized treatment area (refer to Section 3.22).

The basic tasks are detailed as follows:

**Task 1 - Drain and Dry Lagoon**

A pump/drainage system will be constructed using a floating intake line to drain the lagoon down to a level 1 to 2-inches from the mud bottom. Berms would be constructed, using on site soils, to divert runoff from entering the lagoon. Discharge of the drainage system will be piped to the existing API separator, and flows would be limited to the volume of additional existing separator capacity available. Depending on weather conditions, it is anticipated that the lagoon would be allowed to drain and dry over a three to nine month period. This period will correspond to the first year of site decommissioning activities.

**Task 2-- Excavate Material and Backfill Lagoon**

PHC contaminated soils will be excavated from the lagoon and staged at a designated area for temporary storage prior to transfer the centralized treatment cell. The lagoon will be excavated to the limits of contamination as determined by GZA's field laboratory by EPA Method 418.1 for TPH.

Subsequent to confirming the limits of excavation, the excavation will be filled in compacted lifts using clean soils from the site, and regraded to limit surface water accumulation.

GZA

3.23 Other Characterized And Uncharacterized Areas

CDM determined that the three Rack Areas (Pacific, Northeast and Rail Car) and the Texaco Shore Area contain PHC contaminated soils. As noted, we anticipate that other, uncharacterized areas of the site likely contain similar contaminated soils. As a matter of efficiency and manageability, we have designed a remedial program using one strategy to address both. That is, the excavation and transport of all PHC contaminated soils (with the exception of the Shore Area) to one designated on-site land treatment area.

The location of the centralized land treatment area has been selected based on environmental and logistical considerations. Based on the already existing soil contamination in this area and on its ready accessibility, we have selected the Texaco Area for this purpose. The existing bermed tank pads in this area will be used as treatment cells with the existing berms serving as rainwater run-on and runoff control.

Depending on the amount of contaminated material found during the planned site decommissioning, from one to all of the bermed areas in the Texaco Area will be used for treatment. CDM estimates indicate that, excluding the Shore Area, approximately 35,000 $yd^3$ of contaminated material exist on the site. If all this soil were to be treated in one application and assuming a depth of treatment of from one to one and one-half feet, the entire amount of soil could be treated within the nine bermed tank pads in the Texaco Area. As a practical matter, we anticipate (as described below) that soils will be treated in "lifts" and that three to six bermed areas will be used (A2, A3, A5, A6, A8 and A9).

The soils will be aerated using disks, plows and a tiller. The plows will be used to periodically turn the deeper soils (bimonthly) while the disks and tiller will be used more frequently (semimonthly to monthly) to aerate the shallower soils. Should it become necessary to accelerate biodegradation, more frequent aeration may be done.

Based on the lab-scale testing, we will assess whether soil amendments (e.g., nitrogen, phosphates, potassium) will be necessary for an adequate rate of biodegradation. If they are, we anticipate that amendments will be added on an annual basis to bring soil concentrations to adequate levels for biodegradation. Based on the average precipitation this area, we do not anticipate that irrigation will be necessary.

The basic construction and operational elements of this treatment cell are as follows:

**Task 1 - Lab-Scale Biodegradation Testing**

Samples of soil from the contaminated area(s) will be collected and tested in GZA's Newton, Massachusetts laboratory for biodegradability. Laboratory evaluation of soils will be performed in accordance with the methods described above in Section 3.21.

GZA

**Task 2 - Construction of Land Treatment Area**

The area at which treatment will be conducted will be separated from surrounding areas by berms (existing or constructed) to control rainwater run-on and run-off.

**Task 3 - Excavation and Transport of Contaminated Soils**

Following completion of the treatment area berms, soils from the contaminated area will be excavated and transported.

**Task 4 - Operation**

The treatment area will be periodically mechanically tilled (e.g., monthly) to aerate the soil. Fertilizer will also be added periodically (e.g., annually) if necessary.

Surficial soil samples will be collected periodically (e.g., quarterly to semiannually) to monitor the progress of remediation. Composite samples will be analyzed for TPH (EPA Method 418.1).

3.24 Underground Storage Tanks

Underground storage tanks remain at the NEP site. As part of Phase III of the facility decommissioning program, these tanks will be excavated and removed from the site. This work will be conducted in accordance with RIDEM's Regulations For Underground Storage Tank Facilities Used For Petroleum Products And hazardous Materials.

As outlined below, 15 USTs have been identified at the site; some of which are suspected to presently hold petroleum products. As part of the UST removal program, the nature of the products in the tanks will be evaluated to facilitate off-site disposal. Analytical testing of some materials may be performed to characterized unknown or "suspect" materials.

UST excavations will also provide opportunities to evaluate environmental conditions in the area of the tanks. GZA personnel will be present during the excavation efforts to record observations of contamination and collect soils for analytical testing and/or screening. Should contamination be encountered, soils in the area of the tanks will be included in the remedial program described in Section 3.22.

GZA

| TANK NO. | VOLUME (gal) | PRODUCT | STATUS/VOLUME |
|---|---|---|---|
| 1 | 10,000 | toluene | inactive/empty |
| 2 | 5,000 | oil/water | active/? |
| 3 | 5,000 | oil/water | inactive/? |
| 4 | 2,000 | "slop" | active/? |
| 5 | 1,500 | "slop" | active/? |
| 6 | 1,000 | No. 2 fuel | active/750 |
| 7 | 2,000 | diesel | active/1,500 |
| 8 | 1,000 | No. 2 fuel | inactive/500 |
| 9 | 1,000 | No. 2 fuel | inactive/50 |
| 10 | 1,100 | No. 2 fuel | inactive/750 |
| 11 | 275 | No. 2 fuel | inactive/225 |
| 12 | 500 | No. 2 fuel | inactive/400 |
| 13 | 2,000 | unknown | inactive/1" water |
| 14 | 2,000 | unknown | inactive/1" water |
| 15 | 1,000 | unknown | inactive/1" water |

3.30 PROPOSED REMEDIAL PROGRAM (GROUNDWATER)

Based on our knowledge of site conditions, GZA does not anticipate the need for active groundwater treatment at the site. Previous groundwater quality monitoring data from the site suggests that groundwater contamination is limited to the Texaco Shore Area and Shore Area. The source(s) of soil and groundwater contamination in these portions of the site is not known. Previous studies have suggested that these conditions are a result of the area's downgradient position relative to the former petroleum storage and distribution operations. However, other sources suggest that Beach Area conditions may have resulted from direct placement of petroleum products in these areas in the past. Based on groundwater testing results which indicate only minor upgradient groundwater degradation, it is our opinion that saturated and unsaturated contaminated soils along the Shore Area are likely the contributing sources of these conditions.

As described above, PHC contaminated soils in the Shore Area will be subject to in-situ biological treatment and those in the Texaco Shore Area will likely be excavated and transferred to the centralized treatment area. Accordingly, localized sources will be

remediated. We anticipate that removal of contaminant sources from upgradient former operational areas will result in dissipation of the deeper contamination associated with groundwater. The effectiveness of the soil biotreatment program will be evaluated as the project progresses, in part, through groundwater sampling and analysis in this portion of the site. Should it be determined that groundwater quality has not improved as a result of these activities, alternate remedial approachs targeted toward saturated zone contamination will be evaluated.

GZA

## 4.00 VERIFICATION OF SITE REMEDIATION

Evaluation of site clean-up involves two components to assess the completeness of site remediation; each is described separately below.

### 4.10 SITE-WIDE SOIL CONDITIONS

As described in Section 3.10, the facility decommissioning will entail major earth moving activities to establish new grades across the site. These efforts will provide the opportunity and equipment to assess portions of the site where presently uncharacterized contaminated soils may exists.

GZA field personnel will be present during this work to observe and record subsurface conditions. Soils will be evaluated through visual observations, indications of odors and PID screening (HNU or equivalent), and confirmed via TPH analysis performed at the on-site field laboratory. Based on these findings additional explorations and/or excavations will be directed to evaluate the extent of soil contamination.

As noted, our project goal is to segregate and transfer most contaminated soils to the central treatment area. Soil excavations will continue in these contaminated areas until field observations (odors and visual), PID screening and on-site TPH analysis confirm that applicable clean-up criteria have been met.

We will proceed with a certain measure of precaution during these efforts to avoid introducing contaminated soil to the treatment cell which do not readily degrade or which may limit the success of the treatment project. Based on existing information we cannot theorize where such conditions may exist, if at all. Accordingly, our decision to perform additional soil analysis will be based on conditions encountered and the sources identified for creating these conditions. For example, if heavily gasoline contaminated soils are encountered, GZA may select samples for lead analysis (total and TCLP) and VOCs (TCLP). If contamination is encountered which cannot be characterized using our on-site capabilities, we may elect to perform additional laboratory testing to evaluate the nature of the contaminants present. Our decision to perform additional testing will be based on a number of factors. A generalized decision matrix is presented below. Note that matrix applies to segregation and characterization of soils. Verification of soil treatment will be based on the sample/testing design presented in Section 4.20.

GZA

## SOIL EVALUATION

- Visual observations
- Odors
- PID screening
- Source information

### NO INDICATIONS OF CONTAMINATION

- Soils stockpiled for regrading

### SUSPECT CONTAMINATION

- Additional area excavations
- Additional PID screening
- On-site TPH analysis
- On-site VOC screening

## SOIL CHARACTERIZATION

### NO INDICATIONS OF CONTAMINATION

- Soils stockpiled for regrading

### "TREATABLE SOILS"

- Transport to central treatment area

### UNKNOWN CHARACTER

- Additional on-site analysis
- Laboratory testing
- PHC-fingerprint
- Method 8010/8020
- TCLP (VOCs & metals)
- Total lead

### NO INDICATIONS OF CONTAMINATION

- Soils stockpiled for regrading

### "TREATABLE SOILS"

- Transport to central treatment cell

### "NONTREATABLE SOILS" OF CONTAMINATION

- Off-site disposal
- Alternative on-site treatment

GZA

## 4.20 CENTRALIZED TREATMENT AREA AND IN-SITU SHORE AREA

Baseline sampling and analysis of soils will be done prior to treatment to estimate initial TPH concentrations. A systematic sampling plan (as described in EPA's Handbook for Hazardous Waste Sampling and Analysis SW-846) will be used. A grid will be superimposed over the treatment areas. Samples will be taken from each grid line intersection so that a minimum of 30 samples are collected from each area. These samples will be analyzed on site for TPH.

The results of these analyses will be used to estimate the mean and standard deviation of TPH concentrations in the soil which in turn will be used to estimate the number of samples needed during the ongoing monitoring program to assess the extent of remediation. The samples sizes will be chosen to balance the false negative and false positive rate of the planned statistical tests. In general, the number of samples collected will, to a large extent, determine our ability to, 1) detect differences in hydrocarbon concentrations over time (i.e., to assess whether biodegradation is occurring), and 2) assess whether cleanup levels have been achieved. The periodic monitoring discussed in our work plan is directed at achieving the first goal. The periodic monitoring will also allow us to assess whether the concentration of hydrocarbons in the soil are below the required cleanup levels. The work plan also includes a more intensive final round of sampling and analysis to confirm that the cleanup levels have been achieved. Thus, the analytical results from the periodic monitoring will be used in 2 (two) pool statistical test (i.e., to assess whether concentrations have decreased from the previous monitoring period) and 1 pool test (i.e., to assess whether the concentration is below the "fixed" cleanup level). In developing this information we have used baseline data representative of our experiences for similar materials undergoing bioremediation. We have assumed that this information will be representative of the relative variability of the material at the site.

The table below contains the representative data used for our example analysis. Also included in the table are the mean and standard deviations of the sample population. For our analysis, we have made the following assumptions:

- The relative variance will not change with time.
- The statistical test should be sufficiently sensitive to detect a 25% change in hydrocarbon concentration in the soil at a 95% confidence level.
- The data can be adequately represented by a normal distribution. Because our statistical analyses are based on the fairly robust student's t-test, the requirement for strict normality it not critical.
- The cleanup criteria is 100 ug/g total petroleum hydrocarbons (TPH) in the soil.

GZA

| SAMPLE NUMBER | MEASURED TPH CONCENTRATION (ug/kg) |
|---|---|
| A-1 | 705 |
| B-1 | 1571 |
| C-1 | 1133 |
| D-1 | 991 |
| A-2 | 1145 |
| B-2 | 268 |
| C-2 | 912 |
| D-2 | 1440 |
| A-3 | 400 |
| B-3 | 270 |
| C-3 | 740 |
| D-3 | 590 |
| A-4 | 453 |
| B-4 | 455 |
| C-4 | 436 |
| D-4 | 596 |
| A-5 | 966 |
| B-5 | 463 |
| C-5 | 572 |
| D-5 | 704 |
| NUMBER OF SAMPLES | 20 |
| AVE. CONCENTRATION | 741 |
| STANDARD DEVIATION | 361 |

Using the student's t-distribution, the above assumptions and the data contained in the table, we estimate that 23 samples will need to be collected to detect a 25% change in hydrocarbon concentration for our example system. (Note this system contained approximately 6,000 $yd^3$ of soil and thus the estimated required sample "frequency" is one sample per 250 $yd^3$ of soil.) To assess whether the cleanup criteria has been met will

require that only 3 samples be collected. Since the concentrations contained in the table above are significantly greater than the required cleanup criteria, it is reasonable that only a few samples would need to be collected to demonstrate that the levels have not been reached. As the measured concentrations decrease to close to the required cleanup level, the number of samples required to perform this assessment will necessarily increase since the difference that we are trying to assess (i.e., between the sample mean and the cleanup criteria) will be smaller relative to the sample standard deviation.

GZA

The results of on-site TPH analyses of samples collected from the treatment areas (on a quarterly to semiannual basis) will be compared to the baseline data to assess the effectiveness of biodegradation. A one-sided 2 group t-test at a 95% confidence level will be used for this analysis. Also, if significant "scatter" is observed in the data from one sampling round to the next, a nonparametric analysis of trend will be considered for assessing biodegradation.

The results from each sampling round will also be compared to the cleanup target level to assess whether the goal (100 mg/kg TPH) has been reached. One-sided one-group t-tests at a 95% confidence level will be used for this purpose. If there is significant scatter within the data sets, the data from several sampling events may be combined for this comparison. Since the concentration of TPH in the soil should decrease with time, using previous measurements in a test will provide a conservative estimate of whether cleanup levels have been achieved.

Once the on-site TPH analyses indicate the project cleanup goals (< 100 mg/kg TPH) have been reached, duplicate soil samples will be submitted to an independent laboratory for confirmation. This testing will include volatile organic compound analyses (Methods 8010, 8020 and TCLP), TPH and metals (TCLP). The measured concentrations will be compared to the regulatory limits using a one-sided one-group t-test at a 95% confidence level.

For each comparison, the power of the statistical tests, given the sample sizes and variances of the TPH measurements, will be evaluated to assess if larger sample sizes are needed to perform the test at the desired confidence level.

Each set of monitoring data will be analyzed for distributional form (e.g., normal, log-normal) and data transformations will be done if necessary. We anticipate that t-tests will be used for most comparisons since the t-test is a robust parametric statistical data comparison procedure and is typically not sensitive to minor deviations from normality.

The sets of data will be tested to assess whether there is statistical evidence that any observations that appear extreme are outliers and should be assessed separately. Outliers will generally be identified by using a form of the t-test.

For all identified outliers, sampling and analytical data will be reviewed to assess whether the outlier resulted from an error that can be identified. If an error is found, efforts will be made to correct the observation. If no error is found the sample will be reanalyzed to confirm the measurement. If extreme values are found to be valid, statistical tests will be done with and without these values to assess the effect of the outliers on the test results.

GZA