# EXHIBIT EE

TerraNext 11500 Fairview Road Little Rock, AR 72212-2460

RECEIVED
JUL 25 1996
LEGAL DEPARTMENT

**Memorandum**

| | |
|---|---|
| **To:** | John Ross, Spelling Entertainment ACN |
| **From:** | Alan Nye, Terranext-Little Rock |
| **Regarding:** | RIDEM Comment letter |
| **Date:** | 7/24/96 |

I have enclosed a copy of the letter faxed to Greg Fine and Tim O'Connor today (7/24/96). The original letter is being Federal Expressed for delivery to these gentlemen on 7/25/96.

I have also faxed a copy of this letter to you care of Todd Crawford at Tiverton.

Telephone: 501 224•5656 Facsimile: 501 224•0956 www.terranext.com

TerraNext
11500 Fairview Road Little Rock, AR 72212-2460

July 24, 1996

Greg Fine or Timothy O'Connor
Rhode Island Department of
Environmental Management (RIDEM)
Division of Site Remediation
291 Promenade Street
Providence, RI 02908

Dear Mr. Fine and Mr. O'Connor:

We have reviewed the revised draft Remediation Regulations ("Draft Regulations") referenced in Mr. Terrence Gray's letter of June 14, 1996 and would appreciate your consideration of the following comments which supplement those set forth in our letters dated May 24 and June 19, 1996.

Summary of Comments and Recommendations

In summary, our comments and recommendations deal with the following issues:

1. Comment
   Incorrect use of the soil saturation concentration equation to establish Table 1 direct exposure criteria.

   Recommendation
   We recommend that RIDEM examine whether or not chemicals are solid at soil temperatures. For chemicals that exist as a solid at soil temperatures, the lowest of either direct soil ingestion, inhalation of particulate, or leaching to groundwater (i.e., Table 2 leachability criteria) should be used as the direct soil criterion.

2. Comment
   Use of a statistically invalid method to calculate and establish background Table 1 Direct Exposure for many chemicals.

   Recommendation
   We recommend that RIDEM use statistically valid methods for identifying and eliminating data outliers in the background soil data sets. Further, we recommend that RIDEM use the 95% upper confidence limit on the arithmetic mean of the background soil data to establish soil criteria for chemicals present in soil as a part of normal background conditions.

3. Comment
Compliance with the soil objective results in effectively lowering Table 1 direct exposure criteria that are already conservative values.

Recommendation
We recommend that RIDEM drop the 10% compliance criterion and adopt a 10 times rather than 5 times criterion to assess compliance with conservative soil criteria. In addition, we recommend that RIDEM consider adding language to the Draft Regulations that will allow consideration of additional site-specific factors in determining compliance with soil criteria.

4. Comment
The Draft Regulations contain no risk management flexibility in deriving soil criteria for potential carcinogens. The target lifetime cancer risk is set at $1 \times 10^{-6}$ for potential carcinogens.

Recommendation
We recommend that RIDEM adopt the same risk management strategy for potential carcinogens as that used by USEPA. USEPA has established the added lifetime cancer risk range from $1 \times 10^{-4}$ to $1 \times 10^{-6}$ as the acceptable range of added risk.

**1. Soil Saturation Limit Algorithm for Unsaturated Soils ($C_{sat}$)**

It is our understanding that Table 1 direct exposure criteria represent the lowest acceptable soil concentration of a hazardous substance calculated from (1) direct soil ingestion, (2) inhalation of volatile or particulate bound chemicals, or (3) the soil saturation limit. For example, if use of the soil saturation limit equation results in a lower soil concentration for a particular chemical than the concentration calculated from direct soil ingestion or inhalation of a volatile or particle bound chemical, then the value for $C_{sat}$ becomes the Table 1 direct exposure criteria for that chemical. Apparently, $C_{sat}$ is the basis for many Table 1 chemicals such as acenaphthene, acenaphthylene, chrysene, anthracene, benzo(g,h,i)perylene, benzo(k)fluoranthene, fluoranthene, fluorene, 2-methylnaphthalene, naphthalene, phenanthrene, and pyrene as well as for many other semi-volatile and volatile chemicals.

The Draft Regulations further indicate (i.e., page 42 No. 3) that the $C_{sat}$ algorithm is intended to prevent a situation where a hazardous substance in soil results in a pure liquid-phase contaminant occurring in the vadose zone.

> "For a contaminated-site impacting one or more properties utilized for any residential activity, the soil saturation concentration ($C_{sat}$) of the hazardous substance above which pure liquid-phase contaminant is expected in the

> vadose zone shall be calculated using the equation provided in Appendix D....."

The $C_{sat}$ algorithm describes the partitioning of a chemical between soil and water taking into account the chemical's solubility and soil-water partition coefficient (Kd). Our review of the $C_{sat}$ equation and assumptions indicate that $C_{sat}$ cannot be the Table 1 direct exposure criteria in situations where the chemical is a solid at soil temperatures. The $C_{sat}$ equation used by RIDEM follows closely the Risk Based Corrective Action (RBCA) guidance developed by EPA[1] and others. A review of USEPA's technical background guidance document for soil screening guidance states the following:

> "The soil saturation concentration ($C_{sat}$) corresponds to the contaminant concentration in soil at which the absorptive limits of the soil particles, the solubility limits of the soil pore water, and saturation of soil pore air have been reached. Above this concentration, the soil contaminant may be present in free phase, i.e., nonaqueous phase liquids (NAPL) for contaminants that are liquid at ambient soil temperatures and pure solid phases for compounds that are solid at ambient temperatures."

and

> "Table 4 (attached) provides the physical state (i.e., liquid or solid) for various compounds at ambient soil temperature. When the inhalation SSL exceeds $C_{sat}$ for liquid compounds, the SSL is set at $C_{sat}$. This is because, for compounds that are liquid at ambient soil temperature, concentrations above $C_{sat}$ indicate a potential for free liquid phase contamination to be present, and the possible presence of NAPLs. EPA believes that further investigation is warranted when free nonaqueous phase liquids may be present in soils at a site."

and

> For compounds that are solid at ambient soil temperatures (e.g., DDT), Table 3-A indicates that the inhalation risks are well below the screening targets (i.e., these chemical do not appear to be of concern for the inhalation pathway). Thus, when inhalation SSLs are above $C_{sat}$ for solid compounds, soil screening decisions should be based on the appropriate SSLs for other pathways of concern at the site (e.g., migration to ground water, ingestion). [underlining added for emphasis]

---

[1] USEPA, 1996. Soil screening guidance: technical background document, Office of Solid Waste and Emergency Response, EPA/540/R95/128, May 1996.

Thus, according to EPA guidance, the interpretation of $C_{sat}$ results is different for organic compounds that are solid at ambient soil temperature than for chemicals that are liquid at soil temperatures. In USEPA's Table 4, one should look up whether the chemical in question is a solid or liquid at soil temperatures. If the chemical is a solid, then $C_{sat}$ does not apply and the SSL must be based on other pathways such as ingestion risk algorithms or migration to groundwater.

For a chemical that is a solid at soil temperatures, RIDEM's $C_{sat}$ algorithm indicates that when the chemical exceeds the sorptive capacity of soil the chemical exists as a solid and not a "pure liquid-phase contaminant" as defined in the regulations. According to EPA guidance and RIDEM's Draft Regulations, when this situation occurs, RIDEM should then use ingestion, inhalation, or leaching to groundwater based criteria. For example, the current Draft Regulations for chrysene and several other PAHs are based on $C_{sat}$. The $C_{sat}$ algorithm for these chemicals indicate that when chrysene exceeds $C_{sat}$, it will exist as a solid at soil temperatures. Thus, chemicals that exist in soil as a solid should then be evaluated based on the lowest of either direct soil ingestion, inhalation of particulate, or leaching to groundwater (i.e., Table 2 leachability criteria).

**2. A statistically invalid method was used to calculate and establish background Table 1 Direct Exposure for many chemicals**

We have reviewed RIDEM's background metals study used for establishing background metals concentrations in the State and in the Draft Regulations. The method used for calculating a Statewide average is statistically invalid. According to the background document, a 95% confidence interval was determined, and results falling outside of the interval were eliminated. The mean of the adjusted data set was then used as the background based soil criterion for arsenic and other metals. This method is arbitrary and not statistically valid. Outliers should only be eliminated using proper statistical techniques such as those described in ASTM E 178-94 (entitled "Standard Practice for Dealing With Outlying Observations"). The ASTM guidance addresses the arbitrary elimination of extreme data and states: "An outlying observation may be merely an extreme manifestation of the random variability inherent in the data. If this is true, the value should be retained and processed in the same manner as the other observations in the sample."

We also note that RIDEM has used the average rather than the upper 95% confidence limit of mean as the background based soil criterion. For reasons described below, the 95% upper confidence limit on the mean would be a more appropriate soil criterion for arsenic and other metals.

To illustrate our point regarding the statistical determination of background levels of chemicals in soil, we have reviewed the treatment of arsenic in the Draft Regulations. In our previous letter to you dated June 19, 1996, we recommended using the upper 90th

percentile for the arithmetic mean of eastern United States soils as the basis for a background soil criterion for arsenic. At that time, soil data specific to Rhode Island was unavailable to us. For this reason, we used the next best data available (soil data from eastern US compiled by Shacklette and Boerngen, 1984) as the basis for deriving an upper limit concentration for a background concentration of arsenic in soil. Due to the use of eastern US soil data rather than soil data specific to Rhode Island, we considered it more appropriate to use a lower confidence limit (90% versus 95%) to calculate the upper limit background value for arsenic. Given the availability of Rhode Island specific-soil data, we consider the 95% upper confidence limit derived from Rhode Island specific soil data to be a better basis for the criterion. The derivation of a background-based soil criterion for arsenic based on Rhode Island data is described below.

Using the RIDEM background data for arsenic provided in Figure 2, the 95% upper confidence limit on the mean for arsenic is 8.8 mg/kg. Note that the 95% upper confidence limit calculated by us from data in the RIDEM figure is estimated (due to reading data from the figure) and should be confirmed by RIDEM using the actual data.

We have also tested the estimated background arsenic data for outliers according to methods specified in the ASTM reference (Standard Practice for Dealing With Outlying Observations). We concur with RIDEM that the soil arsenic concentration data are lognormally distributed and have confirmed the RIDEM determination of lognormality using D'Agostino's test.

We further tested the highest detected arsenic concentration in soil (15.5 mg/kg) as a possible outlier using the test described in the ASTM reference as "4. Recommended Criteria for Single Samples". According to this test, the 15.5 mg/kg value should not be eliminated as an outlying concentration at the upper 10% level of significance. Thus, arbitrary elimination of arsenic values greater than the 95% upper confidence limit of the mean is not statistically valid. We believe that RIDEM should consult the ASTM outlier procedures or other statistically valid approaches for data evaluation before eliminating any soil data point as an outlier.

We further disagree with RIDEM's use of the mean as the soil criterion on the basis of following points. Firstly, the use of the mean as a soil criterion appears to be contrary to previous statements made by RIDEM. For example, in RIDEM's "Background Levels of Priority Pollutant Metals in Rhode Island Soils" (O'Connor, 1995), RIDEM states that "The geometric average with the application of the 95% confidence interval is the best estimate of the geochemical abundance of priority pollutant metals in Rhode Island soils." As alluded to in this statement, a soil criterion based on the mean (a mean that is made artificially low by omitting higher soil arsenic concentrations from the calculation) cannot account for the natural variability in soil arsenic concentrations that will undoubtedly be encountered State-wide.

In addition, application of the current soil arsenic criterion to soils in Rhode Island will undoubtedly result in compliance problems that are not easily solved. For example, if it is assumed that the background data set compiled by RIDEM for Rhode Island soils is generally representative of uncontaminated soils, it is surprising to note that approximately 67% of the soil arsenic values from that data set are above the current criterion of 1.2 mg/kg. These background data would therefore fail to comply with RIDEM's 10% compliance criterion in section 8.10 A.2. Further, 11 of the soil values are estimated to be more than 5 times greater than the current soil criterion, indicating that the background data set would not comply with the 5 times criterion set forth in section 8.10. A.1. The problem of deriving a reasonable soil criterion for arsenic is further compounded by the fact that Method 2 would not be an option for deriving an alternate criterion. For example, on page 31 of the Draft Regulations, RIDEM states that if a Method 1 Soil Objective has been promulgated for a chemical, Method 2 may only be used to establish leachability criteria or that Method 3 may be used to develop soil objectives for the affected site. As discussed under point 3, Method 3 Remedial Objectives would be unlikely to result in soil criteria significantly above background soil arsenic concentrations due to the use of the 1 x $10^{-6}$ added lifetime cancer risk level as the target risk level.

For the above reasons, we strongly recommend that RIDEM consider the re-calculation of background-based soil criteria for chemicals in soil that uses a statistically valid procedure such as the one outlined above. From our example, we believe that a more appropriate criterion for arsenic is nearer to our estimated 8.8 mg/kg 95% upper confidence limit, not the current 1.2 mg/kg criterion based on an adjusted mean.

**3. Method used to determine compliance with the soil objective effectively lowers already conservative Table 1 direct exposure criteria**

It is our understanding that the RIDEM Table 1 Direct Exposure Criteria were derived using the $C_{sat}$ procedure discussed in point 1, the background procedure described in point 2, and risk-based calculations based on ingestion or inhalation of chemicals in soil. However, before compliance with these very conservative Table 1 Direct Exposure Criteria can be achieved, additional compliance requirements imposed by RIDEM must be also be met. For the reasons described below, it is our opinion that the additional compliance requirements described in section 8.10 of the Draft Regulations pose an undue burden when taken together with the very conservative Table 1 soil criteria. In effect, these additional compliance requirements lower the already conservative Table 1 soil criteria.

As discussed elsewhere in this letter, some of the burden resulting from the combined application of the conservative Table 1 Direct Soil Criteria and the additional stringent requirements for compliance may also be relieved by: 1) revising the conditions under

which the $C_{sat}$ procedure is applied (point 1 of this letter); 2) by using only statistically valid procedures to derive 95% upper confidence limits for background-based soil criteria (point 2 of this letter), and; 3) by including additional flexibility in the management of risks posed by potential carcinogens (i.e., use the USEPA acceptable lifetime cancer risk range instead of fixing all management decisions on the 1 x $10^{-6}$ target lifetime cancer risk level; point 4 of this letter). Our reasoning for these comments is explained below.

When coupled with the very conservative Table 1 direct soil criteria, we believe that imposition of the stringent compliance requirements in section 8.10 of the Draft Regulations will prove so burdensome that compliance will be unachievable at many sites. Application of the additional stringent requirements effectively lowers the already conservative Table 1 Direct Exposure Criteria. These additional stringent requirements for compliance with the Table 1 Direct Exposure Criteria are: 1) "No single sample result may exceed the soil objective by five (hereafter referred to as the "five times rule"; 2) No more than 10% of the individual sample results exceed the soil objective (hereafter referred to as the "10% rule"); and 3) No single sample result exceeds any Upper Concentration Limit as defined by Rule 8.07 (Upper Concentration Limit).

Although we understand that the purpose of the 5 times rule and the 10% rule is to prevent a responsible party from leaving a "hot spot" of elevated chemical concentration in place in soils, we believe that application of these additional criteria is unwarranted in the context of the conservative Table 1 soil objectives. To review, misapplication of the $C_{sat}$ procedure to chemicals that are solids at soil temperatures has resulted in Table 1 soil criteria that are excessively conservative. As illustrated in point 2 (using arsenic as an example), application of the RIDEM background procedure also results in Table 1 soil criteria that are unrealistically low even when considered in the context of typical background soil concentrations. In this section, we also review the very conservative nature of the risk-based direct soil criteria that result from application of RIDEM risk assessment algorithms.

For example, the conservative risk-based soil criteria derived by RIDEM are the result of the use of a series of conservative assumptions. The exposure assumptions used by RIDEM in deriving these risk-based criteria assume that an exposed person consumes either (under residential conditions) 100 (adult) and 200 (child) mg of dirt per day, 350 days per year for 24 (adult) and 6 (child) years, respectively or breathes 20 cubic meters of air per day for 350 days/year for 30 years. These default exposure assumptions are well-recognized as upper 90th or 95th percentile estimates of their respective distributions. For example, the 100 mg/day value for adult soil ingestion is approximately at the 95th percentile of adult soil ingestion rates - only a handful of individuals in a population of 100 would be expected to consume 100 mg/day or more of soil. RIDEM also assumes that the individual is exposed to the soil 350 days each year for 30 years, another unlikely scenario. Individually, each of these exposure assumptions would be considered an unlikely occurrence. When used together, however, these conservative

assumptions produce estimates of soil exposure that are representative of an upper bound soil exposure that is likely to be greater than the most exposed individual in a population of exposed persons.

The example below illustrates the effect of compounding very conservative exposure assumptions in the calculation of risk-based soil criteria. The table compares RIDEM's default assumptions to a more likely point estimate for calculating exposure to a chemical in soil.

| Exposure Factor | More Reasonable Single-Point Estimate | RIDEM Method | Overestimation Caused by RIDEM Methodology |
|---|---|---|---|
| Rate of soil ingestion | 25 mg/day | 100 mg/day | 4 times |
| Frequency of exposure | 35 days/yr | 350 days/yr | 10 times |
| Duration of exposure | 9 years | 30 years | 3.33 times |
| **Calculated Exposure** | | | **133 times** |

These data indicate that the combined application of these conservative assumptions will result in an improbably high estimate of soil exposure and therefore, the calculation of very conservative risk-based soil criteria.

In addition to the above exposure-related examples that indicate a bias toward the development of very conservative soil criteria, there are also conservatisms built into the toxicity assessment values used by RIDEM (e.g., reference dose and slope factors). For example, reference doses are usually derived using multiple safety factors of 10 (the USEPA refers to them as uncertainty factors). The resulting reference dose is often derived from the results of an animal study that have been conservatively adjusted downward by a factor of 1,000-10,000. Likewise, the slope factor is based on the upper 95% confidence limit of cancer data that in many cases is well above the average. In fact, in commenting on the mathematical procedure used to calculate nearly all slope factors (known as the "linearized multistage procedure"), the USEPA has stated that:

> " It should be emphasized that the linearized multistage procedure leads to a plausible upper limit to the risk that is consistent with some proposed mechanisms of carcinogenesis. Such an estimate, however, does not necessarily give a realistic prediction of the risk. The true value of risk is unknown, and may be as low as zero. The range of risks, defined by the upper limit given by the chose model and the lower limit which may be stated as low as zero, should be explicitly stated." (51 Federal Register 33998). (underlining added for emphasis by Terranext)

We believe that the USEPA statement regarding cancer risk calculations is another example of an additional layer of conservatism that is built into the calculation of soil criteria for potential carcinogens.

Finally, RIDEM has used an additional conservative bias by setting soil criteria for potential carcinogens at a target risk level of one in one million ($1 \times 10^{-6}$ or 0.000001). This target risk is the lowest of the added lifetime cancer risks in the allowable range set by USEPA. The upper end of the allowable risk range is one in ten thousand ($1 \times 10^{-4}$ or 0.0001). Thus, while the USEPA uses a flexible range of 100-fold for making risk-management decisions concerning potential carcinogens, the RIDEM calculations use the lowest number of this range for every potential carcinogen (i.e., $1 \times 10^{-6}$). We should note that application of the $1 \times 10^{-6}$ target risk level in tandem with all of the conservative exposure assumptions mentioned above often results in soil criteria that are below background levels or below analytical detection limits. For example, although calculation of a Method 2 Direct Exposure Criteria for chemicals with a Method 1 Direct Exposure Criterion (such as arsenic) is not allowed by the Draft Regulations, it is nonetheless illustrative that an untenably low residential soil criterion for arsenic (0.42 mg/kg) would result from the application of the Method 2 Direct Exposure Criteria. This calculation strongly suggests that little benefit would likely be gained by attempting to calculate a Method 3 Direct Exposure Criterion for residential soil given that the remedial objective for a potential carcinogens is fixed at a target risk of $1 \times 10^{-6}$ for Method 1, 2, and 3 Direct Exposure Criteria.

In summary, as with the $C_{sat}$ and background-based soil criteria, the risk-based soil criteria derived by RIDEM are also very conservative.

To better illustrate the problems resulting from attempting to comply with the highly conservative Table 1 Direct Exposure Criteria and the use of the "five times rule" and the "10% rule", we consider a hypothetical site with detected soil concentrations of arsenic below.

<u>Soil arsenic concentrations from 20 soil samples (mg/kg) at a hypothetical site</u>

| | | | |
|---|---|---|---|
| 8 | 0.9 | 0.6 | 0.4 |
| 2.2 | 0.8 | 0.5 | 0.4 |
| 2 | 0.7 | 0.5 | 0.3 |
| 1.2 | 0.6 | 0.5 | 0.3 |
| 1.1 | 0.6 | 0.5 | 0.3 |

Arithmetic mean arsenic concentration = 1.12 mg/kg

According to the example, 17 of the 20 samples collected at the site would be at or below the direct soil criterion for arsenic (1.2 mg/kg). However, due to the fact that 3 of the 20 samples (15% of the samples analyzed) are above the criterion, the site would not be considered in compliance with the Type 1 criterion for residential soils. In addition, the

maximum detected value (8 mg/kg) is more than five times the 1.2 mg/kg criterion, indicating that the site would also be out of compliance with regard to the five times rule.

In the hypothetical example, we should note that the average site concentration of arsenic in soil was below 1.2 mg/kg and that 85% of the collected samples would be below the Type 1 criterion. Even if 20 more soil concentrations at 0.4 mg/kg resulted from additional investigation at the site (total of 40 soil samples), the site would still be out of compliance with the Type 1 soil criterion on the basis of the five times rule despite an average site soil arsenic concentration of 0.76 mg/kg.

In the above case, failure to achieve compliance is partly due to the very low Table 1 criterion for arsenic. However, application of the 10% rule and five times rule are also overly burdensome for the hypothetical site considered above. Alternatively, if the arithmetic mean soil concentration was used in determining compliance, the hypothetical site considered above would be in compliance. Likewise, modification or elimination of the 10% rule and five times rule would also help to achieve compliance even in situations where unrealistically conservative soil objectives were used.

We believe that the problems illustrated in this example justify the inclusion of greater flexibility in the Draft Regulations. This added flexibility would allow consideration of site-specific factors in complying with the soil objectives. Although the five times rule and 10% rule were intended to address the issue of hotspots, the complexity of the hotspot issue is not adequately addressed by the arbitrary application of the five times and 10% rules. Instead, evaluation of hotspots is dependent on many site-specific factors including the depth of the contaminant, mass, toxicity, and the extent to which the mass concentration exceeds a soil objective.

In light of the problems that will likely be created by application of very conservative direct soil criteria together with the strict compliance criteria, we recommend that RIDEM eliminate the 10% restriction to the statistical analyses of data and change the 5 times criteria to 10 to determine compliance and use a geometric or arithmetic mean concentration when comparing site data to the Table 1 direct exposure criteria. In this manner, RIDEM will continue to address the issue of hot spots yet have compliance criteria that are more reasonable. To add additional flexibility to the evaluation of compliance with the soil criteria, we ask RIDEM to consider adding a statement to section 8.10 A.1.3 indicating that: "At the discretion of the Director, RIDEM will evaluate the soil values on a site-specific basis to determine compliance."

In summary, for the reasons discussed above and in the face of other highly conservative policy decisions, use of an arithmetic or geometric mean soil concentration coupled with a 10 times criterion for the elimination of hot spots will be fully protective of human health and the environment. We further believe that language allowing case-by-case

evaluations of site-specific data should be included in Section 8.10 A.1.3 to allow additional flexibility in complying with the very conservative soil criteria.

**4. Additional Comments**

Page 28, 8.00 RISK MANAGEMENT

We previously provided comments regarding the need for increased flexibility in the acceptable risk range for carcinogenic substances. We suggested that RIDEM adopt the same acceptable risk range as USEPA (i.e., $10^{-4}$ to $10^{-6}$) as a risk management strategy. The rationale we provided for the increased flexibility include the following:

1. Many carcinogenic chemical's Maximum Contaminant Levels (MCLs) under the Federal Safe Drinking Water Act allow risks that are $10^{-4}$ or higher.

2. Background levels of arsenic (and other metals) and PAHs would present cancer risks greater than the remedial objectives set forth in the Draft Regulations.

It is our view that it would be inconsistent to develop a groundwater criterion for a chemical such as arsenic (0.05 mg/L) that allows lifetime cancer risk to exceed 1 x $10^{-3}$ but requires that the calculated soil cleanup criterion achieve a 1 x $10^{-6}$ target risk level. In order to resolve the problem of calculating a soil criterion that is below the risk level that is acceptable under the drinking water standard, and to provide greater consistency in the application of the regulation, we recommend that the range of acceptable cancer risks for potentially carcinogenic metals and metalloids in soil such as arsenic be expanded to include the $10^{-4}$ lifetime cancer risk level.

For example, we note that as written, RIDEM Method 2 or Method 3 Remedial Objectives would not lead to the derivation of a risk-based soil criterion above background concentrations of arsenic in soil. If calculated using Method 2, a risk-based soil criterion of 0.42 mg/kg in calculated for arsenic in residential soils. This concentration is below natural background concentrations. Further, a risk-based soil criterion for arsenic calculated using Method 3 Remedial Objectives would be subject to the same unrealistic risk management criterion (that the soil remedial objective meet the 1 x $10^{-6}$ excess lifetime cancer risk). The blanket use of a 1 x $10^{-6}$ target risk level practically ensures that risk-based soil criteria calculated for chemicals such as arsenic will be below natural background levels. The implication of these calculations is that no matter which RIDEM Remedial Objective is used, compliance with the soil criterion could not be achieved.

Further, EPA and other states are adding flexibility in their regulations according to the weight of evidence for a particular carcinogen. Group C carcinogens are set at a lower

lifetime cancer risk level than Group A carcinogens which are set at a higher lifetime cancer risk level.

Based on the above, we recommend proposed additions to the regulation as follows:

> The remedial objective for each carcinogenic substance should not exceed the upper bound on the estimated cancer risk of less than or equal to $10^{-5}$ (<u>$10^{-4}$ for potentially carcinogenic metals and metalloids</u>; $10^{-4}$ for Class C carcinogens) via soil ingestion along with inhalation of volatiles and particulates, and the cumulative excess lifetime cancer risk posed by the contaminated site does not exceed $10^{-4}$ determined using Appendix D direct exposure criteria.

To further illustrate our point, we used Method 1 and 2 exposure assumptions and equations, and calculated the risk to human health from **<u>background</u>** levels of polycyclic aromatic hydrocarbons (PAHs) in soil as reported by the Agency for Toxic Substances Disease Registry (ATSDR) Dec. 1990.

**Background Concentrations of PAHs In Soil as Reported by the Agency for Toxic Substances Disease Registry (ATSDR)**

| Compound | Urban Soil(µg/kg) |
|---|---|
| Acenapthene | not available |
| Acenaphthylene | not available |
| Anthracene | not available |
| Benzo(a)anthracene | 169-59,000 |
| Benzo(a)pyrene | 165-220 |
| Benzo(b)fluoranthene | 15,000 - 62,000 |
| Benzo(e)pyrene | 60 - 14,000 |
| Benzo(g,h,i)perylene | 900 - 47,000 |
| Benzo(k)fluoranthene | 300 - 26,000 |
| Chrysene | 251 - 640 |
| Fluoranthene | 200 - 166,000 |
| Fluorene | not available |
| Indeno(1,2,3-cd)pyrene | 8,000 - 61,000 |
| Phenanthrene | not available |
| Pyrene | 145 - 147,000 |

We took the lowest and highest concentration of PAHs reported for urban soil and used Method 1 and 2 exposure assumptions to calculate cancer risk to a resident. The results of this analyses indicated that the total additional lifetime cancer risks potentially associated with exposure to soils for a resident would be 3E-05 and 2E-04 for the lowest and highest urban soil PAH concentration, respectively. Interestingly, each individual carcinogenic PAH would have exceeded RIDEM's remedial objective. These data indicate that background concentrations of PAHs in urban soil are above RIDEM's target risk range and represent unacceptable cancer risks to a resident. In fact, using Method 1 guidance, cancer risks from **background exposure to soil** are 3-20 times higher than RIDEM's cumulative target risk level of $1 \times 10^{-5}$.

<u>Page 37</u>

The residential and industrial/commercial Type 1 Direct Exposure Criteria for the PAH 2-methylnaphthalene appear to be in error (0.005 and 0.04 mg/kg, respectively). The bases for developing these values is not known to us. For example, there is currently no oral or inhalation reference dose for calculating a risk-based soil criterion for 2-methylnaphthalene. In our experience, naphthalene is sometimes used as a toxicological surrogate for 2-methylnaphthalene. If this policy is used to calculate a Type 2 Direct Exposure Criterion for 2-methylnaphthalene, a risk-based value of 3128 mg/kg is derived. Apparently, RIDEM did not use naphthalene as a toxicological surrogate for naphthalene in calculating its direct exposure criteria for 2-methylnaphthalene.

Further, although some potentially carcinogenic PAHs have Type 1 Direct Exposure Criteria less than 1 mg/kg, 2-methylnaphthalene is not considered to be a potentially carcinogenic PAH and thus, a direct exposure criterion cannot be calculated on the basis of potential carcinogenicity. Thus, the toxicological or other bases for the very low direct exposure criteria for 2-methylnaphthalene are not clear and should be explained.

In closing, we appreciate the opportunity to submit comments and are available to discuss these comments further or answer any questions you or your staff may have. Toxicology, exposure and risk questions can be directed to Dr. Nye and myself at (501) 224-5656 and Csat related questions to Dr. Schreuder or Dr. Sharma at (303) 914-1700.

Sincerely,

Terranext

Alan C. Nye for Drs. Millner, Schreuder, and Sharma

Alan C. Nye, Ph.D.
Senior Toxicologist

Glenn C. Millner, Ph.D.
Director of Health Sciences/Senior Toxicologist

Willem Schreuder, Ph.D.
Senior Engineer Responsible
for Computational Sciences

Devraj Sharma, Ph.D.
Vice President and Director
of Science and Development

SPELLING
ENTERTAINMENT GROUP INC

faxed
7-26-96
3:42
pm
93

DATE: July 26, 1996

TELECOPY COVER SHEET

TO: Gerald J. Petros, Esq. (NAME)

Hinckley, Allen & Snyder (COMPANY)

401-277-9600 (TELECOPY PHONE NO.)

16 (NUMBER OF PAGES INCLUDING COVER SHEET)

FROM: John E. Ross, Esq. (NAME)

Spelling Entertainment Group Inc. (COMPANY/DEPT.)

MESSAGE (IF ADDITIONAL MESSAGE REQUIRED):

NOTE: IF YOU DO NOT RECEIVE ALL OF TRANSMISSION, CALL US AT:

Voice Number(s): 904 - 281 - 4488

904 - ______ - ______

Automatic Telecopier Number: 904-281-9148

Hours of operation are 8:30 a.m. to 5:00 p.m., Monday through Friday, excluding holidays and weekends.

#40/TCS.d40