# EXHIBIT FF

SPELLING
ENTERTAINMENT GROUP INC

July 16, 1997

Gregory Fine, P.E.
RIDEM
Office of Waste Management
235 Promenade St.
Providence, RI 02902

Dear Mr. Fine:

Charter International Oil Company ("Charter") is making this submittal in an attempt to close out several outstanding regulatory matters with regard to completion of remedial activities at the former Northeast Petroleum Terminal in Tiverton.

Please do not interpret the breadth of material covered by this transmittal as an indication that we request a single response addressing all of the matters presented. Some of these subjects may be agreed to with limited discussion, while others may require several communications prior to reaching a consensus. In order to allow us to archive data and begin closing out the site it would be helpful if you could respond in writing to individual matters as we reach consensus in order to "take them off the table."

These issues can be divided into two categories: administrative issues relating to the 1992 Consent Agreement between Charter and RIDEM, and technical issues relating to site closure.

With regard to the Consent Agreement, it is our view that three matters require clarification:

1. New Standards (paragraph 15).

   It has been our assumption that the remedial objectives and site management directives presented in the RIDEM Rules and Regulations for the Investigation and Remediation of Hazardous Material Releases adopted in 1996 are now applicable to this site. This assumption is based in part on discussions we have had with RIDEM, as well as our understanding that the intent of amending the Remediation Regulations was to create a consistent set of remedial objectives.

   It is our interpretation of paragraph 15 of the Consent Agreement that the application of standards set forth in the new regulations are automatically

applicable under the terms of the Consent Agreement without amendment thereof. We would appreciate your confirmation of this interpretation.

2. Completion of all soil and groundwater remediation by March 1997 (exhibit B, paragraph 3).

   Although Charter has worked continuously to remediate the site since signing the Consent Agreement and have remediated the majority of contaminated soil, we have failed to meet the completion date specified. Due to the discovery of more contamination than was originally expected, and the failure of the shore area insitu remedial action, we respectfully request that RIDEM grant Charter an 18 month extension of the completion date through September 25, 1998.

3. Modification to the Project Implementation Plan (exhibit B, paragraph 2d).

   Charter has produced new information regarding site conditions since the Consent Agreement and at the same time RIDEM has provided increasingly clearer guidance regarding site management. Accordingly, it has been appropriate to deviate from the original work plans. In order to codify these changes Charter will submit under a separate cover a letter explaining the changes which took place and the reasoning behind them. This submittal will cover the period between the signing of the Consent Agreement up to the June 2, 1997 submittal regarding the shore area.

With regard to site closure:

1. BTEX in soil.

   Please refer to the attached Table 1 and Figures 1 and 2. Table 1 presents the results of 154 samples remaining after excavations performed through June 5, 1997. It is evident from reviewing these results that the site is compliant with the Remediation Regulations' Table 1 (Residential Direct Contact) and Table 2 (GA Leachability) remedial objectives.

   Accordingly it is our opinion that the site has achieved the appropriate remedial objectives for this group of contaminants of concern and no further BTEX soil sampling should be required.

2. Polycyclic aromatic hydrocarbons ("PAHs") in soil.

   Please refer to the attached Table 2 and Figure 3. The table presents all PAH soil sample results ever taken at the site (thus excluding two samples of tar-like material taken during the early stages of the site remediation).

Please note that stockpile and biobed samples in Table 2 are not shown on Figure 3, since their point of excavation is unknown. The Table 2 samples are not representative of site soils, but are severely biased. This bias is towards soils where we suspected an increased potential to find PAHs due to (i) high TPH levels, (ii) site history or chromatographic evidence of high boiling TPH fractions, or (iii) apparent recalcitrance of certain soils to biodegradation. This bias is evident by comparing the pre-remedial average TPH concentrations for (i) PAH sample locations where relevant data is available (approximately 4,000 ppm in 49 samples), with (ii) all TPH sample locations across the site (approximately 1,000 ppm in 5,000 samples).

It is our opinion that this PAH data is sufficient to characterize the site, and that PAHs should not be considered a contaminant of concern. This conclusion is based on the following considerations:

A these results are severely biased toward heavily contaminated soils, but indicate statistically insignificant exceedances;

B with the exception of napthalene, the site was compliant with the Remediation Regulations prior to any remedial action;

C napthalene has physical properties that are very similar to a volatile organic compound such as toluene; it is readily biodegradable and volatile, and it is moderately water soluble. Any naphthalene contamination that did exist in the excavated soils has been remediated in the treatment cells; and

D there are only three sample points which exceed five times the napthalene leachability criteria of 0.8 ppm. One of these locations will be excavated this summer to achieve compliance with TPH remedial objectives, and the other two (which are located together) are in the railroad right of way which is to be addressed by risk assessment.

This decision will help Charter avoid the needless expense and time of sampling for a statistically insignificant group of contaminants at the site.

3. Lead in soil.

Please refer to attached Table 3 and Figures 4 and 5. Table 3 presents the results of all total lead samples (229 samples) taken at the site. The results indicate that prior to any remedial activities, the site was in compliance with the RIDEM's Table 1 value (Residential Direct Exposure Criteria).

In order to confirm compliance with RIDEM's Table 2 value (Leachability Criteria), we propose to analyze 30 samples by the synthetic precipitation leaching process (SPLP). Of these samples, 15 will be from locations that have not been excavated and, with some deviation due to current accessibility and to provide geographic distribution, will include at least 10 of the remaining unexcavated locations with the highest total lead sample results. In order to evaluate previously excavated soils, the remaining 15 samples will be randomly selected from archived biobed TPH compliance samples.

If these SPLP samples demonstrate compliance with RIDEM's Table 2 criteria, we request that lead should not be considered a contaminant of concern at the site.

4. Groundwater.

Please refer to the attached Table 4 (the results of the most recent round of groundwater sampling), Table 5 (quarterly sampling results to date) and Figures 6 and 7 (monitoring well locations). These results indicate a minor exceedance of the RIDEM GA Groundwater Criteria for one compound at one well (benzene at 5.3 ppb in MW 26s). Given the volume of groundwater sampling that has been conducted to date, and the fact that this is our only exceedance, it is our opinion that a significant release to groundwater has not occurred at the site and therefore further investigation or monitoring of groundwater is not necessary.

I will contact you in the near future to schedule a meeting between our respective staffs after you have had the opportunity to review these materials. It is my intent to accomplish as much as is feasible during the meeting and hopefully avoid lengthy exchanges of correspondence.

Very truly yours,

John E. Ross

JER/jz

Attachments

cc: Kelly Owens
Tim O'Connor
Adam R. Pacchiana

3882