UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| Charter International Oil Company, Plaintiff,<br><br>v.<br><br>Travelers Casualty and Surety Company (f/k/a Aetna Casualty and Surety Company), Defendant | C.A. No. 06-324 S |

**DECISION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

This matter comes before the Court on the motion of Travelers Casualty and Surety Company ("Travelers") for summary judgment on the Complaint of Charter International Oil Company ("Charter") to obtain insurance coverage for the costs of cleaning up and redeveloping a parcel of land on the shore of the Sakonnet River in Tiverton, Rhode Island. After careful consideration, for the reasons set forth below, Travelers' motion will be denied.

I. Background and Facts

The facts engendering this dispute, or at least those facts necessary to the Court's disposition, are largely undisputed.[1]

---

[1] The Court will not dwell on facts going to Travelers' choice of law arguments, as this decision makes it unnecessary to reach those arguments.

A. The Policies

Travelers, which was formerly known as The Aetna Casualty and Surety Company, issued primary, umbrella, and excess insurance policies to Northeast Equities, Inc. and Northeast Petroleum Industries, Inc. (collectively, "Northeast"), covering at least sixteen annual periods from July 1, 1965 to October 1, 1985 (collectively, "the Policies").[2] At the time each of the Policies was issued, Northeast was a Massachusetts corporation with its headquarters in Massachusetts. The stock of Northeast was purchased by Charter in 1983, and for the remainder of the time period during which the Policies were issued, Northeast was a wholly-owned subsidiary of Charter. Charter is a Texas corporation with its principal place of business in Pittsburgh, Pennsylvania. Charter claims rights under the Policies as the successor in interest by merger to Northeast.[3]

The Policies covered Charter for liability stemming from damage to property, unless a specific exclusion applied. Each of the Policies contained a so-called "no action clause," providing in the following or substantially similar words, that:

---

[2] Charter alleges that Travelers issued policies to Northeast beginning in July 1963. Travelers claims to be unable to confirm the existence, terms, or conditions of policies covering at least five annual periods. However, for the purposes of this Motion, Travelers has not disputed that it issued to Northeast all of the policies alleged in the Complaint.

[3] For convenience, unless otherwise specified, the Court will refer to both entities as "Charter."

> No action shall lie against [Travelers] unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company.

B. The Site

From the mid-1960s until about 2002, Charter owned portions of a parcel of land adjacent to the Sakonnet River in Tiverton, Rhode Island (the "Site"). As others had for decades, Charter used the Site as an oil and gas storage and distribution terminal.

Sometime in 1985, Charter sought approval from the Rhode Island Department of Environmental Management ("RIDEM") for plans to redevelop the Site for residential use. RIDEM required Charter to conduct environmental testing and remediation at the Site. Charter's subsequent testing revealed that the Site was contaminated with petroleum compounds and other substances. Charter hired GZA GeoEnvironmental, Inc. ("GZA"), an environmental consulting firm, to develop a plan for remediating the contamination. GZA's plan called for removal of tanks, pipes, and equipment, and "bioremediation" of the Site. The bioremediation, which would be accomplished by tilling the contaminated soil, thereby increasing its exposure to oxygen and bacteria, would promote the natural decomposition of petroleum compounds. The plan outlined four phases through which the Site would be decommissioned, divided the Site into areas of concern and, for

each area, estimated the volume of contaminants that would be treated and the methods of bioremediation that would be used. GZA noted that it expected to encounter "presently un-characterized areas of soil contamination" once the cleanup began. In 1991, Charter submitted GZA's workplan to RIDEM.

In the meantime, in 1987 and 1988, Charter had attempted to negotiate a consent agreement with RIDEM under which it would agree to clean up the Site. The initial negotiations were unsuccessful, but in 1992, Charter did enter into an agreement with RIDEM. The consent agreement stated, in its "findings of fact," that the Site had "petroleum and/or petroleum products in the soil and groundwater subjacent thereto," and that RIDEM had "reviewed and approved the conceptual GZA Plan, with the condition that all pollutant concentrations at the Site be reduced to the levels specified in 'Exhibit A.'" Under the agreement, which was executed "in lieu of [RIDEM] issuing a Notice of Violation," RIDEM approved the GZA Plan, and Charter "agree[d] to implement the GZA Plan pursuant to the terms and requirements of the schedule of activities attached hereto . . . and subject to the terms of this Agreement and any amendments thereto." Charter also agreed to study and remediate any off-site contamination that was discovered.

Additionally, the consent agreement provided that, if RIDEM issued new cleanup standards, those new standards would apply to the Site cleanup "where appropriate for and applicable to the

remediation of the Site." The agreement also specified that, while RIDEM was not completely precluded from taking other enforcement actions against Charter, the agreement "shall have all the force and effect of a final administrative decision and order under the Administrative Procedures Act [] from which no appeal has been taken" and would be fully enforceable in court. Charter was given 60 months after the execution of the agreement to complete its remediation obligations, although it could seek extensions of time in some circumstances.

Subsequent changes made to the remediation protocol apparently extended the remediation horizon, and Charter continued to undertake remediation activities as late as 2002. In May 2002, RIDEM issued a letter certifying that Charter's cleanup of the Site was complete.

Charter incurred several million dollars in expenses related to remediation of the Site, including legal expenses for hiring its own lawyers between 1985 and 1990 to represent it in connection with the environmental matters at the Site. Charter also incurred several thousand dollars in additional legal expenses in 1999 and 2000 to investigate potential claims for recovery against Travelers.

C. Charter's Claim

In 1986, Charter provided formal notice to Travelers of its discussions with RIDEM about the Site. In December 1991, Travelers

sent Charter a letter stating that Travelers was "denying coverage for this loss." After receiving Travelers' denial of coverage, Charter elected to remediate the Site on its own. It did not, apparently, respond to Travelers' denial of coverage.

On or about June 15, 2006, more than fourteen years after it received Travelers' denial of coverage (but only four years after RIDEM certified the cleanup), Charter filed suit against Travelers in Providence Superior Court, claiming that Travelers breached the Policies by failing to defend or indemnify Charter with respect to the environmental remediation at the Site. Travelers removed the Complaint to this Court on July 17, 2006, and subsequently moved for summary judgment on the ground that Charter's claims are barred by the applicable statute of limitations.

II. Legal Standard

Summary judgment is appropriately granted where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it has the "potential to affect the outcome of the suit." Velazquez-Garcia v. Horizon Lines Of Puerto Rico, Inc., 473 F.3d 11, 15 (1st Cir. 2007) (citations omitted).

Once the movant has made the requisite showing, the nonmoving party "may not rely merely on allegations or denials of its own

pleading, rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). The court views all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. Torrech-Hernandez v. Gen. Elec. Co., 519 F.3d 41, 46 (1st Cir. 2008).

III. Discussion

By Charter's own admission, what presently is before the Court is an indemnity claim.[4] Under a typical insurance contract, an insurer has two distinct obligations: (1) a duty to defend, and (2) a duty to indemnify. See Emhart Indus., Inc. v. Home Ins. Co., 515 F. Supp. 2d 228, 236-37 (D.R.I. 2007). The duty to defend is dependent upon commencement of a lawsuit, see, e.g., Hall v. Allstate Ins. Co., 880 F.2d 394, 399 (11th Cir. 1989) ("duty to defend was conditioned upon commencement of a suit against [the insured]"), and "is measured by the allegations of the underlying complaint." Travelers Ins. Co. v. Waltham Indus. Labs. Corp., 883 F.2d 1092, 1099 (1st Cir. 1989). The duty to indemnify, in contrast, generally is dependent upon the entry of a final judgment, settlement, or other final resolution. See, e.g., Bankwest v. Fidelity & Deposit Co. of Maryland, 63 F.3d 974, 978

---

[4] Charter's Amended Complaint claims that Travelers breached the Policies "by refusing and/or failing to defend and/or indemnify Charter with respect to claims relating to a former petroleum storage terminal located in Tiverton, Rhode Island." (Emphasis added.) However, at oral argument, Charter's counsel repeatedly clarified that Charter's claim seeks indemnity. See, e.g., Hrg. Tr., Sept. 6, 2007, at 27:16, 29:1-9, 30:11.

(10th Cir. 1995 ) (citing Travelers Ins., 883 F.2d at 1099). The duty to indemnify is narrower in scope and distinct from the duty to defend. Travelers Ins., 883 F.2d at 1099 (citation omitted). The reason for this narrowing is that an insurer's obligation to defend is measured by the allegations of the underlying complaint while the duty to indemnify is determined by the facts, which are usually, but not always, established at trial. Id. (citation omitted). In a case like this, where the liability of the insured was established not by a trial but by settlement agreement, the duty to indemnify must be determined by the circumstances of the settlement. Id.

With its motion, Travelers seeks to parry Charter's indemnity claim with the argument that the claim is barred by the applicable limitations period. Travelers contends that, notwithstanding the Policies' lack of any choice of law provision, Rhode Island's choice of law rules compel the finding that the Policies are governed by Massachusetts law, and thus the Massachusetts limitations period. Thus it was, says Travelers, that the limitations period began to run when Travelers denied coverage in December 1991 or, at the latest, when Charter entered into the consent agreement in March 1992, and expired in 1997 or 1998. But even if the Court applied Rhode Island law, Travelers argues, the limitations period would have expired in 2001 or 2002, depending on whether the cause of action is considered to have accrued in

December 1991 (denial of coverage) or March 1992 (execution of consent agreement).[5] Under either scenario sketched by Travelers, Charter's Complaint, filed in 2006, would be time-barred.

While Charter set forth a vigorous defense of Travelers' choice of law arguments, and both parties combined to inundate the Court with well over one hundred pages of factual narrative and legal argument, the motion before the Court turns on a relatively narrow threshold issue: whether the language of the Policies themselves extends the time in which Charter may bring an indemnity claim against Travelers.

A cause of action cannot be said to have accrued until all conditions precedent to accrual are satisfied. See, e.g., Ginn v. State Farm Mut. Auto. Ins. Co., 417 F.2d 119, 122 (5th Cir. 1969) ("Courts generally hold that where a condition precedent to a right of action exists, the statute of limitations does not begin to run until that condition is performed."); DiBattista v. Butera, 244 A.2d 857, 859 (R.I. 1968) (since it was contemplated by the parties, demand for payment was a condition precedent to right to sue on a promissory note). As described earlier, at least fourteen of the Policies contain the following or substantially similar language:

---

[5] Travelers contends that, under Massachusetts law, the applicable limitations period for a breach of contract action is six years and that, under Rhode Island law, the applicable limitations period is ten years.

> No action shall lie against [Travelers] unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company.

On its face, this "no action clause" restrains Charter, in the event that it incurs a liability, from bringing an action against Travelers "until the amount of the insured's obligation to pay shall have been finally determined," i.e. the clause sets forth a condition that must be satisfied before a legal action may commence. In the context of the present litigation, the clause suggests that Charter's claim did not accrue until May 2002 when RIDEM certified that Charter's cleanup of the Site was complete (thereby confirming that Charter would not incur any additional cleanup costs). Travelers, however, contends that the no action clause does not operate to make Charter's claim timely because Charter's cause of action accrued in December 1991 when Travelers denied Charter's coverage request, or, at the latest, March 1992 when Charter and RIDEM executed their consent agreement.

Travelers makes two arguments: First, that the 1992 consent agreement "finally determined" Charter's liability, as that term is defined by the no action clause; and, second, in light of Charter's claim that Travelers breached its duty to defend, the no action clause would not have barred an earlier claim by Charter. Thus, Travelers claims, Charter's claim accrued, and the limitations

period began to run, fourteen years before Charter filed this action.

As to the first issue, the effect of the 1992 consent agreement, while it is true that the consent agreement established Charter's liability - its obligation to pay for the cleanup - it did not "finally determine[]" the amount Charter would be required to pay. This would only be known once the remediation was complete. Thus, the Court cannot conclude as a matter of law that the consent agreement constituted a "judgment against the insured after actual trial," let alone a "judgment" of any kind, upon which "the amount of [Charter's] obligation to pay" was "finally determined" for purposes of the no action clause. It is evident, rather, that the consent agreement heralded the start of a long and involved remediation process that would not be concluded until RIDEM certified the cleanup as complete in 2002.

For example, rather than bringing an end to the proceedings between Charter and RIDEM, the consent agreement provided that it did "not limit the authority of [RIDEM] to initiate any action against Charter . . . in regard to conditions existing at or emanating from the Site upon a determination . . . that: (a) such conditions constitute an immediate threat to the public health and/or environment."[6] Moreover, the implementation schedule

---

[6] In contrast, in its 2002 letter certifying the completion of cleanup, RIDEM reserved the right to require additional actions <u>only</u> if new information was discovered relating to conditions at

appended to the consent agreement required Charter to undertake, as part of the remediation, further testing and evaluation of the Site to determine the extent of contamination present. RIDEM also reserved the right to review and modify Charter's remediation implementation plan. These and other reservations contained in the consent agreement, many of which may have resulted (and apparently did result) in increased liability for Charter, are not consistent with a final determination of the amount of liability.[7] See Fed. Ins. Co. v. Purex Indus., Inc., 972 F. Supp. 872, 880 (D.N.J. 1997) (liability was not "finally determined" under administrative consent order because "any liability was contingent upon the discovery of contamination").

Given that the 1992 consent agreement was not, as a matter of law, a final determination within the meaning of the no action clause, the question remains whether, as Travelers argues, the alleged breach of Travelers' duty to defend Charter began the

---

the Site, policy or regulatory requirements changed, or if Charter committed certain other violations not relevant here.

[7] Indeed, Timothy O'Connor, who was employed at RIDEM from 1987 to 1997 and who, for some of that time, supervised the cleanup of the Site, declared that "[c]onsent agreements were not used as the final resolution of a matter because the investigation required under such an agreement necessarily meant that not all environmental conditions were known at the time the agreement was entered into but would be addressed as discovered and the cleanup then negotiated." While the Court is aware that Mr. O'Connor subsequently left RIDEM and worked on behalf of Charter as a consultant, at this stage of the proceedings his credibility is not an issue.

running of the limitations period -- any limitations period -- with respect to Charter's indemnity claim, notwithstanding the no action clause in the Policies. The answer is more or less provided by Travelers' failure to offer any reasonable alternative construction of the clause other than the one that requires an insured to wait until its liability is finally determined before bringing suit. On the record before the Court, this requirement was not met until RIDEM certified Charter's cleanup as complete in 2002. Consequently, the statute of limitations does not preclude Charter's action. In this sense, the Court is persuaded by the reasoning of cases such as Kielb v. Couch, 374 A.2d 79 (N.J. Super. Ct. Law Div. 1977), in which the court held that the statute of limitations was not applicable because the insured could successfully "withstand a defense based upon the 'no-action' clause in the policy" only after "termination of the third-party action" against the insured and "the totality of his claim . . . was ascertainable and his right of action complete." Id. at 83.

Travelers cites John Beaudette, Inc. v. Sentry Ins. A Mut. Co., 94 F. Supp. 2d 77 (D. Mass. 1999) as distinguishing the view espoused by Kielb. This Court does not agree that John Beaudette should be construed to effectively nullify a no action clause such as the one here. John Beaudette was influenced by the much earlier case of Ratner v. Canadian Universal Ins. Co., 269 N.E.2d 227 (Mass. 1971), in which the Court prevented the application of a no

action clause as a means to bar an insured's cause of action against an insurer for breach of the duty to defend. John Beaudette, 94 F. Supp. 2d at 101 (citing Ratner, 269 N.E.2d at 229). In light of the holding of Ratner, the John Beaudette Court reasoned that "[i]t is therefore unlikely that a Massachusetts court would follow decisions which rely, in whole or in part, on no action clauses as a means to forego triggering the limitations period until issuance of a final judgment in an action alleging breach of the duty to defend." Id. Ratner itself, however, made no mention of limitations periods. Rather, Ratner held only that "the insured after a refusal to defend can declare upon the policy and can assign as breach either the refusal to defend or the later refusal to pay." Ratner, 269 N.E.2d at 229. The Ratner Court explained that "[i]n nearly all, if not in all, the decisions which have dealt with this question, the holding has been that an insurance company which without right has refused to defend an action against its insured no longer can insist upon the case being carried to judgment against the insured." Id. (quoting Berke Moore Co. v. Lumbermens Mut. Cas. Co., 185 N.E.2d 637, 639 (Mass. 1962)). In other words, Ratner refused to allow an insurer disclaiming a duty to defend to use a no action clause as a shield against an action by the insured. See also Condenser Serv. & Eng'g Co. v. Am. Mut. Liab. Ins. Co., 131 A.2d 409, 414 (N.J. Super. Ct. App. Div. 1957) (no action clause was "never intended to serve, nor can it be

construed to serve, the purpose of avoiding a declaration of rights when the insurer allegedly has repudiated the contract and declined to furnish an agreed defense of a covered damage action"). Ratner said nothing about the effect of a no action clause on the applicable limitations period.

Other cases holding that a no action clause does not prevent the accrual of an insured's cause of action involved, like John Beaudette, the duty to defend specifically. See, e.g., Hall v. Allstate Ins. Co., 880 F.2d 394, 397-98, 400 (11th Cir. 1989) (affirming, without discussion, district court's dismissal of cause of action for breach of duty to defend, but holding that insured's cause of action for insurer's refusal to pay adverse judgment did not accrue until entry of final judgment against the insured, notwithstanding the insurer's prior denial of coverage); Paul Holt Drilling, Inc. v. Liberty Mut. Ins. Co., 664 F.2d 252, 254-55 (10th Cir. 1981) (holding that, notwithstanding no action clause, insureds' cause of action for breach of duty to defend arose when insureds incurred defense expenses as a consequence of insurer's refusal);[8] Cardin v. Pac. Employers Ins. Co., 745 F. Supp. 330,

[8] With respect to Paul Holt Drilling, Inc. v. Liberty Mut. Ins. Co., 664 F.2d 252 (10th Cir. 1981), the Tenth Circuit Court of Appeals, in a subsequent case, confirmed the limitations of its earlier holding: "First, Paul Holt Drilling interpreted Oklahoma law, and therefore does not control when, as here, we are required to apply Wyoming law. Second, Paul Holt Drilling involved the single question of whether the statute of limitations for a claim alleging breach of the duty to defend begins to run as soon as the insured incurs defense expenses as a consequence of the insurer's

333-35 (D. Md. 1990) (insured's cause of action for breach of duty to defend accrued as of date insurer refused to pay defense expenses, despite presence of no action clause). Moreover, there is no shortage of courts recognizing the preclusive effect of no action clauses. See, e.g., Haxton v. CNA Fin. Corp., 917 F.2d 1304, *1 (6th Cir. 1990) (per curiam) (no action clause precluded suit by insured prior to judgment or settlement establishing the amount of insured's obligation); Cissell v. Am. Home Assurance Co., 521 F.2d 790, 792 (6th Cir. 1975), cert. denied, 423 U.S. 1074 (1976) (no action clause precluded suit by bankruptcy trustee on debtor's policy prior to judgment or settlement); Zaborac v. Am. Cas. Co., 663 F. Supp. 330, 333 (C.D. Ill. 1987) (no action clause precluded declaratory judgment action by bank directors until insureds' obligation had been determined by judgment or settlement).

Travelers also cites Ins. Co. of N. Am. v. Kayser-Roth Corp., No. C.A. PC 92-5248, 1999 WL 813661 (R.I. Super. July 29, 1999) since, in that case, the court held that liability was "finally determined" for purposes of the no action clause, even though a

---

denial of a request to defend." State of Wyo. ex rel. Dept. of Envt'l Quality v. Federated Serv. Ins. Co., 211 F.3d 1279, *3 (10th Cir. 2000) (unpublished). "Pursuant to the no action clause, [the Insurer's] duty to indemnify does not arise until the amount of [the Insured's] obligation to pay is established by a qualifying judgment or agreement. . . . Thus, even if Paul Holt Drilling's interpretation of Oklahoma law applies equally to Wyoming law, its reasoning would not be applicable to this case, which involves the duty to indemnify and not the duty to defend." Id. at *4.

declaratory judgment had been entered that adjudged the insured responsible for uncertain future remediation costs. However, in that case, there actually had been a trial followed by judgment in the U.S. District Court awarding a monetary judgment to the United States, in addition to the declaratory judgment. Here, in contrast, there was no trial and no monetary judgment. The agreement between Charter and RIDEM was, as described above, substantially less final.

In sum, although Charter could have filed a declaratory relief action, once Travelers had allegedly breached its duty to defend Charter under the Policies, such a move was not required, nor should Travelers' breach redound to its own benefit by nullifying the no action clause. What the Court is left with, then, is a plainly worded no action clause that appears not to have been satisfied until the issuance of RIDEM's certification letter in 2002, since it was not until that moment that the amount of Charter's liability was "finally determined." In the absence of specific definitions in the insurance policy, the words used by the insurer must be accorded their plain, ordinary and commonly understood meaning in order to fulfill the reasonable expectations of the insured. See, e.g., 116 Commonwealth Condo. Trust v. Aetna Cas. & Sur. Co., 742 N.E.2d 76, 78 (Mass. 2001); Employers Mut. Cas. Co. v. Pires, 723 A.2d 295, 298 (R.I. 1999). Therefore, the Court finds that the no action clause in the Policies prevented

accrual of Charter's indemnity action until 2002.[9] In that Charter filed this action in 2006, its claim is not barred by either limitations period advanced by Travelers.

IV. Conclusion

For the foregoing reasons, Travelers' motion for summary judgment is DENIED.

IT IS SO ORDERED.

William E. Smith
United States District Judge
Date: 6/9/08

[9] The no action clause effectively cuts through the Gordian Knot woven by Travelers choice of law and limitations arguments, and renders largely irrelevant the decisional authority cited in support thereof. Cases that might otherwise support an earlier accrual of Charter's cause of action, including Adams v. Town of Burrillville, 249 F. Supp. 2d 151 (D.R.I. 2003) and Gail Frances, Inc. v. Alaska Diesel Elec., Inc., 62 F. Supp. 2d 511 (D.R.I. 1999), applying Rhode Island law, and Travelers Ins. Co. v. Royal Ins. Co., No. 04-P-1776, 2006 WL 223854 (Mass. App. Ct. Jan. 30, 2006), and Lumbermens Mut. Cas. Co. v. Y.C.N. Transp. Co., 705 N.E. 2d 297 (Mass. App. Ct. Jan. 25, 1999), applying Massachusetts law, did not involve contracts containing no action clauses.